# **<u>EXHIBIT A</u>**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JABARI STAFFORD**, <br><br> Plaintiff, <br><br> v. <br><br> **THE GEORGE WASHINGTON UNIVERSITY**, <br><br> Defendant. | Case No. 18-cv-2789 (CRC) |

**MEMORANDUM OPINION**

Plaintiff Jabari Stafford alleges that he was a victim of racial abuse by coaches and teammates during his three-and-a-half years as a varsity tennis player at George Washington University ("GWU" or "the University"). Stafford also claims that the University was deliberately indifferent to the racial hostility he experienced, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Before the Court is GWU's motion for summary judgment. As explained below, the Court concludes that GWU is entitled to summary judgment because Stafford's Title VI claim is entirely barred by the applicable statute of limitations—the one-year limitations period in the District of Columbia Human Rights Act. The Court acknowledges, however, that its statute of limitations holding is a novel one; courts in this district have up to now applied the three-year limitations period from D.C.'s general personal injury law to Title VI claims. In recognition of that fact, and for the benefit of the parties and any reviewing court, the Court also indicates, at the conclusion of its Opinion, how it would view the summary judgment record under a three-year statute of limitations.

1

## I.   Background

### A.  Factual background

Plaintiff Jabari Stafford, who is African American, joined the GWU men's tennis team in the fall of 2014.  Def. SMF ¶¶ 1, 13–15.[1]  According to Stafford, shortly after the start of his freshman season, several of his teammates began using what he refers to as "racial rhetoric": calling him the n-word or using it in his presence, referring to him as a "monkey," asking about whether his ancestors had been enslaved, and posting memes using the n-word to social media.  See Pl. SMF ¶¶ 17–18; Def. Mot. Summ. J., Ex. 2 at 46:1–5 (Jabari Stafford Dep.).  Stafford's statement of disputed fact does not pinpoint the timing of such incidents, and evidence in the record likewise does not always provide a clear timeline.  See Pl. SMF ¶ 17 (placing incidents generally in Stafford's freshman and sophomore years); Def. Ex. 2 at 51:20–22 (explaining only that teammates made such comments "throughout [his] tenure at GW").  Stafford emphasized in deposition testimony, however, that this kind of "[r]acial rhetoric" began in "the very beginning of his freshman year," and that he quicky complained about it to the head coach at the time, Greg Munoz.  Def. Ex. 2 at 48:19–50:21.  Stafford claims that Munoz did nothing in response—and instead participated in and encouraged the mistreatment Stafford faced.  See Pl. SMF ¶¶ 32–40.

_____

[1] The Court draws these facts from the defendant's Statements of Material Facts Not in Dispute ("Def. SMF"), ECF No. 78-1, and the plaintiff's competing Statement of Genuine Issues ("Pl. SMF"), ECF No. 82, as well as other evidentiary exhibits filed by the parties as necessary.  The Court notes that the plaintiff's Statement of Material Facts does not generally satisfy the requirements of Local Rule 7(h)(1), which requires the non-moving party to directly "controvert[]" the facts identified by the moving party.  See LCvR 7(h)(1); see also Cauthen v. District of Columbia, 459 F. Supp. 3d 134, 137 n.1 (D.D.C. 2020).  That deficiency has made it more difficult for the Court to assess the summary judgment record.  Nevertheless, exercising the discretion granted to it by the local rules, the Court chooses not to treat any of the assertions in GWU's Statement of Material Facts as conceded.  See Arrington v. United States, 473 F.3d 329, 335 (D.C. Cir. 2006) (noting that rule "permits, but does not require," district court to treat facts as conceded).

In Stafford's telling, Munoz and other coaching staff singled out him and other players of color because of their race and American nationality in several separate incidents that year. Id. ¶¶ 4–16.

Things first came to a head in January 2015—the middle of Stafford's freshman year—when he was suspended from the tennis team following an altercation with a teammate. See Def. SMF ¶ 32; Pl. SMF ¶ 26. In his statement of facts, Stafford claims that, at the time, his "only confrontations with teammates consisted of him voicing his objections to their racist remarks." Pl. SMF ¶ 26. But the cited portions of the record do not substantiate that allegation. See Def. Ex. 2 at 45:15–46:14 (recounting complaint of racism to Coach Munoz and altercation with teammate, but never claiming that fights with teammates had been limited to objections to racist remarks). And a January 18, 2015, email from Munoz to Stafford lists several other reasons for the suspension, including his "anger control" and "profanity issues," his lack of "pride" in the University, a failure to "support teammates," and an incident in which Stafford "disrespect[ed]" an assistant coach and failed to apologize. Def. SMF ¶ 33; Def. Mot. Summ. J., Ex. 16.

After the suspension, Stafford and his father, Tom, met with Coach Munoz and Nicole Early, the administrator for the tennis team in GWU's Athletics Department. See Def. SMF ¶¶ 34–36; Pl. SMF ¶ 43. The parties' accounts of this meeting differ substantially. Stafford and his father both testified that, during this conversation, they told Early and Munoz about "the racial rhetoric that was going on," including "the names, the harassment, [and] the hostility." See Pl. SMF ¶ 44; Def. Ex. 2 at 120:13–121:19; Def. Mot. Summ. J., Ex. 6 at 41:10–42:11 (Tom Stafford Dep.) (recounting discussions of "unlevel playing field" and "race in America"). In Jabari's view, the two "ignored" his report. Def. Ex. 2 at 120:21–22. GWU, by contrast, insists that the meeting focused solely on "the non-discriminatory reasons" for Stafford's suspension.

3

See Def. SMF ¶ 36; Def. Mot. Summ. J., Ex. 20 at 15 (GWU interrogatory responses).  Notably, Early did not recall any discussion of racism.  Rather, she remembered Stafford's father alleging his son was treated differently than other players who engaged in similarly disruptive and disrespectful behavior, but did not remember him tying this treatment to Jabari's "race."  Def. Mot. Summ. J., Ex. 7 at 49:3–11 (Early Dep.).  The parties have pointed to no evidence in the record that either Early or Munoz took steps to address any racial harassment on the tennis team after this meeting.  A month later, Stafford was reinstated to the team.  Def. SMF ¶¶ 40–41.

Stafford's teammates' use of racial slurs purportedly continued through the end of his freshman year and into his sophomore season.  For example, Stafford testified in his deposition that shortly after his reinstatement, one player yelled the n-word "so loud that pretty much everybody could hear it" while the two were in a hotel room for a tournament.  Def. Ex. 2 at 52:20–53:11.  At some point that spring, another player loudly called an opposing player a "f— porch monkey," while another referred to Stafford as "an ape."  Id. at 54:6–11, 55:9–22; see also Pl. SMF ¶¶ 17, 20.  Stafford recalled that, after one such incident, Munoz claimed that the teammate didn't "really mean it" and instructed Stafford to "shut up" and not "worry about it."  Def. Ex. 2 at 54:11–15; see also Pl. SMF ¶¶ 34–35.  It is undisputed that Stafford did not again report any harassment on account of his race by his teammates or Munoz to others at the University during his freshman year.  See Def. SMF ¶ 53; Pl. SMF ¶ 46.

But the parties do dispute whether Stafford put the University on notice about any mistreatment during his sophomore year—a period when, he says, the racist language by his teammates and coaches continued.  See, e.g., Def. Ex. 2 at 63:2–64:12 (noting altercation with teammate during spring of sophomore year); id. at 199:17–200:9 (recalling statement by Coach

Munoz). Stafford recalls at least three reports to GWU officials, as well as evidence in the record that, he says, demonstrates that the University had heard his complaints.

*First*, Stafford testified that he complained to Coach Munoz about "racial discrimination" by his teammates in the fall of 2015. Def. SMF ¶ 60; Def. Ex. 2 at 59:9–15.

*Second*, Stafford's father recalled speaking about racial harassment on the team with Michael Tapscott, the Director of GWU's Multicultural Student Services Center, at some point that same year. See Pl. SMF ¶¶ 47–48; Def. Ex. 6 at 55:13–56:12 (recounting discussions of the experience of a "kid of color" on a largely white team); see also Def. SMF ¶¶ 61, 66; Def. Mot. Summ. J., Ex. 34 at 14:24–15:2, 20:13–19, 33:4–16 (Tapscott Dep.). Tapscott's memories of his interactions with the Staffords differ sharply. Tapscott testified that the elder Stafford's complaints focused entirely on how much playing time Jabari had received—not race. Def. SMF ¶¶ 66–67. Tapscott likewise reported that he separately spoke with Jabari, and in that conversation Jabari mentioned "derogatory comments" by fellow tennis players, but did not "specifically" tie them to issues of race. Id. ¶ 62. At the end of their conversations, Tapscott encouraged both Jabari and his father to reach out to Nicole Early, the administrator in the Athletics Department with whom the two had met the previous school year. Id. ¶¶ 63, 68. According to Tapscott, Jabari did not respond to any follow-up messages. Def. Ex. 34 at 29:10–30:4.

*Third*, Stafford points to a January 2016 email exchange between two Athletics Department administrators—Early and Ed Scott, a Senior Associate Athletics Director—that, in his view, suggests the University was aware of ongoing discrimination. See Pl. Opp'n to Def. Mot. Summ J. ("Pl. Opp'n") at 7, 17–18. In that email, Early advised Scott of a "disciplinary issue with Jabari Stafford," and warned that Stafford's father would "likely get involved" and

"suggest that Jabari is being discriminated against." Pl. Opp'n, Ex. L. Stafford construes this email as a response to his father's complaints about racism the previous semester, including to Tapscott. Pl. Opp'n at 7. The University rejoins that the email cannot be read to show Early knew about any actual claims of racial discrimination. Def. Reply at 12.

*Finally*, Stafford testified to another discussion with Athletics Department administrators in March 2016, during his sophomore year, shortly after Coach Munoz left GWU and Torrie Browning took over as interim head coach. Def. SMF ¶ 69; Def. Ex. 2 at 196:5–18. That month, Stafford requested a meeting with Early to discuss why Browning had left him out of a tournament lineup. Def. SMF ¶¶ 70–71; Def. Ex. 2 at 203:5–206:4. At that meeting, Stafford recalled, he informed Early about the "racial rhetoric and . . . racial discrimination" he had been "forced to endure" under both Munoz and Browning. Def. Ex. 2 at 211:19–212:13; see also Def. SMF ¶ 71. Again, the University's account of this conversation differs. According to Early, Stafford's complaints centered entirely on his desire for more playing time—not any racial discrimination he'd experienced. Def. Ex. 7 at 152:23–154:16. Given these divergent retellings of the March 2016 meeting, it is unsurprising that the parties also disagree about the import of what happened next. In Stafford's telling, Early responded inadequately to reports of ongoing racial harassment: Rather than take any concrete action to address racism on the team, she only encouraged Stafford to wait for the arrival of a new coach the next fall. See Def. Ex. 2 at 196:13–18; Pl. Opp'n at 19. In the University's telling, however, Early's next steps were entirely appropriate: To address his complaints about playing time, Early set up a meeting with Stafford, his father, and Browning to discuss her lineup decisions and his playing style. Def. SMF ¶¶ 76–80; Def. Ex. 7 at 153:9–154:3; Def. Ex. 2 at 206:19–207:10. The University emphasizes that, in his deposition, Stafford conceded he had been "satisfied" with Early's

response.  See Def. SMF ¶ 72; Def. Ex. 2 at 196:19–197:2.  Stafford likewise recalled that, after these meetings, he believed that "the racial culture was going to change," and that he had been given the go ahead to sit out team events and "focus on [his] academics" for the rest of the semester.  Def. Ex. 2 at 196:21–22, 226:15–18.

At the start of his junior year, in September 2016, Stafford instead learned that he was no longer on the team's roster.  Def. SMF ¶¶ 84, 96.  Frustrated by the coaching staff's explanation—that they thought he had quit the team the previous spring—Stafford and his father contacted several GWU employees:  Early, the tennis team administrator; Tapscott, the Multicultural Student Services Center director; Helen Cannaday Saulny, the Associate Provost for Diversity, Equity, and Community Engagement; and Patrick Nero, the University Director of Athletics and Recreation.  See id. ¶¶ 8, 83–90, 110; Def. Ex. 6 at 239:4–241:15.  That October, the Staffords met with Saulny and Scott, a Senior Associate Athletics Director.  Def. SMF ¶¶ 95, 106–07.  At that meeting, Stafford and his father reported widespread use of "racial epithets" by tennis team members, who, they said, were "trying to get [Jabari] kicked of[f] the team."  Id. ¶ 106.  During this meeting and in email exchanges beforehand, several administrators provided the Staffords with information on how Jabari could make an official report via GWU's student grievance procedures—the mechanism in the University's handbook for addressing incidents of racial bias.  See id. ¶¶ 97, 103–04, 106; Def. Mot. Summ. J., Ex. 43 at 3 (email from Ed Scott); Def. Mot. Summ. J., Ex. 5 at 114:3–11 (Saulny Dep.) (discussing conversation with Tom Stafford about complaint process).  Stafford has conceded that he never lodged any official grievance report during his time at GWU.  Def. SMF ¶ 108; Pl. SMF ¶ 46; Def. Ex. 2 at 123:9–19.

7

As a result of these meetings, the new tennis coach, David Macpherson, agreed to admit Stafford back onto the team roster following a "skills assessment."  Def. SMF ¶¶ 111–12. Stafford rejoined the team that December.  Id. ¶ 112.

Yet, Stafford says the pattern of harassment continued.  At two points the following spring, Stafford recalls, he told Macpherson that he still faced mistreatment by his teammates on account of his race.  Def. SMF ¶ 123; Def. Ex. 2 at 262:19–264:3.  The details of the complaints remain unclear.  Indeed, Stafford at one point testified that he did not directly "link" his complaints to his "race."  Def. SMF ¶ 123; Def. Ex. 2 at 262:22–263:1.  But he elsewhere remembered telling Macpherson that his teammates were "plotting against" him, "taunting" him, and "racially discriminating against" him.  Def. SMF ¶ 123; Def. Ex. 2 at 271:3–7.  According to Stafford, Macpherson reassured him that everything would be "dealt with," but never acted to rein in other players' use of racial epithets.  Def. Ex. 2 at 271:11–15.  This conversation—in the spring of 2017—is the latest point in the record that Stafford reports speaking directly with any coach or Athletics Department administrator about racial harassment.

Stafford's interactions with his teammates during his senior year—beginning in the fall of 2017—do not feature heavily in his briefing.  See Pl. Opp'n at 10–11 (identifying incidents after his return to the team in 2016, but never specifically tying any to his senior year).  But at the summary judgment hearing, Stafford drew the Court's attention to deposition testimony that he contends would support a finding that the harassment continued into his senior year and that GWU coaches knew about it.  See Mot. Hr'g Rough Tr. at 30:9–32:6.  In that excerpt, Stafford testified that "during [his] junior year, but also during [his] senior year," one teammate "was always yelling out" racial epithets in the team van while an assistant couch was "present."  Def. Ex. 2 at 274:8–14.

By the middle of that year, Stafford's position at GWU was precarious.  His grades, though never high, had fallen over the course of the previous year.  See Def. Mot. Summ. J., Ex. 28.  Stafford attributes this academic decline to the racism he allegedly experienced on the tennis team:  Because "everything had intensified so much," he "couldn't focus and . . . wanted to spend time thinking about" how "to cope with the things that were happening."  Def. Ex. 2 at 283:1–8; see also id. at 289:2–6.  GWU points instead to Stafford's longstanding challenges succeeding in school, dating back to high school and continuing in his very first semester at the University.  See, e.g., Def. SMF ¶¶ 2–7, 19–26.  Stafford's academic struggles—including two consecutive semesters with a term GPA below 2.0—soon triggered action on the part of the University.  See Def. Mot. Summ. J., Exs. 28, 62.  In January 2018, GWU informed Stafford that he would be suspended under standard University regulations governing academic performance.  Def. SMF ¶ 128; Def. Ex. 62.

Soon thereafter, Stafford met with one of his academic advisors, Ellen Woodbridge, to discuss his anticipated appeal of GWU's suspension decision.  Def. SMF ¶ 135.  In that meeting, Stafford claims to have again reported experiencing racism at the hands of his teammates.  Id.  He remembered telling Woodbridge that this harassment had contributed to his academic struggles, but testified that she instructed him "not to talk about those issues."  Id.; Def. Ex. 2 at 291:16–293:21.  Instead, Stafford's appeal letter mentioned "issues relati[ng] to . . . focus and attention span," his "poor[] . . . handl[ing]" of his role as a student-athlete, and "marital problems between [his] parents."  Def. SMF ¶ 133; Def. Mot. Summ. J., Ex. 66 at 4–5.  The University denied Stafford's appeal.  Def. SMF ¶ 137.  Although Stafford could have later applied for readmission, Def. Ex. 62, he did not attempt to return to finish his degree at GWU, Def. SMF ¶ 138.

B.  Procedural history

Stafford filed suit on November 26, 2018, bringing a variety of federal and D.C.-law

discrimination claims against GWU; two coaches, Munoz and Macpherson; two Athletics

Department administrators, Early and Nero; and several unnamed former tennis teammates.  See

Compl. ¶¶ 1, 5–10.  After GWU and Early moved to dismiss the complaint, this Court narrowed

the scope of Stafford's claims considerably.  See Stafford v. George Washington Univ., No. 18-

cv-2789, 2019 WL 2373332 (D.D.C. June 5, 2019).  A single federal claim against GWU

remains:  that the University's deliberate indifference to racial harassment by teammates and

coaches contributed to a hostile educational environment, in violation of Title VI of the Civil

Rights Act of 1964, 42 U.S.C. § 2000d.[2]  See id. at *11–17.  The Court gave Stafford leave to

amend his complaint to more specifically plead this hostile-environment claim, and scheduled

discovery.  See id. at *22; Scheduling Order of July 31, 2019; Second Am. Compl. ¶¶ 120–24,

ECF No. 41.  At the close of discovery, GWU moved for summary judgment on the remaining

Title VI claim.[3]  That motion is now ripe.

---

[2] In its opinion on GWU's motion to dismiss, the Court suggested that the heart of
Stafford's remaining Title VI claim was peer harassment, since much of what he had
"document[ed] concern[ed] racial abuse and antagonism by his *teammates* rather than the
University and its employees."  See Stafford, 2019 WL 2373332, at *11.  The Court now reads
the allegations in Stafford's Second Amended Complaint to encompass both student-on-student
harassment and coach-on-student harassment, most notably by Coach Munoz.  See, e.g., Second
Am. Compl. ¶ 28 (alleging "bullying . . . of the non-white tennis players" by Munoz).  The Court
notes that the standards for liability may generally differ for the two sources of harassment.  Cf.
Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 653 (1999) (explaining that "[p]eer
harassment . . . is less likely to" "breach Title IX's guarantee of equal access to educational
benefits" than is "teacher-student harassment").  Whatever differences exist, the Court does not
find them relevant to its resolution of the claims at this stage.

[3] In its motion, GWU describes a discovery dispute over allegations that Stafford "had
bribed and intimidated several witnesses."  Def. Mem. in Supp. of Mot. Summ. J. at 15.  The
Court has already appropriately sanctioned the plaintiff for any misconduct, including by

## II.  Legal Standards

The Court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the moving party, GWU bears the initial burden of demonstrating the "absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1).  In determining the existence of a genuine dispute of material fact, the Court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion."  Scott v. Harris, 550 U.S. 372, 378 (2007) (internal quotation marks and alteration omitted).  The non-moving party may not, however, rely on "mere allegations" or conclusory statements to defeat a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).

Title VI provides that "[n]o person in the United States shall, on the ground of race . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Under Title VI, as under other federal antidiscrimination statutes, federally funded institutions may be liable for intentional discrimination if they have been "deliberately indifferent" to known acts of harassment that give rise to a hostile educational environment.  See Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 643 (1999) (Title IX sexual harassment claim); see also Fennell v. Marion Indep. Sch. Dist., 804 F.3d 398, 408 (5th Cir. 2015) (Title VI racial harassment claim). The D.C. Circuit has yet to consider the appropriate framework for evaluating a Title VI racially

---

excluding any potentially tainted evidence from use at summary judgment.  See Status Hr'g Tr. at 8:23–9:5, ECF No. 77.

hostile environment claim arising from either peer or teacher harassment. But several other federal circuits have applied the Supreme Court's approach from the Title IX context, as laid out in <u>Davis</u>, to claims of deliberate indifference to racial discrimination. <u>See, e.g.</u>, <u>Fennell</u>, 804 F.3d at 408–09; <u>Blunt v. Lower Merion Sch. Dist.</u>, 767 F.3d 247, 272–73 (3d Cir. 2014); <u>Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Okl.</u>, 334 F.3d 928, 934 (10th Cir. 2003).

Although the exact elements of such a hostile environment claim differ across circuits, courts tend to require that an educational institution: "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." <u>Bryant</u>, 334 F.3d at 934. As in the Title IX context, plaintiffs must also show that the institution had sufficient "control over the harasser and environment" to be able to take remedial action. <u>See</u> <u>Fennell</u>, 894 F.3d at 408. To satisfy the actual knowledge element, a plaintiff must establish that an "appropriate person"—one who "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [institution's] behalf"—had actual notice of the alleged misconduct. <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 290 (1998) (setting out standard in Title IX context); <u>see also</u> <u>Zeno v. Pine Plains Cent. Sch. Dist.</u>, 702 F.3d 655, 665–66 (2d Cir. 2012) (applying <u>Gebser</u> to Title VI context).

Courts have likewise clarified that the deliberate indifference prong of this test sets a "high bar for plaintiffs to recover." <u>Prasad v. George Washington Univ.</u>, 390 F. Supp. 3d 1, 25 (D.D.C. 2019) (quoting <u>Stiles ex rel. D.S. v. Grainger Cnty., Tenn.</u>, 819 F.3d 834, 848 (6th Cir. 2016)). As the Supreme Court has explained, institutions "are deemed 'deliberately indifferent' to acts of . . . harassment only where [their] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." <u>Davis</u>, 526 U.S. at 648. "This means that

'courts should refrain from second-guessing the disciplinary decisions made by school administrators,' and . . . that a court can, '[i]n an appropriate case, . . . identify a response as not clearly unreasonable as a matter of law' and, on that basis, enter summary judgment in favor of the school." Cavalier v. Cath. Univ. of Am., 513 F. Supp. 3d 30, 50 (D.D.C. 2021) ("Cavalier II") (quoting Davis, 426 U.S. at 648, 649) (internal citation omitted).

## III. Analysis

The operative complaint recounts Stafford's experiences at GWU and seeks recovery under Title VI for events dating back to his freshman year, in the fall of 2014. See Second Am. Compl. ¶¶ 24, 118. In its motion for summary judgment, GWU contends that much of this claim is barred by a one-year statute of limitations. See Def. Mem. in Supp. of Mot. Summ. J. ("Def. MSJ") at 18–20. It further argues that any remaining discrimination claim within the limitations period must fail, as no reasonable jury could find GWU liable on the summary judgment record. Id. Stafford opposes, urging the court to adopt a longer statute of limitations and find that, under that limitations period, his claim survives summary judgment. See Pl. Opp'n at 13–19.

GWU has the better of this argument. Although the Court has not located any precedent so holding, the appropriate statute of limitations for Title VI claims brought in this district— borrowed from the most analogous state law—comes from the District of Columbia's antidiscrimination statute, the D.C. Human Rights Act ("DCHRA"). Under that shorter limitations period, Stafford's claim fails at summary judgment because he has not established that he notified an appropriate person of any ongoing discrimination during the statutory period. The Court recognizes that its statute-of-limitations holding differs from the conclusion reached by other courts in this district and several federal circuits, which have applied the limitations rules from states' general personal injury law to Title VI claims. But, as the Court will explain,

recent case law in this district and the District of Columbia Court of Appeals, addressing the analogous remedial regime in the federal Rehabilitation Act, warrants a reevaluation of that conclusion here.

Still, given the novelty of its holding and for the ease of any further review of this decision, the Court also indicates how it would rule at summary judgment, should D.C.'s three-year statute of limitations for personal injury claims apply. Under that longer limitations period, the Court would find GWU has satisfied its burden at summary judgment as to only a portion of Stafford's claim. As to his junior and senior years, GWU has demonstrated that its response to any complaints of racial harassment was not "clearly unreasonable" as a matter of law. But genuine disputes of material fact exist as to whether Stafford adequately put the University on notice about the harassment he claims to have faced in his freshman and sophomore years. The legal sufficiency of GWU's response—or lack thereof—thus cannot be evaluated at this juncture. Accordingly, under a longer statute of limitations, the Court would only grant GWU partial summary judgment, and would allow this truncated claim to reach a jury.

A. Application of a one-year statute of limitations

1. *Relevant time limitation*

Because Title VI contains no express statute of limitations, the Supreme Court has instructed courts to "borrow" one from "the most closely analogous . . . state law." DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 158 (1983); Proctor v. District of Columbia, 74 F. Supp. 3d 436, 457 (D.D.C. 2014). In this district, courts have typically borrowed D.C.'s three-year statute of limitations for general personal injury claims for Title VI cases. See, e.g., Richards v. Duke Univ., 480 F. Supp. 2d 222, 237–38 (D.D.C. 2007). But at the motion to dismiss stage here, the Court opined that the one-year limitations period from the DCHRA may

be more appropriate, citing case law from the D.C. Court of Appeals and this Court addressing the same question for claims under the federal Rehabilitation Act.  See Stafford, 2019 WL 2373332, at *7–8 (citing Jaiyeola v. District of Columbia, 40 A.3d 356, 365–67 (D.C. 2012) and Congress v. District of Columbia, 324 F. Supp. 3d 164, 171–73 (D.D.C. 2018)).  Still, the Court noted that the statute of limitations is an affirmative defense, and that GWU had, at that point, only asked for application of a three-year limitations period.  Id. at *8.  The Court therefore declined to apply the DCHRA's shorter limitations period at that juncture.  Id.

In its answer and summary judgment briefing, GWU now asserts a one-year statute of limitations as an affirmative defense.  See Answer at Affirmative Defense ¶ 15, ECF No. 34; Def. MSJ at 18–20.  Stafford's opposition brief does not engage with the merits of applying the shorter limitations period, arguing only that the "Court has already held that a three-year statute of limitations applies."  Pl. Opp'n at 13.  And at oral argument, Stafford's counsel refused to "conced[e]" the statute of limitations issue, but likewise offered little affirmative argument as to why the Court should use a three-year limitations period.  See Mot. Hr'g Rough Tr. at 26:23–27:10.  Because GWU has now raised the defense, the Court will fully consider which statute of limitations is most appropriate:  the one-year period in the DCHRA, or the three-year period for general personal injury claims in the District of Columbia.

At the outset, the Court finds it has the authority to take up this question once again, notwithstanding any litigation at the motion-to-dismiss stage.  In its prior opinion, the Court did not, as Stafford suggests, *hold* that a three-year limitations period applied.  Rather, the Court used the three-year limitations period because GWU asked it to do so—even while suggesting that it was "probably incorrect."  Stafford, 2019 WL 2373332, at *8.

Nor does GWU's past advocacy for a three-year limitations period preclude it—or the Court—from revisiting the analysis laid out in the prior opinion. As GWU correctly notes, the statute of limitations is not a defense that can be waived by failure to raise it in a pre-answer motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure. See Nattah v. Bush, 770 F. Supp. 2d 193, 208 (D.D.C. 2011) (explaining that, because they are based on failure to state a claim, limitations defenses need only be raised in a responsive pleading); Perry v. Sullivan, 207 F.3d 379, 383 (7th Cir. 2000) (holding party "did not waive his statute of limitations defense by waiting to file it until after the 12(b)(6) motions had run their course").

Of course, GWU did more than just fail to raise the one-year statute of limitations in its motion to dismiss; it affirmatively argued that a three-year limit applied. See Def. Mem. in Supp. of Mot. Dismiss at 10–11, ECF No. 4-1. That type of change in position is governed not by waiver, but by the doctrine of judicial estoppel, which precludes a party who "assumes a certain position in a legal proceeding, and succeeds in maintaining that position," from later assuming "a contrary position." New Hampshire v. Maine, 532 U.S. 742, 749 (2001). Although the Supreme Court has set out no "exhaustive formula for determining the applicability of judicial estoppel," id. at 751, it has identified "three key factors":

> (1) whether the party's later position is 'clearly inconsistent' with its earlier position; (2) 'whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'; and (3) 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'

Temple Univ. Hosp., Inc. v. NLRB, 929 F.3d 729, 733 (D.C. Cir. 2019) (quoting New Hampshire v. Maine, 532 U.S. at 750–51). While GWU's position on the statute of limitations has changed, its two arguments do not cut directly against each other in the way the doctrine of

judicial estoppel is meant to discourage.  Nor did GWU ever convince the Court to accept, or Stafford to rely on, its past position.  To the contrary, the court made a conscious choice to apply the longer limitations period in its prior opinion.  That decision, if anything, benefited the *plaintiff* and forced GWU to continue to litigate a potentially stale claim.  Because GWU's past failure to raise a shorter limitations period appears to result at most from an "unthinking . . . blunder," not any "cold manipulation," Davis v. District of Columbia, 925 F.3d 1240, 1256 (D.C. Cir. 2019), the Court sees no reason to hold GWU to its past position here.

Turning to the merits of the limitations question, the Court agrees with GWU, as well as the analysis in its prior opinion, that the one-year statute of limitations in the DCHRA is the most appropriate choice for Title VI claims in the District of Columbia.  The Court recognizes that, in the past, courts in this and other districts have applied the limitations period for general personal injury suits—which in D.C. is three years—to claims arising under Title VI and many other federal antidiscrimination laws.  See, e.g., Richards, 480 F. Supp. 2d at 237–38 (Title VI and Title IX); Doe v. Se. Univ., 732 F. Supp. 7, 8–9 (D.D.C. 1990) (Rehabilitation Act); see also, e.g., Monroe v. Columbia Coll. Chi., 990 F.3d 1098, 1100 (7th Cir. 2021); Sewell v. Monroe City Sch. Bd., 974 F.3d 577, 583 (5th Cir. 2020); Egerdahl v. Hibbing Cmty. Coll., 72 F.3d 615, 618 (8th Cir. 1995); Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 630–32 (10th Cir. 1993).

But courts in this district have started to rethink this approach, at least for disability discrimination laws such as the Rehabilitation Act and the Americans with Disabilities Act ("ADA").  The turning point was the District of Columbia Court of Appeals' 2012 opinion in Jaiyeola v. District of Columbia, which reasoned persuasively that the Rehabilitation Act was much more analogous to the DCHRA than it was to D.C.'s generic personal injury law.  See 40

A.3d at 366–67.  In that opinion, the D.C. Court of Appeals recognized that the DCHRA was

broader in scope than the Rehabilitation Act—tackling discrimination on bases such as race and

gender, too.  Id. at 366.  But it nevertheless concluded that the Rehabilitation Act was still more

closely akin to this "state anti-discrimination statute" than it was to generic personal injury

claims, which "need not—and, indeed, typically do not—seek to remedy discrimination at all[.]"

Id. at 365, 367.  Because the characterization of a federal claim is a matter of federal law, Wilson

v. Garcia, 471 U.S. 261, 269–70 (1985), this Court is not bound by the holding or reasoning of

Jaiyeola.  But federal courts in this Circuit generally defer to the D.C. Court of Appeals on

matters of District law—such as interpreting the DCHRA and personal injury law.  See Williams

v. Martinez, 586 F.3d 995, 1001 (D.C. Cir. 2009).  Giving such deference, and recognizing the

persuasiveness of the Jaiyeola opinion, several courts in this district, including this one, have

held that the DCHRA's one-year limitations period applies to claims brought under the

Rehabilitation Act and other federal disability-discrimination laws.  See, e.g., Congress, 324 F.

Supp. 3d at 171–73; Pappas v. District of Columbia, 513 F. Supp. 3d 64, 82 (D.D.C. 2021)

(gathering cases applying DCHRA limitations period to Rehabilitation Act claims); Arthur v.

D.C. Hous. Auth., No. 18-cv-2037, 2020 WL 1821111, at *6 (D.D.C. Apr. 11, 2020) (applying

same to ADA).

Until now, no court has extended this reasoning to Title VI or any other federal

antidiscrimination statute outside the disability context.  But the Court sees good reason to do so,

as Jaiyeola's reasoning holds no less force in the case of laws prohibiting racial discrimination.

As with the Rehabilitation Act, Title VI and the DCHRA have a "shared purpose and ambitious

aims," Jaiyeola, 40 A.3d at 367:  Title VI seeks to ensure that "[n]o person shall, on the ground

of race, color, or national origin, be excluded from participation in, be denied the benefits of, or

be subjected to discrimination" in federally funded programs.  42 U.S.C. § 2000d; see also

Barnes v. Gorman, 536 U.S. 181, 185–86 (2002) (noting that "Title VI invokes Congress's

power under the Spending Clause . . . to place conditions on the grant of federal funds").  The

DCHRA likewise seeks to secure an end "to discrimination for any reason other than that of

individual merit, including, but not limited to, discrimination by reason of race[.]"  D.C. Code

§ 2-1401.01.  Both are enforceable via private rights of action and provide for similar remedies.

See Alexander v. Sandoval, 532 U.S. 275, 279 (2001) (noting availability of injunctive relief and

damages under Title VI); D.C. Code § 2-1403.16 (providing for injunctive relief and damages,

among other remedies).  Thus, although the DCHRA is in some ways broader than Title VI—

covering more bases for discrimination and extending beyond recipients of federal funding—

"these differences pale in comparison to the similarities."  Jaiyeola, 40 A.3d at 366.

  For several reasons, the Court is not convinced by contrary case law applying the general

personal injury limitations period to Title VI claims.  First, no binding D.C. Circuit or Supreme

Court case law precludes the Court from rethinking the appropriate state-law analogue to Title

VI.  Second, in most of the cases noted above, courts never considered the possibility that a

narrower state antidiscrimination statute might be a closer fit to Title VI than the state's general

personal injury law.  See, e.g., Monroe, 990 F.3d at 1099 (comparing with catchall limitations

period for civil claims); Baker, 991 F.2d at 631 (discussing only 42 U.S.C. §§ 1983 and 1981).

But see Egerdahl, 72 F.3d at 617–18 (rejecting application of limitations period in Minnesota

Human Rights Act).  Third, the Court is not persuaded by the reasoning in many of those cases,

which only conclude that a Title VI claim is analogous to a generic personal injury claim by first

analogizing to federal civil rights claims under 42 U.S.C. § 1983.  See, e.g., Egerdahl, 72 F.3d at

618.  To be sure, the Supreme Court has instructed that § 1983 claims are subject to the

limitations period in each state's general personal injury statute.  <u>Wilson</u>, 471 U.S. at 276.  But whether claims under Title VI and claims under § 1983 are analogous is not the right question; the Supreme Court has instructed courts engaging in this borrowing analysis to generally look to similar *state* law, not federal law.  <u>Cf.</u> <u>DelCostello</u>, 462 U.S. at 171–72 (outlining limited circumstances where analogy to federal law may be appropriate).

In addition, as the D.C. Court of Appeals explained in <u>Jaiyeola</u>, the different structures and histories of § 1983 and later federal antidiscrimination laws suggest that they may not have the same state-law analogue.  <u>See</u> 40 A.3d at 365.  Congress enacted § 1983 shortly after the Civil War, "in response to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers."  <u>Felder v. Casey</u>, 487 U.S. 131, 147 (1988).  The resulting statute provides a broad cause of action to recover against "the deprivation of *any* rights, privileges, or immunities secured by the Constitution and laws" committed by those acting under color of state law.  42 U.S.C. § 1983 (emphasis added).  With its "broad . . . language," "high purposes," and power to "override certain kinds of state laws," § 1983 "can have no precise counterpoint in state law."  <u>Wilson</u>, 471 U.S. at 272 (internal citations omitted).  It is a "uniquely federal remedy."  <u>Jaiyeola</u>, 40 A.3d at 365.  The same is not true for Title VI.  Enacted a century later as part of the Civil Rights Act of 1964, Title VI was intended "to provide the Federal Government with the means of assuring that its funds were not used to subsidize racial discrimination inconsistent with the standards imposed by the Fourteenth and Fifth Amendments upon state and federal action."  <u>Regents of Univ. of Cal. v. Bakke</u>, 438 U.S. 265, 330 (1978) (Brennan, J., concurring in part) (describing introduction of bill in House of Representatives).  That statute is thus targeted more narrowly at discrimination "on the ground of race, color, or national origin" in federally funded

programs.  42 U.S.C. § 2000d.  As outlined above, D.C.'s antidiscrimination statute comes with an analogous set of ambitions, tools, and remedies.

That leaves the final reason courts have cited for applying the statute of limitations for general personal injury claims to Title VI:  the preference for consistent treatment of federal civil rights statutes.  See Rozar v. Mullis, 85 F.3d 556, 561 (11th Cir. 1996).  But if the trend in this district holds, uniformity is no longer an option; Title VI will either be subject to the same statute of limitations as § 1983 (three years) or the Rehabilitation Act (one year).  Given that choice, the Court sees good reason to harmonize its treatment of Title VI with the growing consensus in this district with respect to the Rehabilitation Act.  Congress modeled the remedial provisions in the Rehabilitation Act directly on those in Title VI and presumed they would be interpreted consistently.  See Barnes, 536 U.S. at 185 (explaining that Congress directly tied the "remedies, procedures, and rights" available under the Rehabilitation Act to those available in Title VI); Nat'l Ass'n of the Deaf v. Trump, 486 F. Supp. 3d 45, 54 (D.D.C. 2020) (noting that Congress modeled the Rehabilitation Act's remedial section "on the language of section 601 of Title VI").  Accordingly, the Court concludes that the DCHRA's one-year statute of limitations applies to the remaining Title VI claim in this case.[4]

### 2. Application

Because Stafford filed suit on November 26, 2018, the one-year limitations period covers events on or after November 26, 2017—near the middle of his senior year.  Applying that time

---

[4] To be clear, this conclusion says nothing about the wisdom of the D.C. Council's decision to place a one-year limitations period on DCHRA claims or Congress's decision not to incorporate an express statute of limitations in Title VI.  Those legislative choices work to the disadvantage of the plaintiff in this case.  However, adoption of the Court's holding in other jurisdictions might well result in a longer limitations period on Title VI claims depending on the analogous state law at issue.

limit, GWU argues it is now entitled to summary judgment on Stafford's Title VI claim because he has not created a sufficient factual dispute about any acts of alleged deliberate indifference from the fall of 2017 onwards.  See Def. Reply at 3–8.  The Court agrees.

As outlined above, for an institution receiving federal funding to be liable for deliberate indifference to racial harassment, a plaintiff must establish, among other things, that an "appropriate person" at the institution had actual notice of the alleged misconduct.  Gebser, 524 U.S. at 290.  To be an "appropriate person," an individual must "at a minimum ha[ve] authority to address the alleged discrimination and to institute corrective measures on the [fund] recipient's behalf."  Id.  As the Supreme Court has explained, this rule ensures that institutions will only be held liable for "official decision[s] . . . not to remedy the violation," and not "for its employees' independent actions."  Id. at 290–91.

In the factual record at summary judgment, there are only two potential incidents after late November 2017 that could arguably give rise to deliberate indifference liability for GWU. The first is Stafford's efforts to appeal his academic suspension in January 2018.[5]  Shortly after GWU notified Stafford of the suspension, he met with Ellen Woodbridge, his assigned academic advisor from the Athletics Department.  See Def. SMF ¶¶ 128, 135.  According to Stafford, during that conversation, he confided in Woodbridge about the "racial discrimination" and

---

[5] Much of Stafford's discussion of the appeal comes in a proposed surreply, which he has asked the Court for leave to file.  See Pl.'s Proposed Surreply at 3, ECF No. 88-2.  The materials included in this proposed filing—and in particular any effort to "correct the record" as to the events of January 2018, see Pl.'s Mot. Leave to File at 1, ECF No. 88—do not satisfy the standard for when such a supplemental response is warranted.  See United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 270, 276–77 (D.D.C. 2002) (noting surreplies appropriate only to address "truly new" matters presented in reply briefs, not mere "mischaracterization[s]").  Nevertheless, the Court has considered the evidence Stafford points to and the arguments he makes, none of which alter the conclusions the Court reaches as to the legal significance of this incident, as explained below.

"racial rhetoric" he had experienced on the tennis team, and asked whether he could include that information in his appeal to the University.  Id. ¶ 135; see also Def. Ex. 2 at 296:3–297:12.

GWU challenges the credibility of Stafford's account of his conversation with Woodbridge, who apparently was not deposed.  See, e.g., Def. Reply at 2 (questioning whether conversation happened).  But even assuming that Stafford made these statements, and that they were sufficient to put Woodbridge on notice of the harassment Stafford says he faced, they did not put *GWU* on notice because Woodbridge was not an appropriate person for the purposes of Title VI.  Stafford does not contest that Woodbridge's only relevant role at the University was as his assigned academic advisor.  As such, she had no supervisory position within the Athletics Department, and nothing suggests that she had the authority to institute corrective measures on the tennis team, specifically.  See Doe v. Edgewood Indep. Sch. Dist., 964 F.3d 351, 360 (5th Cir. 2020) ("[T]o be an appropriate person . . . , the official must have authority to both repudiate the conduct *and* eliminate the hostile environment.'" (internal quotation marks and alteration omitted)); cf. Blue v. District of Columbia, 850 F. Supp. 2d 16, 34 (D.D.C. 2012) (deciding, in context of teacher-student harassment under Title IX, that appropriate person is one in chain of command who could "fire or discipline" offender).  Nor can Stafford establish liability on GWU's part just because Woodbridge did not alert anyone with the power to take corrective action about his complaints.  As at least one federal circuit has observed, imposing liability for an employee's "fail[ure] to convey a report" of discrimination "would turn the deliberate-indifference standard into vicarious liability"—something the Supreme Court explicitly "sought to avoid."  Ross v. Univ. of Tulsa, 859 F.3d 1280, 1290 (10th Cir. 2017); see also Kesterson v. Kent State Univ., 967 F.3d 519, 528 (6th Cir. 2020) (rejecting liability based only on "employee's ability to mitigate hardship or refer complaints").

The Court also rejects the only other potentially timely incident that Stafford points to as a source of liability.  At the summary judgment hearing, Stafford for the first time identified testimony in his deposition that, sometime during his senior year, a teammate used racial epithets while in the team van and in the presence of an assistant coach.  See Mot. Hr'g Rough Tr. at 30:9–32:6 (discussing Def. Ex. 2. at 274:8–14).  This argument comes too late.  The summary judgment process does not obligate courts to "sift through hundreds of pages of deposition" to discover disputes of material fact.  Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir. 1996).  Rather, the local rules require parties opposing summary judgment "to crystallize . . . the material facts and relevant portions of the record" in their opposition filing—not at a later hearing.  Id. (discussing predecessor to Local Civil Rule 7(h)).  Because Stafford failed to raise this argument at any time prior to the motion hearing, the Court will not consider it now.  See Physicians for Social Resp. v. Wheeler, 956 F.3d 634, 647 (D.C. Cir. 2020) ("[G]enerally, arguments raised for the first time at oral argument are forfeited.").

The incomplete nature of the record on this issue only bolsters this waiver finding.  Because Stafford's counsel did not raise the purported van incident in his competing Statement of Material Facts or summary judgment briefing, the record is not sufficiently developed for the Court to easily assess whether enough evidence exists for his Title VI claim to survive summary judgment.  Many key questions, both factual and legal, remain unaddressed by the parties, including:  what evidence would support a finding that this incident occurred; if it did occur, whether it happened (or even could have happened) on or after November 26, 2017;[6] what words

---

[6] While the operative complaint generally alleges the harassment continued into the fall of 2017, it also places this supposed van incident in Stafford's junior year—not the fall of his senior year.  Compare Second Am. Compl. ¶ 107 (alleging continuing harassment in fall 2017) with id. ¶¶ 102–03 (describing van incident as an example of effort to "undermine Plaintiff's

were said and in what context; whether the assistant coach overheard the incident, and whether doing so put him on notice of "severe and pervasive" abuse; and whether this particular assistant coach was an "appropriate person" for the purposes of Title VI, such that he had authority to take corrective action once he was put on notice. Had Stafford drawn the Court's attention to this testimony in a timely fashion, GWU would have had the opportunity to locate other evidence in the record—or submit new evidence—that might have definitively resolved any one of these dispositive issues in its favor. Cf. Robertson v. Am. Airlines, Inc., 239 F. Supp. 2d 5, 9 (D.D.C. 2002) (observing that an inadequate Rule 7(h) statement leaves the other side without "an opportunity fairly to contest the . . . case" against it (quoting Burke v. Gould, 286 F.3d 513, 519 (D.C. Cir. 2002))). Because none of this appropriate back and forth occurred, the Court is left only to speculate whether Stafford's brief testimony suffices to create a dispute of material fact.[7] That is not how summary judgment is supposed to work.

Stafford nevertheless contends that his claim is saved by the "continuing violation" doctrine, which allows recovery even for untimely acts giving rise to liability if they are part of an "ongoing pattern of harassment." Cavalier v. Cath. Univ. of Am., 306 F. Supp. 3d 9, 43–44 (D.D.C. 2018) ("Cavalier I") (applying doctrine to Title IX deliberate indifference claim); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115–18 (2002). The Court agrees that the continuing violation doctrine can apply to claims arising out of a pattern of deliberate

---

reinstatement during the Spring 2017 semester"). The allegations in the operative complaint that are tagged to his senior year—none of which were mentioned at summary judgment—do not support a claim that any responsible University official was aware of and indifferent to racial harassment after November 26, 2017. See id. ¶¶ 108–10.

[7] Stafford's limited testimony on this point is also particularly weak evidence that any van incident occurred within the statutory period. There, he stated only that another player was "always yelling out" racial epithets "during [his] junior year, but also during [his] senior year" in the presence of various coaching staff. See Def. Ex. 2 at 274:8–12.

indifference to ongoing harassment, as such hostile environment claims by "[t]heir very nature involve[] repeated conduct." Morgan, 536 U.S. at 115. But the Supreme Court has clarified that, for the doctrine to apply, a plaintiff still must identify an "act that is part of the hostile . . . environment" within the limitations period. Id. at 118.

As the Court has just concluded, Stafford has not identified any such act within the statutory period. His meeting with Ellen Woodbridge is the sole occasion he has cited within the statutory period where he notified anyone at GWU about any harassment he faced. It is therefore the only incident where the University could have acted with deliberate indifference in the face of such knowledge. But, as just explained, Woodbridge's knowledge cannot be imputed to GWU. Because no act that is part of the hostile environment occurred within the one-year limitations period, Stafford's Title VI claim is entirely barred by the statute of limitations.[8]

B. Application of three-year statute of limitations

In the remaining sections of this Memorandum Opinion, the Court signals what conclusion it would reach on GWU's summary judgment motion, were it to use the three-year statute of limitations typically applied to Title VI claims. The Court does so because the D.C. Circuit has not yet weighed in on the developing statute-of-limitations jurisprudence in this district, and because no other court has yet extended this rationale to Title VI claims. The following analysis is therefore offered only to provide guidance to the parties and any reviewing

_____

[8] Stafford has not argued his deliberate indifference claim would remain viable so long as, within the statute of limitations, the University failed to take action on his older complaints. Nor has he claimed that ongoing harassment during the statutory period would suffice. But such arguments would not save his stale deliberate indifference claim in any case. As the Ninth Circuit has observed, a contrary approach would allow a plaintiff to recover so long as he continued to not receive a "desired remedy" within the statutory period—an approach that would "render[] the statute of limitations a virtual nullity." Stanley v. Trustees of Cal. State Univ., 433 F.3d 1129, 1137 (9th Cir. 2006).

court as to the underlying merits of the claim, should a longer limitations period ever be applied.[9] Under that longer limitations period, the decision would be a close one. But the Court would ultimately hold that GWU has not fully met its burden, and that a portion of Stafford's hostile environment claim would survive summary judgment. As explained below, genuine issues of material fact exist as to the University's responses to Stafford's stated reports of racial harassment during his freshman and sophomore years.

### 1. Relevant time limitation

The Court again starts by considering the impact of the statute of limitations. Because Stafford filed suit on November 26, 2018, a three-year statute of limitations would run back to November 26, 2015—the middle of Stafford's sophomore year. But once again, the continuing violation doctrine may allow Stafford to recover even for older acts, so long as they are part of the same pattern of misconduct giving rise to a hostile environment. See Morgan, 536 U.S. at 116–18. As the Court has already explained, the continuing violation doctrine applies to a Title VI deliberate indifference claim. See supra Part III.A.2; Stafford, 2019 WL 2373332, at *15. The Court therefore must decide two ancillary questions about the application of this doctrine: Does the continuing violation apply to any of Stafford's Title VI claim, in particular? And if it does, how much out-of-time conduct can the Court consider?

As to the first question, the Court reiterates that, for the continuing violation doctrine to apply, there must be an act giving rise to liability within the limitations period. See Morgan, 536 U.S. at 118. To establish deliberate indifference, Stafford must demonstrate that, within the

---

[9] GWU's statute of limitations defense is not jurisdictional. See Day v. McDonough, 547 U.S. 198, 205 (2006). Thus, the Court's conclusion in Part III.A.1 does not preclude it from weighing in on these claims or issues.

statutory period, the university "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived [him] of access to the educational benefits or opportunities provided by the school."  Bryant, 334 F.3d at 934.  The relevant question, then, is whether Stafford has satisfied each of these elements as to at least one incident after November 2015, thus justifying application of the continuing violation doctrine.  As the Court will explain in more detail below, see Part III.B.2, he has.  To take just the latter part of his sophomore year as an example, Stafford (1) testified to specific incidents of harassment, see, e.g., Def. Ex. 2 at 63:2–64:12; (2) insisted that he informed an Athletics Department official, Nicole Early, of the harassment he faced, see id. at 211:15–212:13; (3) contended that Early did nothing in response—only encouraging him to wait for turnover in coach leadership, see id. at 196:13–18; and (4) suggested that the stress he faced on account of the unaddressed harassment caused his academic struggles, ultimately leading to his departure from the University, see id. at 283:1–8, 289:2–6.  Of course, many of these elements remain hotly contested.  And there is little, if any, evidence in the record to corroborate Stafford's unilateral version of events.  As detailed below, however, the Court would hold that GWU has not met its summary judgment burden for at least *some* claim within the longer statutory period.

As to the second question, the Court concludes that the continuing violation doctrine allows it to look back to the entire pattern of alleged deliberate indifference by the University, which forms part of the same hostile environment claim.  GWU contests this approach.  In its view, the continuing violation doctrine only allows the Court to consider discrete *acts of racial harassment* from before the limitations period, and would not let it impose liability for older actions (or inaction) by GWU that constitute *deliberate indifference*.  See Def. Reply at 5–6.

The Court disagrees. GWU's proposed limitation ignores the function of the continuing violation doctrine. As the Supreme Court explained in Morgan, when evaluating a hostile work environment claim, because "the incidents constituting a hostile . . . environment are part of one unlawful . . . practice," the continuing violation doctrine allows a court to hold a defendant "liable for *all acts* that are part of this single claim." 536 U.S. at 118 (emphasis added). Morgan treats all elements of that underlying claim (there, severe or pervasive harassment and a basis for employer liability) together, see Davis v. Coastal Int'l Sec., Inc., 275 F.3d 1119, 1122–23 (D.C. Cir. 2002) (listing elements of Title VII hostile environment claim); it does not support the sort of parsing of elements GWU proposes. At least one federal circuit has specifically applied this reasoning to a Title VI hostile environment claim. In Sewell v. Monroe City School Board, the Fifth Circuit held that a Title VI harassment claim survived a motion to dismiss, despite a potential statute of limitations problem, because "some acts contributing to a hostile environment allegedly took place within the prescription period." 974 F.3d at 584. The court did not hold that only some of the claim's elements could be satisfied by events before the limitations period. To the contrary, it found an unheeded report to a school superintendent months before the limitations period began helped satisfy the "actual knowledge" and "deliberate indifference" elements. See id. at 581, 585.

The Court also, unlike GWU, reads Judge Moss's 2018 opinion in Cavalier v. Catholic University of America to support this formulation of the continuing violation doctrine. See 306 F. Supp. 3d at 43–44. There, another court in this district held that the continuing violation doctrine applied to a Title IX deliberate indifference claim. Id. In so doing, that court specifically noted that, at least at the motion to dismiss stage, "the alleged series of actions, and inactions, 'exhibit[ed] the relationship necessary to be considered part of the same actionable

hostile environment claim.'" Id. (quoting Baird v. Gotbaum, 662 F.3d 1246, 1251–52 (D.C. Cir. 2011)). In the context of a Title IX claim, a court's mention of "inaction" necessarily refers to allegations of deliberate indifference on the part of the university. Cavalier I did not suggest that such allegations were limited to events within the limitations period.[10]

The sole case offered by GWU does not support its contrary approach to the continuing violation doctrine. The University cites Kollaritsch v. Michigan State University Board of Trustees, 944 F.3d 613, 623 (6th Cir. 2019), for the proposition that a private cause of action against a school for deliberate indifference to student-on-student harassment has two components—"actionable" harassment and "a deliberate-indifference intentional tort by the school." See Def. Reply at 5–6. That proposition, though true, says nothing about which of these elements courts can consider when defining a federally funded institution's continuing violation of Title VI. As Sewell and Cavalier I indicate, courts make no distinction.

Thus, if the Court were to apply a longer statute of limitations, it would also consider the entirety of Stafford's claim that the University was repeatedly indifferent to his reports of ongoing racial harassment from his earliest time at GWU. In particular, the Court would examine all of the University's allegedly inadequate responses and non-responses to Stafford's complaints, starting in his freshman year.

---

[10] GWU tries to distinguish Cavalier I by asserting that the claimed indifference here, unlike the acts of the defendant there, were discrete events, not "part of the same unlawful [] practice." Def. Reply at 6–7 n.3. The Court does not find the allegations in the two cases to be particularly distinguishable. In each, the plaintiff claimed that a "[u]niversity engaged in an ongoing violation of" their federal civil rights obligations via a pattern of "actions" or "inactions" sufficiently related "to be considered part of the same actionable hostile environment claim." Cavalier I, 306 F. Supp. 3d at 42, 43–44 (internal quotation marks omitted).

2.  *Application*

On the present record, the Court would conclude that, under a longer, three-year statute of limitations, GWU has satisfied its burden at summary judgment as to a portion of Stafford's claim, focusing on any reports of harassment and the school's response in the fall of his junior year going forward.  By contrast, the Court would conclude that some claim arising out of the University's conduct before then—particularly in the winter of Stafford's freshman year and throughout his sophomore year—could reach a jury, as genuine disputes of material fact exist as to key elements of the University's liability.  As a result, were the Court to apply this longer statute of limitations, it would deny in part GWU's motion for summary judgment.

The Court begins by addressing several elements of a Title VI claim that appear undisputed here.  First, GWU does not contest that the University had sufficient "control" over any harassers and the "environment" on the tennis team to be able to take remedial action.  See Fennell, 894 F.3d at 408.  Second, GWU seems to have dropped its contention, since the motion to dismiss, that Stafford's allegations and evidence would not support a jury finding that the harassment he faced was severe, pervasive, and objectively offensive.  This was a wise choice. Stafford has now substantiated his allegations, through his own testimony and that of at least one fellow teammate, that the use of racial epithets, directed at or used around him, was prevalent throughout periods of his tenure at GWU.  See, e.g., Pl. SMF ¶¶ 17, 25 (describing testimony of Stafford and teammate Blake Morton); see also Def. Ex. 2 at 50:19–58:20; Pl. Opp'n, Ex. E (depicting Facebook meme using the n-word).  As this Court previously observed, "repeatedly being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, and being shamed and humiliated on the basis of one's race is harassment far beyond normal schoolyard teasing and bullying," and satisfies the harassment element of a Title VI

hostile environment claim. See Stafford, 2019 WL 2373332, at *16 (quoting Fennell, 804 F.3d at 409) (internal quotation marks and alterations omitted).

The Court next concludes that Stafford would be able to reach a jury on the causation element of Title VI: that any unchecked severe and pervasive harassment he faced had a "concrete, negative effect" on his "ability to receive an education."[11] Davis, 526 U.S. at 654. GWU argues that no reasonable jury could find that the ongoing harassment Stafford faced caused his poor academic performance and ultimate suspension from the University. To that end, it has introduced numerous records related to Stafford's academic history, both in high school and at GWU, demonstrating that he had long been academically challenged and unmotivated. See Def. MSJ at 30–32; see also, e.g., Def. SMF ¶¶ 2–7, 19–26, 44–50, 55–58, 124–29. Stafford, for his part, has repeatedly attributed his academic difficulties, in some way, to the distraction of his ongoing harassment. See, e.g., Pl. SMF ¶ 51; Def. Ex. 2 at 103:13–104:6, 217:8–218:18, 283:1–8.

The Court does not find it impossible, on the current record, for a rational jury to conclude that unchecked racial harassment deprived Stafford of access to the educational

---

[11] Some courts have added a second causation element, which ties the institution's indifference to future harassment. The exact formulations of the element differ. Some courts require a showing of actual "further actionable harassment," while others ask only that the indifference made the plaintiffs "vulnerable to future harassment." Compare Kollaritsch, 944 F.3d at 622–23 (applying former) with Cavalier II, 513 F. Supp. 3d 30, 52 (D.D.C. 2021) (applying latter); Zeno, 702 F.3d at 666 (applying latter). The Court sees no need to wade into this debate, as it would reach the same outcome no matter what—if any—future harm standard applies. As explained below, Stafford's only viable deliberate indifference claim would center on the University's inaction during his freshman and sophomore years. Because Stafford has also introduced evidence that the harassment allegedly continued at least through his junior year, see Pl. Opp'n at 10, he would satisfy any element concerning future harm.

benefits offered at GWU.[12]  Though Stafford struggled academically in high school, Def. Mot.

Summ. J., Ex. 4 (noting overall 2.81 GPA in high school), high-school GPAs do not *necessarily*

reflect a student's ability to succeed academically in college.  And presumably, GWU would not

have admitted Stafford if it thought he were destined to fail.  Still, Stafford's grades did suffer

during his time at GWU.  See Def. Ex. 28 (noting overall 2.28 GPA at GWU).  While there could

be any number of explanations for that decline in academic performance, Stafford has testified

that one reason was the racial harassment he faced from his teammates, starting from his very

first weeks on campus.  And, at least for his first two years at the University, Stafford's grades

appeared to be lowest during a semester in which, as explained below, he testified to first

reporting racial harassment and receiving an inadequate response.  See id. (noting significant

drop between Fall 2014 and Spring 2015 GPAs); Pl. SMF ¶¶ 43–44 (describing early 2015

discussion with Athletics Department administrator).  While "a mere decline in grades" is not

enough to establish a claim under Title VI, such a change may "provide[] necessary evidence of

a potential link between [the plaintiff's] education and [the] misconduct," when considered in

light of the "persistence and severity" of the harassment.  Davis, 526 U.S. at 652.

_____

[12] In his opposition brief, Stafford explains that he could conduct "expert discovery" to
further bolster his claim that the "hostile educational environment" impacted his "grade[s] and
mental health."  Pl. Opp'n at 16–17.  GWU asks the Court to treat this offer as an effective
concession of the weakness of the current record.  See Def. Reply at 21 n.8.  The Court will not
do so, as expert testimony would not be necessary for Stafford to satisfy this element for
summary judgment purposes.  Still, the Court rejects Stafford's suggestion that the scheduling
order in this case—which deferred expert discovery until after summary judgment, see Minute
Order of Apr. 23, 2021—would offer an excuse for any failure of proof on this element.  If
Stafford felt, after reading GWU's brief, that expert discovery was, indeed, necessary to survive
summary judgment, he could have requested under Rule 56(d) that the Court defer ruling on the
motion or allow this additional discovery.

And unlike the plaintiffs in several cases cited by GWU, Stafford has alleged—and testified—that his "dropping grades" and "increased absenteeism" in class, C.S. v. Couch, 843 F. Supp. 2d 894, 908–09 (N.D. Ind. 2011), were a product of the stress caused by his teammates' abuse. Compare Def. Ex. 2 at 283:1–8 ("I really couldn't focus in class anymore, because at that point . . . everything had intensified so much.") with Hawkins v. Sarasota Cnty. Sch. Bd., 322 F.3d 1279, 1289 (11th Cir. 2003) (holding that mere testimony that students were "upset" or faked sick "falls short of demonstrating a systemic effect of denying equal access"); Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163, 315 F.3d 817, 823 (7th Cir. 2003) (finding no evidence that student was denied access to education where "her grades remained steady" and "her absenteeism . . . did not increase"); Simonetta v. Allegheny Coll., No. 20-cv-32, 2021 WL 927534, at *4 (W.D. Pa. Mar. 11, 2021) (noting that any decline in grades was temporary).

The Court recognizes the significant evidence GWU puts forward highlighting the potential weakness of Stafford's causal claim. That evidence demonstrates Stafford has long struggled academically, failed to take advantage of the academic-support resources the University offered, and may have engaged in acts of academic dishonesty—including plagiarism—from his earliest time at GWU. See, e.g., Def. SMF ¶¶ 3–7 (describing high school difficulties); id. ¶¶ 19–26 (discussing freshman academic performance and plagiarism report).[13]

---

[13] For several of the unfavorable facts GWU presents, the record also includes alternative explanations that could strengthen the link between any harassment and Stafford's academic performance. For instance, GWU points out that Stafford has admitted that his participation in a fraternity took a "toll" on his academics. Def. MSJ at 31 (citing Def. SMF ¶ 45). But Stafford testified that he only joined this fraternity at the behest of then-Coach Munoz, who faulted him for socially "distancing" himself from the teammates who were harassing him. See Pl. SMF ¶ 38; Def. Ex. 2 at 101:19–104:6. GWU also notes that Stafford did not mention "alleged racial discrimination or harassment" in his academic appeal of his suspension in January 2018. See Def. MSJ at 31–32. But again, the record contains an explanation for this omission. As even

The Court agrees that, were this evidence to be presented to a jury, it very well might conclude that the University's deliberate indifference did not deprive Stafford of educational access. But GWU has not established that no reasonable jury, looking at this evidence, could find that the behavior on the tennis team "so undermine[d] and detract[ed] from the victim's educational experience" that Stafford had "effectively been denied access to [the] . . . resources and opportunities" offered at GWU. Hawkins, 322 F.3d at 1289.

The Court therefore turns to the two remaining elements: whether the University had actual knowledge of any harassment, and whether its response, or lack thereof, was deliberately indifferent. See id. at 1287 ("The deliberate indifference issue is intertwined with the question of notice since whether the Board's actions were clearly unreasonable must be measured by what was known."). On these elements, the strength of Stafford's claim varies over time. Thus, under a three-year statute of limitations, the Court would grant GWU only partial summary judgment.

a. Freshman Year

Stafford recalled making two reports of racial harassment to GWU employees in his first year as a student. First, Stafford testified that, shortly after the start of his freshman year, he told then-Coach Greg Munoz about "racism by his teammate[s]," and that "Munoz immediately retaliated against" him for that report. Pl. SMF ¶ 32. Second, Stafford recounted a discussion of racism and harassment during a winter 2015 meeting with Munoz and Athletics Department administrator Nicole Early. Id. ¶ 44. There is no evidence in the record that either Munoz or Early responded to these complaints. The Court would conclude that Stafford's reports to

---

GWU acknowledges, Stafford testified that an academic advisor discouraged him from including any allegation of racism in his appeal. See Def. SMF ¶ 135.

Munoz could not support any finding of liability, but that a sufficient factual issue would preclude it from granting summary judgment to GWU as to the potential report to Early.

Stafford cannot premise any Title VI claim on a report of harassment to Munoz because he has consistently described Munoz as a ringleader in the mistreatment he faced. Title VI does not permit a damages recovery for deliberate indifference "based on principles of *respondeat superior* or constructive notice." Gebser, 524 U.S. at 285. Because a defendant's "liability rests on actual notice principles, . . . the knowledge of the wrongdoer himself is not pertinent to the analysis." Id. at 291. In both his summary judgment submissions and throughout the record, Stafford has framed Munoz as a source of harassment. In his statement of genuine issues, for instance, Stafford stated that Munoz directed "threats and harsh treatment" only at "non-White and American tennis players" and consistently minimized incidents of racism by other players. See Pl. SMF ¶¶ 9, 32–37. At one point in his deposition, Stafford also described the "racial rhetoric" and "racial discrimination" he faced as part of an "environment that Munoz created." Def. Ex. 2 at 212:4–10. Because Munoz was an alleged wrongdoer, his knowledge of discrimination was insufficient to constitute actual notice to GWU.

The Court would reach a different conclusion with respect to Stafford's report to Nicole Early. GWU has not contested that Early is an "appropriate person" to whom Stafford could raise complaints of harassment. The Court would hold that Early is such an appropriate person because, as the team administrator, she had "authority to address the alleged discrimination and to institute corrective measures on [GWU's] behalf." Gebser, 524 U.S. at 290; see Def. Ex. 7 at 23:7–12 (stating that team administrator had supervisory authority over coaches).

The University quibbles instead with the sufficiency of the knowledge Early had. In GWU's view, Stafford's report of "the racial rhetoric that was going on," including "the names,

the harassment, the hostility" was not specific enough to give Early, and thus the University,

actual notice of any racially hostile environment.  See Def. Reply at 9 (citing Def. Ex. 2 at

120:16–121:7).  The Court does not share that view.  In his deposition, Stafford testified that,

while meeting with Early in January 2015, he described to her, at a minimum, the racist name-

calling that his teammates had engaged in over the prior semester.  See Def. Ex. 2 at 120:13–

121:19.  Standing alone, that statement already includes more detail than the complaints other

courts have deemed insufficient.  In several of the cases GWU cites, for instance, courts refused

to impose liability when a school failed to infer specific misconduct from general reports that a

claimant "wasn't feeling comfortable" or was "bother[ed]" by a peer.  See, e.g., Gabrielle M.,

315 F.3d at 823–24 (finding report that another student "began bothering" plaintiff insufficient to

put school on notice that behavior was sexual in nature); I.L. v. Hous. Indep. Sch. Dist., 776 F.

App'x 839, 844 (5th Cir. 2019) (holding "vague" testimony that family notified school district

that student "wasn't feeling comfortable" not enough to support finding of actual knowledge).

Here, Stafford reported the nature and source of the harassment.

Moreover, when read in context, Stafford's testimony about his discussion with Early

suggests that he may, in fact, have provided more details about specific misconduct during that

conversation.  At that point in his deposition, Stafford had just extensively described the

treatment he claims to have faced at GWU from a select number of students—the other dozen or

so members of the tennis team.  His stated report—of "the names, the harassment, the

hostility"—is thus readily distinguishable from the claimed notice given in the main case GWU

relies on, Stiles ex rel. D.S. v. Grainger County, Tenn., 819 F.3d at 834.  There, the Sixth Circuit

refused to credit a statement in a student's affidavit that, at some unspecified point in his eighth-

grade year, he told teachers about bullying he had experienced from a variety of students over

the entire course of middle school.  See id. at 843 n.5.  Stafford's testimony here, by contrast, refers to a particular report of specific conduct by the small number of players on the tennis team.  Under these circumstances, the Court would not grant summary judgment to GWU on the sole ground that Stafford's retelling of his years-old conversation with Early involved too much cross-referencing to and summarization of his other deposition testimony.

As a result, the Court would conclude that Stafford's testimony is sufficient to create a genuine issue of material fact about whether, in January 2015, he gave Early actual notice of the racially hostile environment he says he faced.  Given this holding, the Court would likewise find that there is a genuine issue of material fact as to the sufficiency of the University's response.  After that meeting, there is no evidence in the record that Early took any steps to work with Stafford, his coaches, or members of the tennis team to acknowledge or address any racial harassment.  If the factfinder were to accept Early's account of the meeting and agree with GWU that Stafford never made clear to Early the harassment he suffered, then this inaction would be entirely understandable and have no legal significance.  But if the finder of fact were to resolve the disputed notice question in Stafford's favor, the current record could support a finding of deliberate indifference.  A reasonable jury could conclude that doing nothing in the face of such a report is clearly unreasonable.  See Doe v. Pawtucket Sch. Dep't, 969 F.3d 1, 9–10 (1st Cir. 2020) (finding allegation that school district "fail[ed] to take any action to stem the tide of" misconduct plausibly satisfied deliberate indifference element at motion to dismiss stage); Prasad, 390 F. Supp. 3d at 31 (describing cases where schools "ignored [the] plight" of a victim or "made no effort whatsoever" to remedy violation).

b.   <u>Sophomore Year</u>

The Court reaches a similar set of conclusions with respect to the events of Stafford's sophomore year.  There are three potential reports of racial harassment that school year.

Stafford first claims he and his father complained to Coach Munoz about both harassment by members of the tennis team and unequal treatment by coaching staff, including Munoz.  <u>See</u> Pl. Opp'n at 6; Def. SMF ¶ 60.  But, as the Court has already explained, any report to Munoz—a key wrongdoer in Stafford's narrative—would not give the University actual knowledge of the mistreatment for the purposes of Title VI.  <u>See</u> <u>Gebser</u>, 524 U.S. at 291.

Stafford next points to discussions he and his father had with Michael Tapscott, the director of GWU's Multicultural Student Services Center, in early fall of 2015.  <u>See</u> Pl. Opp'n at 6–7.  Considering the evidence in the record about these conversations, the Court would conclude they cannot be a source of Title VI liability for GWU.  As the University notes, there is no evidence to contest Tapscott's testimony that, in any one-on-one meeting with Jabari Stafford, the issue of racism never came up.  <u>See</u> Def. SMF ¶ 62.  This conversation thus could not have given GWU actual notice of a racially hostile environment.  Nor could Tapscott's actions during and following his September 2015 conversation with Tom Stafford give rise to Title VI liability.  As has often been the case in this suit, the participants disagree about what was discussed.  <u>See</u> <u>id.</u> ¶ 67; Pl. SMF ¶ 47.  But even if the Court accepts Tom Stafford's version of events, GWU's response to this conversation could not amount to deliberate indifference.  As the Supreme Court has explained, an institution only engages in deliberate indifference when its actions are "clearly unreasonable *in light of the known circumstances.*"  <u>Davis</u>, 526 U.S. at 648 (emphasis added).  Here, the elder Stafford only recalled telling Tapscott "a little bit about what was going on" with his son, and then discussing generally the experience of "being a kid of color" on a mostly white

team. See Def. Ex. 6 at 56:3–12. After these conversations, Tapscott encouraged Jabari to meet with Athletics Department administrator Early to discuss his concerns; reached out to Early himself to discuss bullying on the team; and attempted to check in with Jabari several times. Def. SMF ¶¶ 63–65, 68. In light of the at-best-vague report Stafford's father made about the nature of the problems Jabari faced, the Court would conclude that Tapscott's response was not unreasonable as a matter of law. See Hawkins, 322 F.3d at 1287 (explaining that whether remedial actions "were clearly unreasonable must be measured by what was known").

Finally, Stafford asserts that his conversation with Nicole Early in the spring of 2016, recounting the racially hostile environment under coaches Munoz and Browning, was sufficient to trigger the University's obligation to act. Here, as with the similar report in Stafford's freshman year, the Court agrees that a claim arising out of this conversation could survive summary judgment. To begin, the parties again dispute whether this conversation focused on racism. See Def. SMF ¶¶ 72–73. The Court would have to resolve this disagreement in Stafford's favor at this juncture. Scott, 550 U.S. at 378. Moreover, a jury could indeed find that Stafford told Early about the "racial rhetoric and . . . racial discrimination" he had been "forced to endure" under both Munoz and Browning. Def. Ex. 2 at 212:4–13. As it would for the similar report a year earlier, the Court would reject GWU's suggestion that any reasonable jury would have to find this report too vague to impart actual knowledge. Once again, Stafford has recounted a specific conversation where he described a longstanding pattern of harassment by a particular group of students—fellow members of the tennis team. That is not the kind of "extremely vague" report courts have rejected.[14] See I.L., 776 F. App'x at 844.

---

[14] In his briefing, Stafford also emphasizes an email Early sent to fellow Athletics Department administrator Ed Scott in January 2016, warning that Stafford's father might

And if a jury found that Stafford adequately put Early on notice, it could likewise find

that her response on GWU's behalf was deliberately indifferent. To be sure, deliberate

indifference is a high bar. Because the standard protects schools' "flexibility" in administrative

matters, the Court must "refrain from second-guessing the . . . decisions made by school

administrators." Davis, 526 U.S. at 648. Still, once put on notice, an official with authority to

remedy a violation cannot "refuse[] to take action." Gebser, 524 U.S. at 290. And though the

test for liability "is not one of effectiveness by hindsight," a school may also be liable where it

has continued to use a "known 'ineffective practice.'" Prasad, 390 F. Supp. 3d at 27 (first

quoting Porto v. Town of Tewksbury, 488 F.3d 67, 74 (1st Cir. 2007) then quoting Stiles, 819

F.3d at 849–50). Here, Stafford has testified that, following his report of racial harassment, the

only steps Early took were to (1) set up a meeting with Coach Browning, where they discussed

only his position in the lineup; and (2) reassure him he'd have a fresh start with a new coach in

the fall. Def. SMF ¶¶ 72, 76–77. Were a jury to credit Stafford's version of events—including

two separate reports, more than a year apart, of ongoing racial abuse on the tennis team—it could

conclude her response was clearly unreasonable. As a result, were the Court to reach the

question, it would conclude that the events arising out of Stafford's claimed report to Early in his

sophomore year, too, cannot be resolved at summary judgment.

---

"suggest that Jabari is being discriminated against." Pl. Ex. L. In Stafford's telling, this email
separately creates a dispute of material fact about whether Early had actual knowledge of
ongoing discrimination. See Pl. Opp'n at 17–18. GWU disagrees. In its alternate reading, the
email indicates only that Early thought a complaint about some kind of discrimination—not
necessarily on the basis of race—might be forthcoming. See Def. Reply at 12. The Court agrees
with GWU that this email is not, by itself, proof that a clear report of discrimination had in fact
been made. But a reasonable jury could find it to be circumstantial evidence of Early's
knowledge of a racial discrimination complaint—particularly when read in context with
Stafford's allegation that he had complained to her about such discrimination the previous year.

      c.  <u>Junior Year</u>

For a variety of reasons, however, the Court would reach the opposite conclusion as to any potential Title VI claim arising out of the remainder of Stafford's time at GWU.  For each remaining incident, either Stafford failed to put an appropriate person on notice or the University's response does not constitute deliberate indifference as a matter of law.

First, no reasonable jury could find that the University was deliberately indifferent to Stafford's reports of racial harassment in the fall of 2016.  That semester, in a series of phone calls, emails, and a meeting with GWU administrators, several University officials encouraged Stafford to use the University's student grievance procedures to report incidents of racial bias and discrimination, and provided him with information about how to do so.  <u>See</u> Def. SMF ¶¶ 96, 104, 106.  Yet, Stafford chose not to pursue any official report.  <u>See id.</u> ¶ 108; Pl. SMF ¶ 46. Other courts have specifically rejected deliberate indifference claims where a school has "encourag[ed]" complainants "to secure protections available," but the complainant has declined to do so.  <u>Prasad</u>, 390 F. Supp. 3d at 31; <u>see also</u> <u>Roe v. St. Louis Univ.</u>, 746 F.3d 874, 883 (8th Cir. 2014) (holding university not deliberately indifferent under Title IX where administrator informed student of how to make a complaint and respected her decision not to report).  Here, crucially, it was Stafford who chose not to pursue a claim of racial bias further.

Stafford may be right that the officials he spoke with had the "power to initiate an investigation independent" of any formal grievance.  <u>See</u> Pl. Opp'n at 19.  But Title VI does not give a claimant the "right to make particular remedial demands."  <u>Davis</u>, 526 U.S. at 648.  Title VI therefore imposed on GWU no obligation to pursue such an independent investigation once Stafford dropped his complaint.  <u>See</u> <u>Fennell</u>, 804 F.3d at 410–11 (explaining that "[o]fficials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of

harm," and even "relatively weak responses to harassment" are not tantamount to intentional discrimination).

The University likewise could not be liable for any inaction surrounding the sole remaining potential reports during Stafford's junior year: two conversations, at some point during the Spring 2017 semester, with Coach David Macpherson about "the racist acts of [his] teammates." See Pl. Opp'n at 10–11 & 11 n.2; Def. Ex. 2 at 262:22–263:17, 271:3–15. The parties debate whether Macpherson, as head tennis coach at a large university program, is an "appropriate person" whose actual knowledge of discrimination and failure to act could render the University liable. See Def. MSJ at 28–30; Pl. Opp'n at 18. The Court need not resolve that disagreement.

Even if Macpherson were an appropriate person, Stafford's accounts of these conversations do not indicate that he put the new head coach on actual notice of any specific acts of discrimination by his players. In particular, the Court finds Stafford's recollection of his conversations with Macpherson less specific than his retelling of his earlier meetings with administrator Nicole Early. For instance, Stafford recounted one conversation with Macpherson and another teammate where he apparently told Macpherson that he "thought racism was at play" in his interactions with his teammates. Def. Ex. 2 at 263:6–22. But he did not offer any other details, and at one point even conceded that he "didn't link the conspiracy to [his] race" because, in his view, the "whole context" of his allegations were "about race." Id. at 262:22–263:7. The same is true for a phone conversation Stafford and Macpherson apparently had in the spring of 2017. As to that call, Stafford only testified that he told his new coach his teammates were "plotting," "taunting" and "racially discriminating against" him. Id. at 271:6–10. Although the Court has rejected GWU's vagueness argument at other points, this description falls on the other

side of the line. No reasonable jury could find that such general allegations, which don't even gesture at specific incidents of name-calling or misconduct, gave Macpherson, and thus GWU, actual notice of the nature of the problems Stafford faced on the tennis team.

d. <u>Senior Year</u>

The Court finally reaches Stafford's final year at GWU, starting in the fall of 2017. The only potential event giving rise to liability here that the Court would consider is one already discussed: Stafford's academic suspension and subsequent appeal in January 2018. As the Court has already explained, under any statute of limitations, the University cannot be liable for deliberate indifference arising out of this incident because, even on Stafford's telling, no "appropriate person" was given actual knowledge of racial abuse. <u>See</u> <u>Gebser</u>, 524 U.S. at 290; <u>supra</u> Part III.A.2.

**IV. Conclusion**

For the foregoing reasons, the Court will grant the Defendant's Motion for Summary Judgment. A separate Order shall accompany this memorandum opinion.

_____<br>
CHRISTOPHER R. COOPER<br>
United States District Judge

Date: <u>January 4, 2022</u>