# EXHIBIT 1

# (Redacted)



# Transcript of Michaela Smith

**Date:** March 20, 2023
**Case:** Smith -v- Howard University

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

53

1  Q  Did you ever get treatment or see a
2  therapist or get counseling before you entered
3  Howard?
4      A  No, sir --
5      Q  Okay.
6      A  -- not at that time.
7      Q  And no one diagnosed you with depression
8  or anxiety before you got to Howard; is that
9  right?
10     A  No -- no, sir, no one did --
11     Q  Okay.
12     A  -- diagnose me.
13     Q  All right.  So you enrolled in medical
14 school at Howard in fall 2017; is that right?
15     A  Yes.
16     Q  And did your parents provide any financial
17 support for you while you were in medical school?
18     A  Yes.
19     Q  What did they pay for?
20     A  Incidentals, living expenses.  For
21 example, dorm room supplies, food, the like.
22     Q  Okay.  Did there ever come a time when you

54

1  didn't have money for living expenses or food?
2      A  When I -- not a -- yes.  I couldn't
3  provide it myself, but I had to get it from my
4  parents.
5      Q  They'd been providing you living expenses
6  and food for your whole time at Howard, right?
7      A  Yes.
8      Q  Okay.  So was there --
9      A  As much as was necessary.
10     Q  Okay.  So was there ever a time when you
11 didn't -- simply did not have the money to pay
12 rent?
13     A  Yes --
14     Q  Okay.
15     A  -- there was a time.
16     Q  When was that?
17     MS. NORRIS:  Objection; relevance.
18 BY MR. PRYWES:
19     Q  When was that?
20     A  I did not have the money to pay rent in
21 the fall of 2018 due to a financial aid issue
22 brought on me on the part of Howard.

55

1      Q  Okay.  Was there ever a time when you were
2  at Howard that you didn't have enough money for
3  food?
4      MS. NORRIS:  Objection.  I think that's a
5  little bit -- that could be considered harassing.
6  I think that that's not really appropriate.
7  BY MR. PRYWES:
8      Q  You can answer.
9      A  I was able to receive money from my
10 parents to cover food expenses.
11     Q  Okay.  So at no time were you unable to
12 get food that you needed while you were at Howard;
13 is that right?
14     A  That is, in part, correct, yes.
15     Q  Okay.  What's the "in part" it's not
16 correct?
17     A  The "in part" is that I could not
18 supplement these things myself, but I did receive
19 assistance and help that did came -- come --
20     Q  Okay.
21     A  -- from my parents.
22     Q  Okay.  When you enrolled at Howard in fall

56

1  of 2017, did you receive any materials about your
2  rights and duties as a student?
3      A  I believe so, yes.
4      Q  What did you receive?
5      A  I don't know the titles of those exact
6  documents.  I did receive a copy of the policies
7  and procedures manual.  I believe I signed
8  something to the effect of an integrity or
9  statement of discourse or an agreement to
10 matriculate.  Things of that nature.
11     Q  Okay.  Let me show you Exhibit 3.
12     (Whereupon Defendant's Exhibit 3 was
13 marked for identification.)
14     THE WITNESS:  Thank you.
15     THE COURT REPORTER:  I'll hand you the
16 marked copies, Ms. Smith.
17     MR. PRYWES:  Yeah, I'm sorry.  I'll take
18 that.
19     Q  Okay.  Is that your signature on the
20 bottom of this page?
21     A  Yes.
22     Q  And you signed that on July 26th, 2017?

57

1    A   Yes.

2    Q   And I'd like to direct your attention to
3  the bottom of that first page, and the language
4  there, towards the end, it says, and I quote:
5  That the profession of the physician is an
6  honorable one and that physicians and students
7  must eschew dishonorable practices that -- and
8  that expulsion from the college of medicine be the
9  penalty for a student adjudged of cheating in an
10 examination.

11       Did you understand at that time that if
12 you cheated on an examination and were found
13 guilty of that, you'd be expelled?

14   A   Yes.

15   Q   Okay.  And did that understanding ever
16 change while you were at Howard?

17   A   No, sir.

18   Q   Okay.  Did you fail two courses in the
19 fall 2017 semester?

20   A   Yes.

21   Q   And did you take a leave of absence
22 starting in January 2018?

58

1    A   It was either January or February, to my
2  recollection.

3    Q   Okay.  And why did you take a leave of
4  absence?

5    A   I took the leave of absence because my
6  grades were being affected by the depression and
7  the test anxiety that I was experiencing during
8  that time.

9    Q   And what was -- what do you believe was
10 the source of your depression and anxiety at that
11 time?

12   A   I have -- I've had irritable bowel
13 syndrome, and it -- I have flare-ups of it, and it
14 was presenting itself with the new rigors and, as
15 I had expressed before, the transition from
16 undergrad into Howard --

17   Q   Okay.

18   A   -- with, you know, that situation that we
19 spoke about earlier.

20       And I believe it was, you know, the new
21 environment, the new rigors, and my IBS symptoms,
22 exacerbating.

59

1    Q   Okay.  Did you see any sort of counselor
2  or therapist at Howard University?

3    A   I did.

4    Q   And was that Dr. Erica Shelby?

5    A   I don't recall her name.

6    Q   Dr. Shelby?

7    A   That rings a bell, but I don't recall her
8  name.

9    Q   Well, how often did you see the counselor?

10   A   I saw her, I believe, one time.

11   Q   Okay.

12   A   Perhaps twice.

13   Q   And did you see any other counselors to
14 help you through the -- that difficult period for
15 you?

16   A   Yes, sir.  I sought out spiritual
17 counselors and pastors of that sort as well.

18   Q   Can you speak up a little bit?

19   A   Yes, sir.  I said I --

20   Q   You said you sought out spiritual
21 counseling?

22   A   Yes, sir.

60

1    Q   And who was that from?

2    A   That was from Mr. Greg White, Bishop Greg
3  White at time as well.

4    Q   And is he a man of the cloth?  Is he --

5    A   He is.

6    Q   -- a clergyman?

7    A   He is, he is.

8    Q   Okay.

9    A   Yes.

10   Q   And have you ever --

11   A   He's a pastor.

12   Q   -- seen anyone else for depression,
13 anxiety, those kinds of issues?

14   A   No, sir.

15   Q   Okay.  When you with- -- when you -- you
16 withdrew from the first year, right?

17   A   Yes, sir.

18   Q   And was Dr. Debra Ford helpful with you --
19 helpful to you in arranging your withdrawal and
20 ability to come back?

21   A   In part.  In part, yes.

22   Q   In what way was she helpful to you?

6

1     A  She actually suggested to me that I take a
2  leave of absence.
3     Q  Okay.  Was there any way that she was
4  unhelpful to you in that period?
5     A  At that time -- from my perspective at
6  that time, no, there --
7     Q  Okay.
8     A  -- was no....
9        THE COURT REPORTER:  I didn't --
10 BY MR. PRYWES:
11    Q  And later on --
12       THE COURT REPORTER:  I didn't hear the
13 full response.
14       THE WITNESS:  Okay.  I said from my
15 perspective at that time, no, there -- she was not
16 unhelpful, from my perspective at that time.
17 BY MR. PRYWES:
18    Q  Did she tell you that you could come back
19 and repeat the first year when you felt better?
20    A  She did.
21    Q  Okay.  And eventually you arranged to go
22 back to school, right?

62

1     A  Yes.
2     Q  And did you understand when you
3  returned --
4     A  Could I have a -- could I clarify that,
5  please?
6        I know you said "eventually."  Like, you
7  used the word "eventually" I decided.  It was
8  somewhat planned at the same time that the
9  withdrawal occurred.  You know, it wasn't, like,
10 decide six months or something later.
11    Q  Right.
12    A  It was --
13    Q  So it was understood that you would plan
14 to return in fall 2018?
15    A  Yes.
16    Q  Okay.
17    A  Yes.
18    Q  All right.  So -- and did Dr. Ford tell
19 you that when you did return, you'd be considered
20 a repeating student, and, as such, if you failed
21 any course, you would be dismissed from the
22 medical school?

63

1     A  She did explain somewhat of the returning
2  student status.  I don't -- "returning,"
3  "repeating" being somewhat interchangeable to
4  that.  But I don't remember the specifics of her
5  explanation of that in particular, but to my
6  knowledge of the policy itself, yes.
7     Q  So when you started your first year as a
8  repeating student, did you understand that you
9  would be dismissed if you failed any course?
10    A  Yes.
11    Q  Okay.  Now, during the fall 2017 to spring
12 2018 academic year, did you file some sort of
13 satisfactory academic performance appeal?
14    A  What was that time?
15    Q  Satisfactory academic performance appeal.
16    A  What time period was in your question?
17 I'm sorry.
18    Q  The -- your first attempt that first year.
19    A  I didn't file a -- I didn't file an SAP
20 appeal that -- in '17 -- in the '17 to '18 school
21 year, no.
22    Q  Okay.  Did you file any sort of appeal

64

1  that year?
2     A  No, sir.
3     Q  Did you file any challenge questions that
4  year?
5     A  No, sir.
6     Q  Did you ever submit any challenge
7  questions before the one for Lab 3 and Structure
8  and Function 2 in spring 2019?
9     A  I believe I had, yes.
10    Q  What course was that in?
11    A  I believe it was for another Structure and
12 Function --
13    Q  Okay.
14    A  -- course.
15    Q  And do you remember which course it was?
16 Structure and Function I?
17    A  I think it was for Structure and Function
18 I, yes.
19    Q  And how did you go about submitting that
20 challenge?
21    A  I don't entirely recall the full process
22 of how I submitted it, but ultimately I placed my

**Page 69**

```
1        A  I was.
2        Q  Okay.  Could you describe that?
3        A  Can I describe the diversion program?
4        A  Yeah.  What was the -- what were you
5   accused of shoplifting, and then what exactly was
6   this diversion program?
7        A  What I was accused of shoplifting --
8           MS. NORRIS:  Objection; compound.
9   BY MR. PRYWES:
10       Q  You can answer.
11       A  What I was accused of shoplifting was
12  clothing.  The nature of the diversion -- clarity:
13  Accused of shoplifting with a friend -- a former
14  friend that I was with at the time.
15       Q  Okay.  Did your former friend shoplift?
16       A  Yes.
17       Q  Okay.  What did she shoplift?
18       A  Clothes.
19       Q  Okay.  And tell me about the diversion
20  program you were placed into.
21       A  The diversion program was -- well, I can
22  tell you the requirements of the diversion
```

**Page 70**

```
1   program.
2        Q  Okay.
3        A  There were two requirements: to complete a
4   sort of counsel course and to pay a $500 fee.
5        Q  Okay.  Did you pay a $500 fee?
6        A  I did.
7        Q  Do you have any records relating to this
8   arrest and the diversion program?
9        A  Yes.
10       Q  Did you ever accept responsibility for
11  shoplifting?
12       A  No.
13       Q  Okay.  Why did you pay the $500 fee?
14       A  That was a part of the diversion program.
15       Q  Did that require any acknowledgment of
16  guilt or responsibility?
17       A  It did not.  Those charges were dropped.
18       Q  Okay.  Have you ever been arrested or
19  charged with a crime on any other occasion?
20       A  No.
21       Q  Okay.  When you -- I want to ask you about
22  your return to the Howard medical school in fall
```

**Page 71**

```
1   of 2018.
2        A  Okay.
3        Q  So now we're going to talk about the 2018
4   to '19 academic year.
5        A  Okay.
6        Q  All right.  So when you returned, what
7   materials were you given about the program?
8        A  About which program?
9        Q  Were you given any policy manuals?
10       A  I was.
11       Q  Hm?
12       A  I was, yes, sir.
13       Q  Okay.  So --
14       A  The 2018/2019 procedures and policies.
15          MR. PRYWES:  Okay.  So let's mark that as
16  Exhibit 100.
17          (Whereupon Defendant's Exhibit 100 was
18  marked for identification.)
19          THE WITNESS:  I was also -- if I may?
20  BY MR. PRYWES:
21       Q  Yeah.
22       A  I was also given the Howard University --
```

**Page 72**

```
1   access to the Howard University-wide manual.
2        Q  Okay.  Okay.  So Exhibit 100, is that the
3   policies and procedures manual that you received
4   at the beginning of the '18 to '19 academic year?
5        A  Without currently going through each of
6   the pages, it appears so.
7        Q  Okay.
8           MR. PRYWES:  And let me mark this as
9   Exhibit 178.
10          (Whereupon Defendant's Exhibit 178 was
11  marked for identification.)
12  BY MR. PRYWES:
13       Q  Okay.  Is Exhibit 178 the other document
14  that you said you received?
15       A  Yes.  The university-wide -- again,
16  similar with this one:  Without going, you know,
17  through the -- each of these pages, it appears so.
18       Q  Okay.  Did you receive any other general
19  policy statements or handbooks when you returned?
20       A  Not to my knowledge --
21       Q  Okay.
22       A  -- at this time.
```

**77**

1  was the spring semester and we discussed, you
2  know, the SAP appeal.
3      I had to return to her -- set up a meeting
4  and return to her so that she could sign off on
5  some document -- a document relating to my SAP
6  appeal.  I believe I discussed with her a
7  financial aid matter that I had discussed with
8  Dr. Aitcheson as well.
9      Then in the second semester in February, I
10 had a meeting with her, and she referred me to the
11 policies and procedures because she said that I
12 would have to go before the honor council for what
13 she was referring to as academic dishonesty.
14     In May, I spoke with her regarding the
15 promotions and graduates committee circumstances
16 that can be found in the policies and procedures
17 manual and her role as chair of the promotions and
18 graduates committee.
19     I also spoke with her in regards to P&G --
20 for short, "P&G" -- committee about how to go
21 about writing an appeal of a -- what then would
22 have been a potentially adverse decision, and

**78**

1  to -- that is the extent of my knowledge at this
2  time.  I don't recall --
3      Q  Okay.
4      A  -- anything else.  Perhaps I missed
5  something, but I don't recall.
6      Q  Okay.  Do you recall discussions with any
7  other faculty member about the substance, the
8  content, of these two university documents?
9      A  I do recall.
10     Q  Okay.  What else do you recall?
11     A  I recall speaking with Dr. Aitcheson, the
12 financial aid director who I spoke of earlier,
13 also regarding the SAP appeals and, you know,
14 funding for that academic year.
15     I also spoke with Dr. Rose, the dean of
16 student affairs, regarding student quorum
17 membership on the honor council panel, as in the
18 policies and procedures.  I also spoke with
19 Dr. Rose about makeup exams that are missed, which
20 is detailed in the policies and procedures.
21     I spoke with Dr. Callender briefly prior
22 to the honor council hearing regarding information

**79**

1  I was expected to receive per my understanding of
2  the policy, you know, in relation to that.
3      I spoke with Diane Thomas, Dean Mighty's
4  secretary, regarding her involvement via e-mail, I
5  believe, that primary took place in March
6  regarding her involvement or her knowledge thereof
7  of the honor council proceedings, and it was there
8  that I also received correspondence that she would
9  send me relating to the honor council
10 scheduling --
11     Q  Okay.
12     A  -- things of that sort.
13     I also, via e-mail with Diane Thomas,
14 referenced policy and procedural breaches.  I
15 was -- well, my intended audience was Dr. Mighty,
16 but it -- the e-mail went with her -- to Mighty
17 and Ms. Thomas, to their office, regarding ways in
18 which I believe the policies and procedures had
19 been breached against me regarding honor council
20 matters, regarding professors' involvement,
21 matters of that sort.  So I spoke with them about
22 that.

**80**

1      I also spoke with Diane Thomas via e-mail
2  in June -- I apologize, in May when I actually had
3  to submit my appeal of the adverse P&G committee
4  decision that was related to the policies and
5  procedures when I submitted that in the time frame
6  I submitted that in.
7      I spoke with Dr. Mighty himself in the
8  presence of Diane Thomas in a meeting that he
9  called with me that ultimately occurred on
10 June 3rd.  And we spoke about the -- in part,
11 about the allegations and, in part, about an
12 attachment I was trying to submit along with the
13 P&G appeal letter that I had submitted previously
14 to his offices.
15     I addressed in a formal complaint to the
16 university provost, Dr. Antony Wutoh, regarding
17 policies and procedures as well as student
18 handbook violations that I noted over the course
19 of this ordeal.  And I addressed the policies and
20 procedures and -- you know, the student-wide
21 student handbook policies and procedures with him
22 in that discourse.

8

1    And, to the best of my knowledge, that's
2 currently --
3    Q  Okay.
4    A  -- that's currently the extent of that.
5    Q  Thank you.  In any of those
6 communications, did any of the people you've
7 mentioned tell you that the policies and
8 procedurals -- policies and procedures manual was
9 a binding contract?
10   A  No, not in either -- not in any of those
11 correspondences, no.
12   Q  And no one told you that verbally, either?
13   A  I do not recall anyone telling me that
14 verbally, no.
15   Q  Okay.  So take a look, if you would, at
16 Exhibit 100, and take a look at Page 2.  And
17 towards the bottom of the page there,
18 second-to-last paragraph, it says, and I quote:
19 The information within this brochure does not
20 constitute a contract.  End of quote.
21     Did you read that language in -- during
22 the 2018 to '19 academic year?

82

1    A  I did.
2    Q  Okay.  Did you ask anyone about that?
3    A  I did not.
4    Q  What did that mean to you?
5    A  To me that meant that -- well, to me that
6 meant just what it says:  That the information in
7 this brochure does not constitute a contract.
8    Q  Okay.
9    A  I'm sorry, I don't --
10   Q  So did you understand when you received
11 this that none of the provisions in this manual
12 were contractually binding on Howard University?
13     MS. NORRIS:  Objection; calls for a legal
14 conclusion.
15     THE WITNESS:  In part.  I understood the
16 first sentence in this paragraph in the context of
17 the sentence after it as well, beginning "the
18 College of Medicine reserves the right to modify,
19 delete, or add policies and procedures as
20 necessary before or during matriculation or at any
21 time during the academic year."  End of quote in
22 here.

83

1 BY MR. PRYWES:
2    Q  Okay.
3    A  And so with that in full, I understood
4 that any policy or procedure, should it be changed
5 or altered, to my understanding that amendment
6 would be disseminated to the student body --
7    Q  Okay.
8    A  -- as well.
9    Q  Okay.  Did you understand that you had a
10 contractual right to the university following the
11 provisions of this handbook?
12   A  I don't understand the question.
13   Q  Was the handbook contractually binding on
14 Howard University, according to your understanding
15 when you received this?
16   A  According to my understanding when I
17 received it?  No.
18   Q  Did you ever come to the conclusion that
19 this policies and procedures manual was
20 contractually binding?
21     MS. NORRIS:  Objection; calls for a legal
22 conclusion.

84

1 BY MR. PRYWES:
2    Q  You can answer.
3    A  I believe so, yes.
4    Q  And when did you come to that conclusion?
5    A  I came to that conclusion after I was
6 wrongfully expelled.
7    Q  Okay.  Did you come to that conclusion
8 before consulting with an attorney?
9    A  I did.
10   Q  Okay.  And what was the basis of you
11 coming to that conclusion?
12   A  The exchange of funds in return for fair
13 treatment under not only Howard University's
14 policies, but also in my signature to accept the
15 university's offer that we would be in mutual
16 agreement of both my part as a student and
17 Howard's part as the university with me.
18     And also -- but primarily, the money in
19 exchange for fair treatment, not only holding them
20 accountable to their own university policies and
21 procedures, but as well as their duty to me in
22 Federal Title IX.

85

1    Q  Okay.  Well, are you saying that you came
2  to believe that Howard University had a
3  contractual obligation to provide you with fair
4  treatment?
5    **A  Yes.**
6    Q  And are you -- was it your understanding
7  that Howard University had a contractual
8  obligation to provide you with all the detailed
9  procedural provisions that are in Exhibit 100?
10      MS. NORRIS:  Objection; calls for
11 speculation.
12 BY MR. PRYWES:
13    Q  In other words, was it just a general
14 obligation of fair treatment, or did you come to
15 believe that Howard had to -- was contractually
16 bound to follow all the provisions in the policies
17 and procedures manual?
18    **A  The latter.**
19    Q  That Howard was required to pro- --- and
20 when did you come to that conclusion?
21    **A  This was during the course of the -- 2019.**
22    Q  Okay.  I thought you told me it was after

86

1  you were expelled that you came to that
2  conclusion.
3    **A  That was in 2019, yes, sir.**
4    Q  Okay.  So the only --
5    **A  I can't tell you exactly when in that**
6  **year.**
7    Q  So you only came to that conclusion after
8  you were expelled; is that right?
9    **A  Part -- in part, during -- or near the end**
10 **time, that --**
11    Q  Near the end?
12    **A  Yes.**
13    Q  So around when did you come to that
14 conclusion?
15    **A  I do not recall.  I do not recall exactly.**
16    Q  Okay.  Let's take a look at Exhibit 178.
17    **A  Sure.**
18    Q  And if you look at the first page after
19 the cover sheet, do you see there it says:  The
20 H-book is edited & published by the Office of
21 Student Life & Activities.  It serves as a general
22 source of information for the Howard University --

87

1  for the Howard University students.  The
2  information in the H-book should not be regarded
3  as a contract between the students and Howard
4  University.
5      Did you read that at the beginning of the
6  2018/19 year?
7    **A  I didn't read that phrase --**
8    Q  Okay.
9    **A  -- at the beginning of the year.**
10    Q  Did you ever -- have you ever read that
11 phrase?
12    **A  I have.**
13    Q  When did you read that?
14    **A  I do not recall.**
15    Q  Okay.  What does that language mean where
16 it says "the information should not be regarded as
17 a contract"?
18      MS. NORRIS:  Objection; calls for
19 speculation and a legal conclusion.
20 BY MR. PRYWES:
21    Q  You can answer.
22    **A  I don't know.**

88

1    Q  You don't know what that language means?
2    **A  I know what this language means, yes.**
3    Q  Well, what does it mean to you?
4    **A  It means that the information in the**
5  **H-book should not be regarded as a contract --**
6    Q  Okay.  Did you --
7    **A  -- with an asterisk --**
8    Q  Did you regard --
9    **A  -- next to it saying "except where**
10 **indicated" as well.**
11    Q  Where is that asterisk?
12    **A  The asterisk is after the word "contract."**
13 **And then if you skip below that --**
14    Q  Oh, okay.
15    **A  -- small paragraph, it -- "except" --**
16    Q  Except --
17    **A  -- "where indicated."**
18    Q  So did you find anywhere in this handbook
19 where it indicates that a provision should be
20 regarded as a contract?
21    **A  I don't recall.  I don't know.**
22    Q  Okay.  Let me ask you to take a look at

89

1 Page 15. And under Section 3 there -- which says
2 Administration of the Code?
3    **A Yes.**
4    Q Did you read this paragraph at some point?
5    **A I did.**
6    Q Okay. You see it says, in the second
7 sentence: In professional schools and colleges
8 that have adopted honor codes, the honor code may
9 supersede this Code?
10    **A Yes.**
11    Q Do you see that?
12    **A Yes, sir.**
13    Q So did you understand that the Howard --
14 that the honor code in Exhibit 100, the policies
15 and procedures manual, superseded in the honors
16 provisions in the student handbook?
17    **A Yes.**
18    Q Okay. At any time prior to your meeting
19 with Dr. Ford on February 26th, 2019, did you
20 believe that Dr. Ford did anything to indicate any
21 bias towards you on the basis of your gender?
22    **A No. No, sir.**

90

1    Q Okay. Dr. Ford's a woman, right?
2    **A She is.**
3    Q Do you believe that Dr. Ford was biassed
4 against you because of your gender?
5    **A Yes, I do.**
6    Q And what's your basis for saying that?
7    **A My basis for saying that is the treatment**
8 **with -- which I received from her as compared to**
9 **similarly situated male students.**
10    Q Okay. Which similarly situated male
11 students did she treat differently?
12    **A For example, _____,**
13 **a former classmate —**
14    Q Anyone else?
15    **A — fellow classmate. To my knowledge as**
16 **well, Mr. -- or Dr. -- he may be a doctor now --**
17 **_____, a former friend and**
18 **classmate as well of mine. An associate, close**
19 **associate, classmate.**
20    Q Did Dr. Ford ever make any comment that
21 you heard or observed where she said something
22 discriminatory about women?

91

1    **A No.**
2    Q In what way did Dr. Ford -- do you believe
3 Dr. Ford treated _____ differently?
4    **A I believe she _____ him an opportunity**
5 **to appear before the promotions and graduates**
6 **committee in person.**
7    Q And when was that?
8    **A I do not know.**
9    Q And who told you that -- about that?
10    **A _____ himself.**
11    Q Okay. Did you ever ask to appear in
12 person before the P&G committee?
13    **A I did not. I didn't know that that option**
14 **existed until I spoke with _____.**
15    Q Do you know if he asked --
16    **A I don't believe he did.**
17    Q But that's all -- you're getting that
18 information -- your only source of information is
19 from a conversation with _____ --
20    **A Yes.**
21    Q -- is that right?
22    **A Mm-hm. On that matter, yes, sir.**

92

1    Q Did you ever ask him if he had asked to
2 appear in person before the P&G committee?
3    **A I did ask him if he asked her that.**
4    Q And what did he say?
5    **A He said he didn't recall asking.**
6    Q Okay. He said he didn't recall asking?
7    **A He said he did not recall asking. He said**
8 **that was his recollection of —**
9    Q Okay.
10    **A — her options to him.**
11    Q Okay. And what else do you remember about
12 your conversation with _____?
13    **A I recall that he told me about some**
14 **personal medical history of his. We spoke about**
15 **that.**
16
17
18
19
20
21    **And he also told me about being**
22 **extended -- or him submitting an appeal in his**

93

1 case as well and -- at -- in brevity.
2     And he also relayed to me with e-mail
3 proof, correspondence that he had been offered an
4 opportunity to appear before the student grievance
5 committee to have his appeal heard and
6 adjudicated.
7    Q Okay. Do you remember anything else about
8 your conversation with him?
9    A It was general friendship conversation.
10 How are you?
11    Q Okay.
12    A How is your life going in _____?
13 Just friendly banter, aside from that --
14    Q Okay.
15    A -- but not of any relevance in my
16 opinion --
17    Q Okay.
18    A -- to this, no.
19    Q So you don't recall anything else, other
20 than friendly talk?
21    A Friendly talk.
22    Q Okay.

94

1    A And "happy birthdays."
2    Q So when you said something about an appeal
3 in his case, was that an appeal of the P&G
4 committee finding that you understood he was
5 referring to?
6    A I believe so, yes.
7    Q Did he say it was a P&G committee finding?
8    A I don't want to -- I would never want to
9 quote anybody verbatim, but the lead-in
10 conversation would suggest that, yes, that is what
11 he was referencing was a P&G appeal --
12    Q Okay.
13    A -- to my recollection.
14    Q Okay. Tell me about what information
15 you've obtained from _____
16    A I did not obtain any information from him
17 directly --
18    Q Okay. What did you --
19    A -- regarding how Dr. Ford may have treated
20 him differently than --
21    Q Have you received information from
22 _____?

95

1    A _____
2    Q _____
3    A _____ Yes, Dr. --
4    Q _____?
5    A Yes, sir.
6    Q What did she tell you?
7    A She told me that _____ -- that she and
8 _____ had a conversation on campus one day, and
9 in this conversation, he told her that he had
10 failed a course during, I guess, the regularly
11 scheduled -- or the on-season semester scheduled
12 course.
13      He failed a course and he took a retake
14 examination for the course and he failed that
15 retake examination and was subsequently placed in
16 summer school remediation for that course. And
17 upon completion of the summer school course, he
18 failed the final, and as a result of that, he was
19 dismissed by a committee that I believe to have
20 been the promotions and graduates committee,
21 although that is not the committee that he told
22 _____ he was dismissed by, but he was dismissed.

96

1      And he appealed that dismissal on the
2 basis that the professor who wrote the
3 examination, wrote the questions for the
4 examination, was not the lecturing professor for
5 the course.
6      And so that -- I'm -- I believe that that
7 discord -- he -- that was the basis of his appeal.
8 And upon submitting that appeal, he was
9 reinstated -- his appeal was granted and he was
10 reinstated.
11    Q Okay. Was this -- _____ was he a
12 repeating student?
13    A He was not.
14    Q And was _____ a repeating student?
15    A He was.
16    Q Okay. And do you know if he's a -- if he
17 ever graduated from Howard --
18    A Who?
19    Q -- school of medicine?
20    A Which one? Which of them?
21    Q _____
22    A _____ did not.

97

1    Q  Okay.  Do you know what Dr. -- did anyone
2 tell you what Dr. Ford's role was in the ▮▮▮▮
3 ▮▮▮▮ situation?
4    A  No.  Nobody told me what her role was, no.
5    Q  Is there any other basis that you have,
6 any other facts, that makes you believe that
7 Dr. Ford was biassed against you because of your
8 gender?
9    A  Not that I can recall at this time.
10    Q  You mentioned a SAP appeals -- special
11 academic performance appeal.  I --
12    A  Satisfactory, yes.
13    Q  Yeah.  I still don't understand what that
14 was.  What was your SAP appeal?
15    A  Okay.  So the SAP appeal is a -- it's an
16 appeal -- when a -- whenever a student comes back
17 from a leave of absence, they have to make a, I
18 guess, formal appeal to the university that they
19 will, I guess, try their best to do better
20 academically upon, in my case, rematriculation,
21 but, you know, I believe the undergrad has that as
22 well.  I don't want to speculate on that, but I do

98

1 believe they have a similar -- SAP appeal isn't
2 just for the medical school.
3        And when con- -- when doing the SAP
4 appeal, I had to consult this student handbook,
5 Exhibit 178, in part.
6    Q  Okay.  Did you file a SAP appeal?
7    A  I did.  That's what I had to file --
8    Q  Do you have a copy of that?
9    A  I don't have -- I do have a copy, but not
10 on my person.
11    Q  Okay.
12    A  I believe I have a copy.
13    Q  Where is that?
14    A  It might be in my e-mail, but I had to
15 submit it to Dr. Ford as well.
16        Dr. Ford had to see it.  I don't recall if
17 I sent that to her via e-mail, or if it was a hard
18 copy of that.  But as -- referencing an earlier
19 question, she was my academic advisor --
20    Q  Okay.
21    A  -- and so she had to sign off that she,
22 too, read and acknowledged my SAP appeal.

99

1    Q  Okay.  We'll check if we have that.
2    A  Okay.
3        MS. NORRIS:  And I know you asked for some
4 other documents earlier.  If you could just issue,
5 like, a formal, you know, request.
6        MR. PRYWES:  Okay.  Well, I'm going to ask
7 for it now, but I will follow up.
8        MS. NORRIS:  Under, like, the -- because
9 we want to make sure we're getting -- having the
10 right number of --
11        MR. PRYWES:  Okay.
12    Q  All right.  In the spring 2019 semester,
13 did you pay for your tuition all upfront at the
14 beginning of the semester?
15    A  I filed through FAFSA, so as far as I
16 could tell, yes.
17        Because to my knowledge, had I not, then I
18 would not have been permitted to continue the
19 semester.  But as far as when the federal
20 government delivered the aid to Howard on my
21 behalf, I don't know.
22    Q  After you submitted the challenge

00

1 questions --
2    A  Challenge responses.
3    Q  -- challenge response, did you pay any
4 tuition after that point in time?
5    A  Again, I don't know when the government --
6 I didn't deal direct --
7    Q  Okay.
8    A  I never wrote a personal check --
9    Q  Okay.
10    A  -- to Howard.  I paid for the education
11 through loans, and the loan server, Great Lakes,
12 whomever was the borrower -- I believe that was
13 who I borrowed it from -- paid it out according to
14 their payment schedule with the university.
15    Q  Okay.
16        MR. PRYWES:  Let's mark this document as
17 Exhibit 25.
18        MS. NORRIS:  These are interesting exhibit
19 orders -- order of exhibits.
20        (Whereupon Defendant's Exhibit 25 was
21 marked for identification.)
22 BY MR. PRYWES:

1    Q  Okay.  Is this a syllabus for the --
2  Structure and Function: Unit 2?
3    **A  Without looking through it all, it appears**
4  **to be; however, the copy I had was in black and**
5  **white.  It wasn't -- it --**
6    Q  Okay.
7    **A  That's minor.  I'm -- you know, I'm**
8  **just -- you know --**
9    Q  Okay.
10   **A  -- trying to be as complete as possible,**
11 **as thorough as possible.**
12   Q  Did you receive this syllabus at the
13 beginning of the Structure and Function: Unit 2
14 course?
15   **A  Yes, sir.  I would have --**
16   Q  Okay.
17   **A  -- received it at that --**
18   Q  I'm just going to refer to it as SF2.  Is
19 that okay?
20   **A  Yes, that's awesome.**
21   Q  Okay.
22   **A  I'll do the same.**

1    Q  Okay.  So did you read this when you got
2  it?
3    **A  Yes, sir.**
4    Q  And on Page 11 -- Page 10 to 11, it talks
5  about Professional Behavior and the Honor Code.
6  Do you see that?
7    **A  Yes, sir.**
8    Q  And do you see on the next page, 11, it
9  describes fabrication, and it says:  This includes
10 falsifying, manipulating, creating, enhancing, or
11 otherwise changing actual results in academic,
12 clinical, or research matters.
13     Do you see that language?
14   **A  Yes, I do.**
15   Q  So did you understand when you started
16 this course that it was not permitted for you to
17 alter exam questions on your score sheet?
18   **A  I --**
19   Q  After you submitted them.
20   **A  I never had access to the exam questions**
21 **prior to -- I never had access to the exam**
22 **questions.**

1    MS. NORRIS:  Objection --
2    THE WITNESS:  That was with the --
3    MR. PRYWES:  Well --
4    MS. NORRIS:  -- it calls -- like,
5  misstating testimony.  Like, she never said that.
6    MR. PRYWES:  Well, let me restate my
7  question.
8    Q  Did you understand at this point in time
9  that it was forbidden for you to alter --
10 physically alter an answer on an answer sheet --
11   **A  No.**
12   Q  -- and submit it with a request for a
13 higher grade?  Did you understand that that was
14 prohibited?
15   **A  Yes.**
16   Q  Okay.
17   MS. NORRIS:  Objection.  I don t think
18 that that was very clear, the questioning.
19   MR. PRYWES:  Well, you --
20   THE WITNESS:  It wasn t, I agree.
21 BY MR. PRYWES:
22   Q  Well, what was unclear about my question?

1    **A  It was unclear --**
2    MS. NORRIS:  Are you referring to the
3  challenge answers?  Or you referring -- what are
4  you referring to?
5    THE WITNESS:  That's --
6  BY MR. PRYWES:
7    Q  My question was did you understand at the
8  beginning of the course that it was not
9  permissible for you to change a grade -- change an
10 answer on an answer sheet and resubmit it with a
11 request for a higher grade?
12     Was that permitted or prohibited?
13   **A  I don't know.**
14   Q  You don't know?
15   **A  I don't know.**
16   Q  Okay.  Why don't you know?
17   **A  I don't know because I did not consult**
18 **with anyone prior to about that --**
19   Q  Okay.
20   **A  -- statement -- that question.**
21   MS. NORRIS:  Objection; she doesn't know.
22 Like --

05

1  BY MR. PRYWES:
2      Q  Did you --
3        MS. NORRIS:  -- she doesn't know.
4  BY MR. PRYWES:
5      Q  Did you believe at any time while you were
6  taking this course that it was permissible for you
7  to cheat on an exam?
8      **A  I knew that it was impermissible to cheat**
9  **on an exam.**
10     Q  Okay.  Did you cheat on any exam in this
11 course?
12     **A  No.**
13     Q  Okay.  And have you ever told anyone
14 you've cheated?
15     **A  No.**
16     Q  Had you ever apologized for cheating?
17     **A  No, sir.**
18     Q  And you don't believe you cheated?
19     **A  No, sir, I do not believe I cheated.**
20     Q  Okay.
21     **A  I did not cheat.**
22     Q  I've seen your interrogatory answers where

06

1  you stated that your -- there would have been no
2  point in you cheating on Lab Exam 3 because you
3  passed it, you passed that lab exam before making
4  alt- -- any alterations.  Do you remember that?
5      **A  I do recall.**
6      Q  If you scored higher -- if you got a
7  higher score than a merely passing score on Lab
8  Exam 3, wouldn't that have positively affected
9  your overall grade --
10     **A  No, sir.**
11     Q  -- in the course?
12     **A  No, sir, not —**
13     Q  Why not?
14     **A  — by my calculations.**
15         **Taking into account how much this exam was**
16 **worth.  And I was not — I did not borderline pass**
17 **this exam.  And by that, I mean I was not on the**
18 **cusp of an "unsat," which is a U — we're on a**
19 **three-letter grading scale, as I'm sure you know,**
20 **which is U for unsat, S for sat.  Anything 69.5**
21 **and above to —**
22     Q  Okay.

07

1      **A  — 84.5 is in the satisfactory range.**
2  **Anything 85 and beyond is an honors; it's an H.**
3      Q  Okay.
4      **A  So -- and that's for exam grades as well**
5  **as course grades.**
6      Q  Okay.  Isn't it true that at the time you
7  took the Lab Exam 3, the only grades you had in
8  this course were for Lab Exam 2 and Written
9  Exam 2, as you missed Lab Exam 1 and Written
10 Exam 1?
11     **A  I believe — I believe so.**
12     Q  Okay.  Isn't it true that you failed Lab
13 Exam 2 and you failed Written Exam 2?
14     **A  No, sir, I don't recall.**
15     Q  You don't recall that?
16     **A  I don't recall that, no.**
17     Q  So you don't recall being concerned when
18 you took Lab Exam 3 that you were so far failing
19 that course and were in jeopardy of being
20 academically dismissed?
21     **A  No, sir, I wasn't.  Because of the cum- —**
22 **the additive cumulative nature of the way in which**

08

1  the grades are determined.
2      Q  Okay.
3      **A  So — yeah.**
4      Q  So what was your understanding of the
5  cumulative way that grades are determined?
6      **A  May I use an example —**
7      Q  Sure.
8      **A  — to describe what I —**
9      Q  Sure.
10     **A  — mean?  Okay.  So, for example, on**
11 **Exam — on — for Exam 2, the lab for that was —**
12     Q  You're looking at Page 7?
13     **A  I'm — I'm sorry, yes.  I'm referring to**
14 **Page 7, yes.  That's the page we were on before?**
15     Q  Right.
16     **A  Okay.  Yes, sir.**
17         **So at the bottom where it denotes how much**
18 **each article is worth, or what have you, for**
19 **Exam 2, the lab exam, for example, if I would have**
20 **received a failing grade of 50 percent for that**
21 **test, I still would have gotten five percentage**
22 **points of the ten percentage points additive to my**

09

1  grade.
2       So it's percentagewise, so even had I made
3  a 50 percent -- because, I mean, you -- you're
4  saying that you have information about me failing.
5  I don't have that in front of me and I don't
6  recall that, but even with a failing grade, you
7  still receive some fraction of that percent --
8     Q  Right.
9     A  -- so --
10    Q  Okay.
11    A  -- no.  Yeah.
12    Q  So -- but as of the time you took
13 Exam 3, the only grades you had were failing
14 grades?
15    A  I do not recall that --
16    Q  Okay.
17    A  -- to be the case.
18    Q  And so you don't recall being concerned
19 when you took Exam 3 that your trajectory at that
20 time was towards failing the course, based on the
21 record so far?
22    A  No, sir.  I don't recall -- based on your

1     Q  Okay.
2     A  So....
3     Q  But sitting here today, you don't have any
4  grounds to dispute that those were your grades?
5     A  I dis- -- I do dispute that I was -- I
6  received a zero for Lab Exam 3 --
7     Q  Well, I understand that, but --
8     A  -- and I --
9     Q  -- I'm just talking about the two exams I
10 was referring to.
11    A  Oh, just the two that you were --
12    Q  Lab and Written Exam 2.
13    A  I don't have anything -- my own records to
14 compare with this --
15    Q  Okay.
16    A  -- to say yea or nay to that --
17    Q  Okay.
18    A  -- Mr. Prywes.
19    Q  So let's go back and look at the syllabus,
20 Exhibit 25, Page 7, that you were pointing to.
21    A  Okay.
22    Q  If -- let's say that you had scored an

0

1  previous question, I said I don't recall failing
2  those courses.  So I also -- that would follow
3  that I don't recall feeling worried about failing
4  an exam.
5       MS. NORRIS:  Objection, misstates her
6  testimony and misstates the record.
7       MR. PRYWES:  I'm sorry, I didn't hear you?
8       MS. NORRIS:  Objection; it misstates the
9  testimony and misstates the record.
10      MR. PRYWES:  Let's mark this as
11 Exhibit 130.
12      (Whereupon Defendant's Exhibit 130 was
13 marked for identification.)
14 BY MR. PRYWES:
15    Q  According to this document, your grade on
16 Lab 2 was 63.53, and your grade on Exam 2 was
17 62.80.  Those were --
18    A  Okay.
19    Q  -- do you have any reason to dispute those
20 grades?
21    A  I don't have my grades that -- the -- my
22 copy of it to compare.

2

1  80 on Lab Exam 3.  If you had scored a 100 on
2  Exam 3, didn't that potentially raise your overall
3  grade in the course at the end of the course?
4       MS. NORRIS:  Objection.  That calls for
5  speculation.
6  BY MR. PRYWES:
7     Q  You can answer.
8       MS. NORRIS:  Do you understand the
9  question?
10      THE WITNESS:  No.  That's why I --
11 BY MR. PRYWES:
12    Q  Well, you just mentioned --
13    A  -- didn't answer.
14    Q  -- that the grades were cumulative, right?
15    A  Additive --
16    Q  Right.
17    A  -- based off --
18    Q  Additive --
19    A  -- the cumulative nature --
20    Q  So at the end --
21    A  -- yes.
22    Q  -- of the course, you add up all your

7

1       MS. NORRIS: -- an objection. I m making
2 objections. You -- I ve let you ask your
3 questions. You can pause and let me make my
4 objections --
5       MR. PRYWES: Okay.
6       MS. NORRIS: -- and be respectful.
7       THE WITNESS: She asked me if I
8 understood. She -- I was in no way coerced or --
9 I was in no way coerced by her. She just simply
10 asked me if I understood your question.
11 BY MR. PRYWES:
12   Q Okay. Do you understand my question?
13   A No.
14   Q Okay. Let me try to phrase it as clearly
15 as I can: If you had scored a 78 on Lab Exam 3,
16 rather than, let s say -- assume 73, would that
17 increase your final cumulative grade for the whole
18 course?
19   A Not --
20       MS. NORRIS: Objection. Objection; asked
21 and answered. Objection; calls for speculation.
22 BY MR. PRYWES:

8

1   Q You can answer.
2   A Not to any degree -- no. No.
3   Q It wouldn't have affected it at all?
4   A It could have perhaps affected it.
5   Q Okay. So it could have been affected it,
6 right?
7   A Not by much.
8   Q Okay. But you were failing the course,
9 right? So you needed every point you could get,
10 right?
11       MS. NORRIS: Objection; misstates
12 testimony.
13 BY MR. PRYWES:
14   Q You needed every point you could get at
15 that point of time because you were in fear of
16 being dismissed for flunking that course --
17       MS. NORRIS: Objection
18 BY MR. PRYWES:
19   Q -- isn't that true?
20       MS. NORRIS: -- that misstates --
21 objection, that misstates testimony --
22 BY MR. PRYWES:

9

1   Q Isn't that true?
2       MS. NORRIS: -- misstates her testimony.
3       THE WITNESS: That's untrue.
4 BY MR. PRYWES:
5   Q Okay. How's it untrue?
6   A I was not in fear of that. I was not in
7 fear of failing the course.
8   Q Okay.
9       MS. NORRIS: Objection; badgering. Like,
10 this is -- I feel like this is badgering and
11 harassing.
12 BY MR. PRYWES:
13   Q Okay. So let me ask you about Lab Exam 3.
14 So you took that exam on January 28th, 2019; is
15 that right?
16   A To my knowledge, yes.
17   Q And it involves a cadaver with different
18 parts of the anatomy tagged; is that right?
19   A In part, yes, sir.
20   Q Okay. And then you walk around the
21 cadaver and the tags are numbered and you have to
22 write down what piece of the body that is; is that

20

1 right?
2   A In part, yes, sir --
3   Q Okay. What's --
4   A -- it is right.
5   Q -- the other part?
6   A The other part is it also involves
7 models -- plastic models or diagrams. It also
8 involves just standalone questions sometimes. And
9 it also involves interpretations of questions on
10 radiographs -- radiograph images, MRIs, CT scans,
11 the like. I mean, it's not only cadavers.
12   Q Okay. Okay.
13       MR. PRYWES: Let's mark this as
14 Exhibit 38.
15       (Whereupon Defendant's Exhibit 38 was
16 marked for identification.)
17 BY MR. PRYWES:
18   Q Okay. Is this -- are these your answers
19 for Lab Exam 3?
20   A To the best of my knowledge, yes.
21   Q Okay. And if we look at Question No. 14,
22 it says there anterior semicircular canal; is that

**2**

1 right?

2    **A Yes, sir.**

3    Q Now, when you were taking the exam, when

4 you handed in the exam, did it say anterior

5 semicircular canal?

6    **A Yes, sir.**

7    Q And had you originally wrote down

8 something else?

9    **A During the test?**

10    Q Yes.

11    **A I had originally wrote down posterior --**

12    Q Okay.

13    **A -- semicircular canal.**

14    Q And is this written in pen or pencil?

15    **A These exams are taken in pencil.**

16    Q Okay. And then -- so during the exam, did

17 you erase posterior and write down anterior?

18    **A Yes, sir.**

19    Q Okay.

20    **A During the exam.**

21    Q During the exam.

22    **A Mm-hm.**

**22**

1    Q And then you handed it in; is that right?

2    **A Yes.**

3    Q When you handed it in, were you aware that

4 the college of medicine had a practice of

5 photocopying answer sheets before returning the

6 work to the student?

7    **A I was, yes, sir.**

8    Q How were you aware of that?

9    **A We were told by the professors of the**

10 **course, to my knowledge. Yes.**

11    Q Okay. And what -- sitting here today,

12 what do you believe the correct answer was for

13 Question 14?

14    **A I believe that -- the professor gave us**

15 **his answer, which his -- the answer that he**

16 **disseminated to the class conveyed posterior.**

17 **That was Dr. Gilland.**

18    Q Okay. And --

19    **A Dr. Gilland conveyed that posterior was**

20 **the -- posterior semicircular canal was the**

21 **correct answer --**

22    Q Okay. And --

**23**

1    **A -- to the class. That's what he conveyed.**

2    Q -- do you believe that was the correct

3 answer?

4    **A I believe that that is what he -- I**

5 **believe that that is what he believed the correct**

6 **answer to be, yes.**

7    Q Well, what did you believe the correct

8 answer to be --

9    **A I --**

10    Q -- when you handed in the exam?

11    **A I was going back and forth in my head. I**

12 **second -- I was second-guessing myself between**

13 **posterior semicircular canal versus anterior, and**

14 **to me, the model was tagged in a way that made it**

15 **appear as though two -- the two different parts of**

16 **the diagram had markings on them. So....**

17    Q Okay. Well, did you decide at some point

18 that the correct answer was posterior?

19    **A I saw that that's what Dr. Gilland had**

20 **placed on his answer key. That his answer --**

21 **according to him, it was posterior.**

22    Q Okay. And then did you tell him that --

**24**

1 did you advise him that that was the correct

2 answer -- posterior was the correct answer?

3    **A Did I advise him?**

4    Q Did you write down that posterior

5 semicircular canal was the correct answer?

6    MS. NORRIS: When?

7 BY MR. PRYWES:

8    Q When you submitted your challenge.

9    **A That was about to be my question, yes,**

10 **sir. When?**

11    Q When you submitted your challenge.

12    **A Okay. Could you re- -- could you ask that**

13 **question again now that I --**

14    Q When you submitted your challenge, did you

15 write down that posterior was the correct answer?

16    **A I believe so, yes.**

17    Q Okay. So when -- so back in early

18 February 2019, you believe that posterior was the

19 correct question -- correct answer?

20    **A I con- -- I wished to consult**

21 **Dr. Gilland --**

22    Q Okay.

25

1    A -- about that.
2    Q  Okay.  All right.  So did you get your
3  answer sheet back?
4    A  I did get my answer sheet back.
5    Q  And was that on February -- on
6  January 30th, 2019?
7    A  To my knowledge, yes, sir.
8    Q  Okay.  And did you look over -- and when
9  did he post the answers?
10   A  I do not recall, but -- I don't want to
11 speculate.
12   Q  Okay.
13   A  I don't want to speculate on the -- I
14 don't know when he did it.
15   Q  Okay.
16   A  I do not know when he posted the answers.
17   Q  But when you got this back on
18 January 30th, Question 14 had been marked wrong;
19 is that right?
20   A  Yes.
21   Q  Okay.  And did you have a discussion with
22 him, Dr. Gilland, about your exam on February 1st?

26

1    A  I did.
2    Q  What'd you ask him?
3    A  I asked him how to go about writing my
4  challenge responses.  And I wished to explain to
5  him, you know, what I had explained to you just
6  now about the model being intact.  And I also
7  wished to discuss three other challenge responses
8  that I wanted to submit as well.  And I also
9  wanted to discuss with him the nature of the
10 placement of the appeal box, the appeal
11 receptacle --
12   Q  Well, tell me, to the best of your
13 recollection, what you said to him and what he
14 said.
15   A  Okay.  Well, I approached him -- if you
16 mind me describing the encounter?
17       I approached him shortly before a small
18 group learning session and I told him that I had
19 some -- a question, a concern, as to how to go
20 about writing my challenge responses.
21       And he told me, Okay.
22       And I asked him about the challenge box.

27

1    And I was attempting to go through my challenge
2  response or my questions that I had that I wanted
3  to submit, and he told me to just write them up
4  how I saw fit, and if he had any other problem or
5  if something -- issue he wanted to speak to me
6  about, then he would come to me.  And he told me
7  that he wasn't going to be placing the appeal box
8  out until sometime the following week.
9        And, I mean, he was very general --
10   Q  Okay.
11   A  -- and positive in nature at that point.
12   Q  Do you remember anything else about that
13 conversation?
14   A  No, sir, I don't think so.
15   Q  And did you actually tell him anything
16 about how you believed there were some answers
17 that did not reflect your knowledge?  Tell him
18 anything about that in that call -- in that en- --
19 meeting?
20   A  When I was speaking to him?
21   Q  Yeah.
22   A  Yes -- well, it wasn't a formal meeting.

28

1  It was, like, around -- kind of --
2    Q  Okay.
3    A  -- around a table like --
4    Q  What did --
5    A  -- we are.
6    Q  -- you tell him about your answers?
7    A  I just told him -- I don't --
8        MS. NORRIS:  Objection; asked and
9  answered.
10 BY MR. PRYWES:
11   Q  You can answer.
12   A  Yeah.  I mean, I don't recall the
13 specifics of what I stated with regards to each of
14 my four challenge responses, but I did convey to
15 him that I had second-guessed myself and it, you
16 know, appeared odd to me --
17       MS. NORRIS:  The time --
18       THE WITNESS:  -- for 14.
19       MS. NORRIS:  The time is now 12:20.  Do
20 you want to continue or -- right now --
21       MR. PRYWES:  Let's go off the record for a
22 minute.

29

1    MS. NORRIS: -- or take a lunch break?
2    THE COURT REPORTER: Sure. Allow the
3 videographer just one moment.
4    MR. PRYWES: Go off the --
5    THE VIDEOGRAPHER: All right. Off the
6 record at 12:21 p.m.
7    (Whereupon a recess was taken.)
8    THE VIDEOGRAPHER: Back on the record.
9 The time is 12:22 p.m.
10 BY MR. PRYWES:
11   Q  Okay. Did the exam sheet indicate how to
12 make challenges?
13   **A  In part, yes. Somewhat in --**
14   Q  What did the exam sheet say?
15   **A I don't have it in front of me to recall**
16 **specifics, but it did state a 48-hour rule on the**
17 **back that submissions --**
18   Q  Did it -- on the back of it?
19   **A  On the back of the actual sheet itself.**
20 **It's not on the back of this one, because it's the**
21 **copy, but on the original --**
22   Q  Okay.

30

1    **A  -- it was on the back. It was printed on**
2  **the same sheet -- on the same sheet that I handed**
3  **in on the 28th.**
4    Q  Okay. So let me show you what is the
5  original.
6    **A  Okay.**
7    MR. PRYWES: And I'm going to ask the
8  court reporter to very carefully mark this as
9  Exhibit 1.
10   (Whereupon Defendant's Exhibit 1 was
11 marked for identification.)
12 BY MR. PRYWES:
13   Q  So can you confirm that Exhibit 1 is --
14 the front page is the original score sheet, and
15 the reverse side of that document are the
16 instructions on how to make challenges, and then
17 below that, in your -- is your handwriting with
18 your challenges?
19   **A  I do not -- yes, to the front.**
20   **And for the back, I acknowledge that this**
21 **is the format to follow, but I don't acknowledge**
22 **that this is exactly how to go about make -- that**

3

1  these are instructions for how to go about making
2  **them.**
3    Q  Why don't you acknowledge that?
4    **A  I do not acknowledge that because this is**
5  **a format. This doesn't, you know, spell out all**
6  **the possibilities that participating -- or**
7  **submitting challenge responses could contain. I**
8  **mean --**
9    Q  Okay.
10   **A  -- I don't know how to answer that**
11 **question any --**
12   Q  So why would --
13   **A  -- differently, I'm sorry.**
14   Q  -- Dr. Gilland tell you to use whatever
15 form you saw fit, if the answer sheet itself had
16 instructions?
17   **A  He didn't tell me to use whatever format I**
18 **saw fit. He told me to write up my challenge**
19 **responses as I saw fit.**
20   Q  Okay. And so that's what you did, right?
21   **A  By following this format --**
22   Q  Okay.

32

1    **A  -- yes.**
2    Q  Now, before you had that conversation with
3  Dr. Gilland, had you filled out the reverse page
4  of Exhibit 1 with your challenges?
5    **A  No, sir.**
6    Q  Okay. When did you do that?
7    **A  I don't recall when I did it. I don't**
8  **recall when I did it --**
9    Q  Okay.
10   **A  -- but I know that I didn't have it done**
11 **prior to.**
12   Q  Okay. Can I see that for a second?
13   **A  Sure.**
14   Q  Let's treat it with care; it's already
15 ripping. So when you -- so you saw -- on
16 Exhibit 38, we saw the --
17   **A  On Exhibit --**
18   Q  -- original exam sheet, right?
19   **A  Okay.**
20   Q  That you got handed back. And it says --
21 on Question 14, it has the word "anterior," and
22 this one says "posterior." So my question to you

33

1  is how did you go about changing anterior to
2  posterior?
3  **A  I just -- to the best of my knowledge, I**
4  **just drew a P and an O over the original A and the**
5  **N.**
6      Q  So you wrote a P over the A; is that
7  right?
8  **A  Correct.**
9      Q  And then you wrote an O over the N?
10  **A  Yes.**
11      Q  And then did you sneak a little S in in
12  between?
13  **A  I wouldn't use the verbiage of "sneak."**
14 **I --**
15      Q  Well, did you squeeze it in there?
16  **A  I wrote an S, yes.**
17      Q  Okay.  And why didn't you just sort of
18  cross it out and write "posterior" on the side?
19  **A  I wrote it up how -- per the instruction**
20 **of Dr. Gilland --**
21      Q  Okay.  Dr. --
22  **A  -- to the best way I saw fit.**

34

1      Q  Did Dr. Gilland ever say that you should
2  alter what you write?
3  **A  Those were not his words --**
4      Q  No.
5  **A  -- no.**
6      Q  So you thought that what you did was
7  consistent with his instruction to you to write it
8  up as you saw fit?
9  **A  Yes, sir.**
10      Q  Okay.  It -- did you write over the A with
11 a P, and so forth, in order to conceal the fact
12 that you were making a change?
13  **A  No, sir.**
14      Q  And I understand your position is you were
15 making the change because you wanted to
16 demonstrate your knowledge; is that right?
17  **A  I wanted -- not to simply just demonstrate**
18 **my knowledge, but -- I don't want to just single**
19 **out 14 alone, because I was submitting four --**
20      Q  Okay.
21  **A  -- challenges, and so all of this is for**
22 **edification of --**

35

1      Q  Okay.
2  **A  -- the knowledge base.**
3      Q  So you weren't seeking a higher grade on
4  the exam?
5  **A  No, sir.**
6      Q  Okay.  Let's take a look at the other side
7  here, Page -- side 2 of Exhibit 1.
8  **A  Mm-hm.**
9      Q  And when we see the write-up for
10 Question 14 -- that's No. 2 there.  Do you see
11 that?
12  **A  Yes.  Yes.**
13      Q  And under B, it says: posterior
14 semicircular canal.  And under D, you wrote: My
15 answer was correct, yet marked wrong.
16      Okay.  So were you telling him -- were you
17 trying to communicate that your answer had been
18 posterior, but was marked wrong anyway?
19  **A  No, sir.**
20      Q  Well, why did you tell him your answer was
21 correct?
22      MS. NORRIS:  Do you have another copy of

36

1  this?  I don t have a copy of this in front of me.
2      MR. PRYWES:  Oh, I m sorry.
3      Let s mark this as Exhibit 39 so we have
4  it clear in the record.
5      MS. NORRIS:  Isn t it already marked 1?
6      MR. PRYWES:  Well, I don t want to -- I m
7  worried we re mis- -- we re --
8      THE WITNESS:  She could just --
9      MS. NORRIS:  It s the same exhibit, right?
10      MR. PRYWES:  Yeah, but it s getting
11 damaged.  So let s -- we ll have it here if she
12 wants to look at it.
13      MS. NORRIS:  Yeah.  I just -- it s not a
14 different --
15      MR. PRYWES:  Okay.
16      MS. NORRIS:  -- copy, right?  This is
17 the --
18      MR. PRYWES:  Okay.  Well --
19      MS. NORRIS:  -- same thing?
20      MR. PRYWES:  Yeah, it s the same thing.
21 I ve given --
22      MS. NORRIS:  Okay.  So --

37

1    MR. PRYWES: -- a copy of it.
2    MS. NORRIS: I don t know. Okay.
3    MR. PRYWES: So we ll do it that way.
4    MS. NORRIS: I mean --
5    MR. PRYWES: Okay.
6    MS. NORRIS: -- is this a different copy?
7 Like, is -- so this is the copy, and you re saying
8 the copy is a different exhibit than the original?
9 Is that what you re saying?
10    MR. PRYWES: This --
11    MS. NORRIS: Because we already marked
12 this as Exhibit 1, so --
13    MR. PRYWES: This is a copy of Exhibit 1.
14    MS. NORRIS: Yeah. So -- okay. So it
15 hasn t been altered?
16    MR. PRYWES: I haven t altered it.
17    MS. NORRIS: Okay. Just wanted to make
18 sure it s the same thing.
19    MR. PRYWES: Well, you re welcome to
20 review it.
21    MS. NORRIS: Because I was confused
22 because you marked it as Exhibit 1 -- this

38

1 Exhibit 1, and you re saying this a different
2 exhibit.
3    MR. PRYWES: Well, I was going to --
4    MS. NORRIS: So it s confusing.
5    MR. PRYWES: I agree it s confusing. Now
6 I ve tried to clarify it. This is a photocopy of
7 Exhibit 1.
8    MS. NORRIS: Okay.
9    MR. PRYWES: Okay?
10    MS. NORRIS: And so are you marking -- my
11 question is are you marking this as a different
12 exhibit --
13    MR. PRYWES: No. No.
14    MS. NORRIS: Okay. So it s Exhibit 1?
15    MR. PRYWES: Right --
16    MS. NORRIS: Okay. Got it.
17    MR. PRYWES: -- it s Exhibit 1.
18    Q Okay. So under item 2 there, it says: My
19 answer was correct, yet marked wrong.
20    You said your answer was correct. Which
21 answer were you referring to?
22    **A I was referring to No. 14.**

39

1    Q Okay. Were you referring to the original
2 answer sheet that you handed in, Exhibit 38, where
3 you wrote "anterior"? Were you telling him that
4 your original answer was correct?
5    **A No, sir. I was trying -- no, sir. I was**
6 **trying to convey my understanding of the model and**
7 **the diagram and the mixup with the tags in the**
8 **briefest most --**
9    Q Okay.
10    **A -- effective way I saw fit --**
11    Q Okay. So --
12    **A -- per Dr. Gilland at the time.**
13    Q So just to make clear: Your answer on
14 Exhibit 38 was not the correct answer?
15    **A Again, not according to the --**
16    Q Okay.
17    **A -- answer key that Dr. --**
18    Q Okay.
19    **A -- Gilland gave the class.**
20    Q And did you, in any -- you said it was
21 marked wrong. Did you indicate here in any way
22 that you had altered your original answer to

40

1 Question 14 --
2    **A No. I --**
3    Q Okay.
4    **A -- don't believe so.**
5    Q And then you wrote "recalculation needed."
6 What did you mean by that?
7    **A I was following the prompt at the top. I**
8 **was following the format at the top, what it says**
9 **for E.**
10    Q Okay.
11    **A E as in the E follows just --**
12    Q Okay. So you wanted your exam grade
13 recalculated; is that right?
14    **A No.**
15    Q Well, that's what E says: Recalculate
16 score. So you're writing "recalculation needed."
17    **A I was simply following the prompt, sir. I**
18 **was just simply following the format.**
19    Q Okay. Well, on some of these others, I
20 don't see recalculation as being requested. So I
21 don't see that in Question -- in item 1 there,
22 which refers to Question 8; I don't see that in

45

1    A  My testimony is that I did not commit an
2  act of academic dishonesty --
3    Q  Okay.
4    A  -- during the challenge period.
5    Q  Okay.  So why --
6    A  Had I cheated on the exam, as per what I
7  was -- what I -- what you -- what we read --
8    Q  Okay.
9    A  -- earlier, then my exam would have been
10  taken from me on January 28th during the
11  administration thereof, and it was not.  So I did
12  not cheat --
13    Q  Okay.
14    A  -- on this exam, nor did I commit any
15  academic dishonesty during the challenge period.
16    Q  Okay.
17    A  I passed this exam on the 28th of January
18  when -- I'm assuming when Dr. Gilland graded it.
19  It -- there was no -- there was nothing noted in
20  that, and I received the grade 46 out of 60 --
21    Q  Right.
22    A  -- back on Wednesday, January --

46

1    Q  Right.
2    A  -- 30th.  That is my testimony.
3    Q  So why didn't you tell Dr. Gilland that
4  you were not seeking a recalculation of your grade
5  when you wrote "recalculation needed"?
6        MS. NORRIS:  Objection; asked and
7  answered.
8  BY MR. PRYWES:
9    Q  I don't understand your answer.
10    A  What --
11    Q  Why did you write "recalculation needed"
12  if you weren't looking for a higher grade?
13    A  Again, I was following the format.
14    Q  Okay.  It was the format?
15    A  It was a format.  It was a format.
16    Q  What was there about the format that made
17  you write "recalculation needed"?
18    A  It's the format listed in E on Exhibit 1.
19  It says, E for "Other."  Example:  Recalculate
20  score.  Et cetera.  I was merely following the
21  format.
22    Q  It says Example:  Recalculate score.

47

1    A  Yes.
2    Q  So you wanted your score to be
3  recalculated, didn't you?
4    A  No, sir.  I did not require my score to be
5  recalculated because it would not have made a
6  difference even had I gotten all four.
7        It could -- I could only get a maximum of
8  six points added to my grade for this, going from
9  a 46 to a 47, which is approximately, I believe,
10  77 percent.  I believe; I did not --
11    Q  Well, you challenged --
12    A  -- calculate this, but --
13    Q  You challenged four questions --
14    A  -- 7 --
15    Q  -- right?
16    A  I'm sorry, sir, you're interpreting me.
17    Q  I'm sorry.
18    A  I'm sorry.  But 47 percent of -- or, I'm
19  -- I apologize.  77 percent of the overall
20  6 percent is not -- is where I'm at with my --
21    Q  Okay.
22    A  -- testimony --

48

1    Q  Okay.
2    A  -- so....
3    Q  All right.  Did you have Dr. Gilland's
4  e-mail address and telephone number?
5    A  I believe I had his e-mail address, yes,
6  sir.
7    Q  Did you ever send him an e-mail explaining
8  that you had made that change from your original
9  answer to the changed answer?
10    A  No, sir.  That would have gone against
11  the -- his advisement as per the February 1st
12  conversation that we had.
13    Q  So did you ever tell him -- did you ever
14  have a discussion with him about your answer to
15  No. 14?
16    A  Outside of my brief reference to him
17  regarding --
18    Q  Right.
19    A  -- it on February 1st?
20    Q  Right.
21    A  No, I haven't.
22    Q  Okay.

49

1     A  That's actually been one of my primary
2  issues with that -- with all of this.
3     Q  When you changed the A to a P and so
4  forth, were you -- did you erase anything with an
5  eraser?
6     A  That I don't recall.
7     But I wouldn't even call it a "change."  I
8  wrote it -- I wrote it in, like, over it.
9     Q  You wrote over the words that were there?
10  You wrote over --
11     A  I wrote over --
12     Q  -- anterior --
13     A  Yes.
14     Q  -- correct?  Okay.
15     A  I wrote over it.
16     Q  Okay.  Have you ever told anyone that you
17  did try to cheat?
18     A  No, sir.
19     Q  Have you ever told anyone that you accept
20  responsibility for trying to cheat?
21     A  No, sir.
22     Q  Have you ever apologized for trying to

50

1  cheat?
2     A  No, sir.
3     Q  Just before we take our break, I want to
4  be clear on something:  You wrote here "My answer
5  was correct, yet marked wrong."  Tell me what did
6  you mean by that?
7     A  I was conveying my understanding of the
8  model displayed on January 28th and what I
9  believed to have been an improperly or confusingly
10  tagged model and convey my second guess,
11  particularly against Dr. Gilland's answer key --
12     Q  Okay.
13     A  -- that he put out for students --
14     Q  So were --
15     A  -- to see.
16     Q  -- were you telling him that your answer
17  anterior was correct?  Is that what you were
18  trying to tell him?
19     THE WITNESS:  Did we answer this question
20  before?
21     MS. NORRIS:  I believe so.  I'm going to
22  object to that: answered --

51

1  BY MR. PRYWES:
2     Q  Well, you can answer.
3     MS. NORRIS:  -- asked and answered.
4  And --
5     MR. PRYWES:  I don't think we asked -- I
6  asked that exact question.
7     MS. NORRIS:  Can you restate the question?
8     MR. PRYWES:  Yeah.
9     Q  Did you -- when you wrote "my answer is
10  correct" were you meaning to tell him that your
11  answer "anterior" was correct, or that your
12  answer -- that the answer of "posterior" was
13  correct?
14     A  I was trying to convey that on the
15  physical diagrammed model, there appeared to be
16  both parts tagged.  And I did that in the briefest
17  form possible with Dr. Gilland's input and
18  advisement to write it up as I saw fit.  That is
19  my testimony.
20     Q  I'm just trying to understand, though,
21  were you telling him that your answer "posterior"
22  was correct, or were you telling him that your

52

1  answer "anterior" was correct?
2     MS. NORRIS:  Objection.  She --
3  BY MR. PRYWES:
4     Q  Which --
5     MS. NORRIS:  Asked and answered.
6     MR. PRYWES:  No, but she --
7     MS. NORRIS:  This is the same question.
8     MR. PRYWES:  She didn't answer the
9  question, that's why I'm repeating it.
10     Q  Which answer are you referring to there?
11     A  I was referring to the model appearing to
12  have each of these answers on them, sir.
13     Q  No.  It says "my answer was correct."
14  Which answer are you saying was correct --
15     A  I was saying --
16     Q  -- anterior or posterior?
17     A  I was saying that before I second-guessed
18  myself and placed "anterior," that "posterior"
19  seemed to have been more correct.  But I was
20  trying to convey my understanding -- or mixup on
21  the diagram itself, sir.
22     Q  Okay.

53

1    A  I was referencing post- -- the answer
2  "posterior," sir --
3    Q  Okay.
4    A  -- based --
5    Q  So when you wrote "my answer was correct,"
6  you were -- you meant to say my "answer
7  'posterior' was correct"?  That's what you
8  intended for him to understand, correct?
9    A  I intend for him -- the intention was for
10 us to speak on this if Dr. Gilland had an issue
11 with it.
12   Q  Okay.  But you intended him to understand
13 that your answer "posterior" was correct.  Am I --
14 is that right?
15   A  I intended him to understand that I
16 second-guessed myself --
17   Q  Okay.
18   A  -- and --
19   Q  I know this --
20   A  -- that was my intention.
21   Q  This shouldn't be so hard.  I'm just
22 trying to find out --

54

1    A  It's not hard, sir.  I --
2    Q  -- when you said "my answer was correct,"
3  which answer are you referring to, "anterior" or
4  "posterior"?
5    A  Sir -- I just said "posterior," sir.
6    Q  Okay.  That's fine.
7       MR. PRYWES:  Okay.  Why don't we take our
8  lunch break.
9       THE VIDEOGRAPHER:  Okay.  Off the record
10 at 12:46 p.m.
11      (Whereupon a recess was taken.)
12      THE VIDEOGRAPHER:  We are back on the
13 video record.  The time is 2:00 p.m.
14 BY MR. PRYWES:
15   Q  Good afternoon, Ms. Smith.
16   A  Good afternoon.
17   Q  I'll ask you to take a look at this,
18 Exhibit 1, and the back page there where it has
19 the practical challenge instructions and then your
20 writing on it.  Do you see there in bold black it
21 says things like "Sorry, but no"?
22   A  Yes, sir.

55

1    Q  Did you ever receive the -- this sheet
2  back from Dr. Gilland or anyone else with those --
3  where you could see those markings?
4    A  No, sir.
5    Q  Okay.
6    A  Well -- I apologize.  I never received it
7  back from Dr. Gilland, but I received a copy of
8  it, similar to what you gave Ms. Norris, like, a
9  copy of this, what you gave her, at the honor
10 council hearing that I had.
11   Q  Okay.  So at the honor council hearing,
12 you were shown Exhibit 1, the front and the back?
13   A  Yes, sir.
14   Q  Okay.
15   A  That had the --
16   Q  Okay.
17   A  -- "Sorry, but no."  But I never got it
18 back from Dr. Gilland.
19   Q  Okay.
20   A  Yeah.
21   Q  So I think we were talking about your
22 discussion with Dr. Gilland an February 1st, and

56

1  did you submit your challenges on February 6th,
2  2019?
3    A  To my knowledge, yes, sir.
4    Q  And how did you go about submitting it?
5    A  I placed it into the appeal box,
6  receptacle, whatever.
7    Q  Okay.  And did you have a discussion with
8  him on February 15, 2019, where you asked about
9  the status of your challenge?
10   A  Yes, sir.
11   Q  Okay.  What was discussed about your
12 challenge at that time?  What did you say?  What
13 did he say?
14   A  Well, I asked him about, you know,
15 feedback on my challenge, that, you know, I hadn't
16 received my challenge back.  And he was pretty
17 dismissive of it because of the other reason that
18 I approached him with my classmate.
19      And we also needed to -- "we" as in my
20 classmate and I needed to speak with Dr. Gilland
21 about taking a makeup exam that we had missed, and
22 so he was pretty disgruntled during this

57

1 encounter, but ultimately he just said, you know,
2 he wasn't focusing on, you know, my challenge
3 submission at that time; he wanted to schedule the
4 retake -- or not "retake." The makeup
5 examination --
6     Q  Was that --
7     A  -- that we had missed.
8     Q  Was that a makeup on exam No. -- Lab
9 Exam 4?
10    A  Yes, sir, the last one.
11    Q  Okay. And did he have to get another
12 cadaver to give you the makeup exam?
13    A  He didn't have to get another cadaver. We
14 just used whatever ones were already in the lab.
15 We didn't have to -- we did not have to dissect a
16 new body for that exam.
17        Did I answer your question?
18    Q  Yeah. I'm just trying to understand. Was
19 it a different body than you had used for Lab
20 Exam 3?
21    A  So -- okay. Can I make an explanation,
22 and then maybe our questions can both be

58

1 clarified? Or -- because I'm not sure.
2     Q  Can you answer --
3     A  So we use multiple bodies per test. We
4 use multiple cadavers for -- per exam. Multiple
5 cadavers are analyzed, what have you.
6        So for lab -- for this makeup lab exam, we
7 used just a -- not the full -- not all of the
8 bodies that we dissect in class, but we used a few
9 of them for this -- in this makeup exam.
10    Q  Okay. So --
11    A  Yeah.
12    Q  -- it wasn't a different body than you had
13 used before?
14    A  Now, that I don't recall if it was
15 literally a different --
16    Q  Okay.
17    A  -- body. Because we use multiple bodies
18 per exam. You know, I don't remember which human
19 body it was, you know. I....
20    Q  Okay.
21    A  Other than that, I don't think I
22 understand the question too well.

59

1     Q  Okay. On February 15th, did -- do you
2 remember any other discussion with Dr. Gilland
3 about your challenge?
4     A  Not other than what I just told you.
5     Q  Okay.
6     A  He didn't tell me anything else.
7     Q  Okay. So do you recall you had a meeting
8 with Dr. Ford on February 26th, 2019?
9     A  Yes, sir.
10    Q  And at that meeting, did she show you the
11 original answer sheet and -- which was Exhibit 38,
12 and did she show you Exhibit 1 at that time?
13    A  Yes, sir.
14    Q  She showed you both of them?
15    A  Yes, sir, to --
16    Q  And what did --
17    A  -- my recollection.
18    Q  -- she say about them?
19    A  She laid them out on the table before me
20 and just stated, like, You cheated on this paper.
21 Those were more or less her statements on that.
22    Q  Did you tell her that you had changed your

60

1 answer on No. 14 from the first one to the
2 challenge --
3     A  No, sir.
4     Q  -- version? You didn't tell her that you
5 changed your answer?
6     A  No, sir.
7     Q  Did you offer any explanation why the
8 answers were different to Question 14?
9     A  I told her that I -- well, I attempted to
10 explain to her that I had a conversation with
11 Dr. Gilland regarding my challenge responses prior
12 to, but she didn't allow me the opportunity to
13 elaborate on those, because she told me that I
14 would have to essentially settle that with the
15 honor council.
16    Q  And did she tell you anything about
17 getting a zero --
18    A  She told me --
19    Q  -- for that exam?
20    A  -- she'd be giving me a zero for this
21 exam. That's what she told me.
22    Q  And did she tell you that you'd have to go

6

1 to the honor council?
2     A  Yes, sir.
3     Q  Did she tell you what would happen if the
4 honor council exonerated you --
5     A  No, sir.
6     Q  -- to that zero?
7     A  No, sir.  She -- we didn't get into the
8 specifics of that, no, sir.
9         Referred me to -- any question that I
10 asked, she referred me to the policy manual.  And
11 she told me that she herself was not on the honor
12 council; she wasn't involved with the honor
13 council.  She told me that her responsibility was
14 to route things, was her quote.  Those were her
15 words.
16    Q  What did she mean "by wrap things up"?  Or
17 what did you understand --
18    A  Route, route.  Sir, I'm sorry.
19    Q  Oh, route things?
20    A  R-O-U-- yeah.
21    Q  Okay.  Okay.  And did she tell you that
22 she'd -- how she'd -- how she had obtained

62

1 Exhibit 1 and Exhibit 38?
2     A  No, sir.
3     Q  Okay.  Did you reach any conclusion how
4 she had obtained them?
5     A  At the time, I -- at the time, I believed
6 or speculated that she had received it from
7 Dr. Gilland, the proctoring instructor.
8         MS. NORRIS:  Objection; calls for
9 speculation.
10 BY MR. PRYWES:
11    Q  Okay.  Who proctored the examination?
12    A  Dr. Gilland.
13    Q  Okay.  Who was in charge of the course?
14    A  Drs. Wilson and Graff were the S&F2 unit
15 coordinators, and Dr. Gilland was the lab
16 coordinator.
17    Q  Under Howard's policies, who was -- was
18 there any definition about who could report
19 misconduct to the honor council?
20    A  Yes.
21    Q  Who?  Who could report it?
22    A  So anyone could report something that they

63

1 witnessed, but if you had knowledge of -- to --
2 this is to my knowledge.
3         If you have knowledge of any type of
4 discrepancy issue, infraction, whatever, then you
5 have a duty to report, and that person in -- if --
6 should he have felt necessary in that case, would
7 have been Dr. Gilland.
8     Q  When you met with Dr. Ford, did you tell
9 her that you had not done anything wrong?
10    A  I don't quite recall.
11    Q  Was there anything wrong with her giving
12 you -- well, let me strike that.
13        Did you deny at that meeting that you had
14 changed the answer to Question 14?
15    A  I do not recall affirming or denying that.
16    Q  At some point after that meeting, did you
17 seek out legal advice?
18    A  After the meeting with Dr. Ford?
19    Q  Right.
20    A  Yes.
21    Q  Okay.  When did you seek legal advice?
22    A  In March.

64

1     Q  March 2019?
2     A  Yes, sir.
3     Q  And who did you seek legal advice from?
4 I'm not asking what you said, but --
5     A  Right.
6     Q  -- who did you seek the advice from?
7     A  This was a family friend attorney, my
8 father's friend.  His name is Leon.  I don't
9 recall his last --
10    Q  Do you recall a last name?
11    A  -- name.  I don't.
12    Q  Okay.  Do you know if Leon has been asked
13 if he has any nonprivileged documents about your
14 situation?
15    A  No.  No, sir.  But I did not consult him
16 in the same way that I consulted Attorney Norris.
17 I consulted him regarding a mishap in the -- in --
18 a scheduling mishap made by the university.
19    Q  What kind of scheduling mishap?
20    A  Well, originally, my hearing -- my honor
21 council hearing, which ultimately took place on
22 April 16th, it had originally been scheduled for

**65**

1  April 1st, and there was a time conflict with an
2  unrelated makeup exam that Dr. Ford notified me of
3  via e-mail. And she -- I believe Dr. Wilson and
4  herself were involved in scheduling that makeup on
5  April 1st, and I also had the hearing scheduled
6  for April 1st.
7      Q  Okay. So at your request, the hearing was
8  postponed to April 16th, 2019 --
9      A  I --
10     Q  -- is that right?
11     A  Partially.
12     Q  What do you mean by "partially"?
13     A  I requested myself, you know, through this
14 family friend attorney, that one of -- these
15 things couldn't be on the same day, but I -- my --
16 I did not explicitly ask for it to be placed on
17 the 16th.
18        I just notified them, you know, through my
19 attorney and -- you know, that at that time, there
20 was a time con- --- there would have been no way I
21 could be at these two places at once. And so that
22 is what was conveyed.

**66**

1      Q  You were fine with having the hearing
2  rescheduled to April 16th, right?
3      A  I was fine --
4      Q  Okay.
5      A  -- with that at the time.
6      Q  And did you consult with Attorney Leon
7  about the charges of academic dishonesty?
8      A  No, sir.
9      Q  When is the first time you sought counsel
10 with respect to that issue?
11     A  It was later the same year of -- 2019.
12     Q  Was it after you'd been expelled?
13     A  Yes, sir.
14     Q  Okay.
15     A  Yes, sir.
16     Q  And who was that attorney?
17     A  Well, I contacted several law offices,
18 ultimately leading to my contract with my
19 attorney --
20     Q  Okay.
21     A  -- Ms. Norris now.
22     Q  Did you have any meetings with any other

**67**

1  attorneys before you met Ms. Norris?
2      A  I had a couple of consultations.
3      Q  Okay. Did you provide any of those
4  attorneys with documents?
5      A  No, sir.
6      Q  Okay. Let me show you a couple documents.
7         MR. PRYWES: We'll mark this as
8  Exhibit 80.
9         (Whereupon Defendant's Exhibit 80 was
10 marked for identification.)
11        MR. PRYWES: And -- okay.
12     Q  Let me ask about Exhibit 80. I'll come
13 back to that other document. Did you ever see the
14 e-mail here from Debra Ford to Clive Callender
15 dated March 11, 2019?
16     A  I did. I didn't see his response or
17 the --
18     Q  Okay.
19     A  Not this document in this way, no.
20     Q  Okay.
21     A  The bottom portion, yes.
22     Q  Okay. The bottom portion --

**68**

1      A  Yes.
2      Q  -- where it says 2. Ms. Michaela Smith?
3      A  To Ms. Michaela --
4         MS. NORRIS: Objection --
5         THE WITNESS: It doesn't say that.
6         MS. NORRIS: -- misstating the documents.
7  It doesn't say that.
8         THE WITNESS: Where does it say that?
9  BY MR. PRYWES:
10     Q  Do you see where it says --
11        MS. NORRIS: Oh, I think he means two --
12 BY MR. PRYWES:
13     Q  -- 2. --
14        MS. NORRIS: -- like, the number two.
15        THE WITNESS: Oh, the number two. Oh.
16 BY MR. PRYWES:
17     Q  The number two. And then it says
18 "Ms. Michaela Smith." Do you see that paragraph?
19     A  Yes.
20     Q  And --
21     A  Yes, I saw that.
22     Q  -- did you see that before you were

**69**

1  expelled?
2  **A Yes.**
3  Q And when did you see that?
4  **A I was given this on April 15th, per my**
5  **request the day before my honor council hearing.**
6  Q Okay. And the first sentence there says:
7  The student changed an answer on an anatomy lab
8  exam after the student's key for copy and return.
9      Was that statement correct? Is that a
10 truthful statement?
11 **A I — no.**
12 Q Why not?
13 **A I don't even know what that statement**
14 **means entirely, sir.**
15 Q Well --
16 **A I asked Dr. Ford to clarify that at the**
17 **honor council hearing. I don't know what that**
18 **statement, as written, means.**
19 Q Okay. Well, do you understand that she
20 meant "key" to be your answer sheet?
21 **A I would be speculating on —**
22 Q Okay.

**70**

1  **A — what someone else is writing meant.**
2  Q Okay. Well, did you attempt to get credit
3  after you changed the answer sheet?
4  **A No, sir.**
5  Q Okay. And then it says: The student
6  admitted to changing the answer sheet.
7      Did you admit to Dr. Ford that you changed
8  the answer sheet?
9  **A No, sir.**
10 Q Why didn't you?
11 **A She -- in my meeting with her on the 26th,**
12 **she laid out that she —**
13     MS. NORRIS: Objection. That calls for
14 speculation.
15 BY MR. PRYWES:
16 Q My question was why didn't you tell her --
17 did you tell her that you changed the answer
18 sheet?
19 **A No, I didn't.**
20     MS. NORRIS: Objection --
21 BY MR. PRYWES:
22 Q Okay.

**7**

1      MS. NORRIS: Objection; asked and
2  answered.
3      MR. PRYWES: Okay.
4      MS. NORRIS: Let's move on.
5  BY MR. PRYWES:
6      Q All right. So did you tell the hearing
7  council -- the honor council that you had changed
8  the answer sheet?
9  **A Partially.**
10     Q Okay. What's the partially yes and what's
11 the partially no?
12 **A I told the honor council that with respect**
13 **to Dr. Gilland, per the instruction and the**
14 **advisement of Dr. Gilland, I wrote my answer**
15 **choices of how I saw -- I'm -- not my answer**
16 **choices, my challenge responses how I saw fit.**
17     Q Okay. All right. Did you tell the honor
18 council meeting that you changed your answer to
19 Question No. 14 from the exam as originally
20 submitted to the answer "posterior" that was on
21 there when you submitted your challenge? Did you
22 tell them you made that change?

**72**

1      A Yes, sir.
2      Q Okay. So you did admit to changing the
3  answer sheet, at least to the honor council?
4      MS. NORRIS: Objection. She stated --
5  that s misstating testimony.
6      MR. PRYWES: Okay. All right. Okay.
7      Q So that was February 26th -- you had the
8  meeting with Dr. Ford February 26th. March 11th,
9  this e-mail was sent, but you didn t know about
10 it.
11 **A No, sir.**
12     Q On March -- what s the next time you heard
13 anything about an honor council or anything
14 regarding your exam?
15     MS. NORRIS: Objection. I don t think
16 that was her testimony.
17     MR. PRYWES: Okay.
18     Q Well, what s the next time --
19     MS. NORRIS: I couldn t actually hear all
20 that you were saying -- you re kind of mumbling --
21 and --
22     MR. PRYWES: Oh, I m sorry.

73

1      MS. NORRIS: -- I didn't get the question.
2  BY MR. PRYWES:
3    Q   Okay.  After February 26th, when's the
4  next time you heard anything about an honor
5  council meeting or anything relating to a charge
6  of academic dishonesty?
7    **A   From the dean's secretary, Ms. Diane**
8  **Thomas, in March.  I believe that to have been**
9  **March 22nd, to be exact.**
10     MR. PRYWES:  Okay.  Let me mark this as
11 Exhibit 81.
12     (Whereupon Defendant's Exhibit 81 was
13 marked for identification.)
14 BY MR. PRYWES:
15   Q   Looks like Dr. Ford, on March 22nd, 2019,
16 asked to meet with you.  Did you meet with her on
17 or about that day?
18   **A   On March 22nd?**
19   Q   Yeah.
20   **A   No.  No, sir.  No.**
21   Q   Did you --
22   **A   I didn't see this at the time.**

74

1    Q   You did not receive this?
2    **A   I didn't --**
3      MS. NORRIS:  Do you need some time to
4  review the document?
5  BY MR. PRYWES:
6    Q   Oh, go ahead.
7    **A   Okay.  Yes, sir.  The top e-mail in which**
8  **Dr. Ford says "I would like to meet with you today**
9  **to follow up on our discussion," I didn't see that**
10 **at this time.  This is my first time seeing --**
11   Q   Okay.
12   **A   -- her say that.**
13   Q   So you did not respond to that?
14   **A   I didn't respond -- I didn't see that.**
15   Q   Okay.
16   **A   But the bottom part -- well, you see my**
17 **response is --**
18   Q   Okay.
19   **A   -- indicated there.**
20   Q   All right.  So when you met with -- going
21 back a minute to your meeting with Dr. Ford on
22 February 26th, did she make you aware that there

75

1  were allegations against you of dishonesty?
2    **A   Yes, sir.**
3    Q   Okay.
4    **A   She also discussed a makeup exam with me**
5  **as well.  She --**
6    Q   Right.
7    **A   -- referenced a makeup exam with me as**
8  **well.**
9      MR. PRYWES:  Okay.  Let's mark this as
10 Exhibit 83.
11     (Whereupon Defendant's Exhibit 83 was
12 marked for identification.)
13 BY MR. PRYWES:
14   Q   Okay.  Did you receive this letter on or
15 about March 25th, 2019?
16   **A   May I review it?**
17   Q   Certainly.
18   **A   Yes, I received this.  I received this**
19 **from Ms. Diane Thomas --**
20   Q   Okay.
21   **A   -- via e-mail.**
22   Q   And did you understand that this honor

76

1  council complaint involved your answers on the
2  Laboratory 3 exam?
3    **A   Yes.**
4    Q   Okay.  Now, did -- in this time period,
5  did you receive a copy of Dr. Wilson's memorandum
6  to Dr. Ford?
7    **A   I received it along with this document.**
8    Q   Okay.  So that was on March 25th?
9    **A   To my recollection, yes.**
10   Q   Okay.
11   **A   It was via e-mail through Diane Thomas as**
12 **well.**
13   Q   Okay.
14     MR. PRYWES:  Okay let's mark this as
15 Exhibit 103.
16     (Whereupon Defendant's Exhibit 103 was
17 marked for identification.)
18 BY MR. PRYWES:
19   Q   So what we have here is an e-mail from
20 Diane Thomas to you dated March 27, 2019, and we
21 have attached that -- Dr. Wilson's letter of
22 February 19, 2019.

77

1      So did you receive that letter on or about
2  March 27, 2019?
3      MS. NORRIS:  Do you need time to review
4  the document?
5      THE WITNESS:  Yes, please.
6      Yes, sir, these e-mails and this document.
7  And also, just as a note, if you look at the top,
8  it falls in line with what I said was the original
9  date of my scheduled hearing at the top:  Monday,
10 April 1st.
11 BY MR. PRYWES:
12   Q  Understood.
13   **A  Yes, sir.**
14   Q  Okay.  So in between March 27 and
15 April 16, 2019, did you consult with any attorney?
16   **A  No, sir.**
17   Q  Did you do anything --
18   **A  Well, I'm -- I apologize.  March 2- --**
19 **that was the time frame -- other than Leon --**
20   Q  Yes.
21   **A  -- about that?  No.  No, sir.**
22   Q  Okay.

78

1      **A  This was the -- this, along with -- in**
2  **conjunction with the e-mail I received from**
3  **Dr. Ford and Dr. Wilson speaking about the makeup**
4  **exam I had to take on April 1st is what prompted**
5  **me to contact legal aid, is to say -- that's the**
6  **answer.**
7      Q  Okay.  Did this letter from Dr. Wilson --
8  did you consider that letter to be an accusation
9  of academic dishonesty?
10   **A  No.**
11   Q  Why not?
12   **A  I -- according to the policy, it was not a**
13 **formal allegation of academic dishonesty.**
14   Q  What did it -- what was it lacking?
15   **A  Well --**
16     MS. NORRIS:  Objection.  There's -- is
17 there an attachment to this?  You're saying
18 that --
19     MR. PRYWES:  Last page.
20     THE WITNESS:  This --
21     MS. NORRIS:  Oh, okay.
22     THE WITNESS:  -- last page.

79

1      MS. NORRIS:  I don't know if I have -- oh,
2  okay.
3      THE WITNESS:  It was from --
4  BY MR. PRYWES:
5      Q  Why do you say it was not a formal
6  allegation of academic dishonesty?
7      **A  Because it did not go from an accuser to**
8  **Dr. Clive Callender, the chair of the honor**
9  **council.**
10   Q  Okay.  And where --
11   **A  Per policy.**
12   Q  And where does it say in the policy manual
13 that it has to go directly to Dr. Callender?
14   **A  I cannot recall the exact --**
15   Q  Okay.
16   **A  -- page of that.**
17   Q  Okay.  But when you received this, was
18 there any doubt in your mind that you were being
19 accused of academic dishonesty?
20   **A  I did think that I was being accused of**
21 **academic dishonesty --**
22   Q  Okay.

80

1      A  -- yes.
2      Q  And what did you do between March 27th --
3  or what did you do between, actually, February 26,
4  2009 [sic], and April 16th, 2019, to prepare for
5  the honor's council hearing?
6      **A  I consulted the policies and procedures**
7  **manual, per Dr. Ford's advisement.**
8      **I wrote up -- drafted questions for**
9  **Dr. Gilland, the only person who I had a**
10 **conversation with regarding this matter, and the**
11 **proctoring professor.  I drafted questions for**
12 **him.**
13     **I sought out information regarding the**
14 **honor council process from Ms. Diane Thomas, who**
15 **did not answer -- or could not answer my questions**
16 **that I had.**
17     **I spoke with Dr. Rose regarding the makeup**
18 **of the honor council, specifically -- more**
19 **specifically, the student quorum of the honor**
20 **council.**
21     **And -- that's all I can recall --**
22   Q  Okay.

**8**

1    A -- at this point.

2    Q  Did you ever ask Dr. Gilland to be present

3  for the honor's council hearing?

4    A  No, sir.

5    Q  Did -- in advance of the hearing, did you

6  ever tell anyone that you wanted Dr. Gilland to be

7  present?

8    A  No, sir.

9    Q  Had Dr. Gilland been present at the honor

10 council hearing, what would you hope that he would

11 say?

12    MS. NORRIS:  Objection; calls for

13 speculation.

14    THE WITNESS:  That would have -- that

15 would cause for me to speculate.  I don't --

16 BY MR. PRYWES:

17    Q  Okay.  Well, you said you prepared

18 questions for him?

19    A  I did.

20    Q  What were you going to ask Dr. Gilland if

21 he had been at the honor's council hearing?

22    A  About his recollection of our

**82**

1  conversations in February --

2    Q  Okay.

3    A -- that we mentioned earlier, and the

4  contents thereof.

5    Q  So you would have asked him to confirm

6  your testimony about what was discussed on

7  February 1 and February 15th; is that right?

8    A  In part, yes, that is correct.

9    Q  What else would you have asked him about?

10    MS. NORRIS:  Objection; calls for

11 speculation.

12 BY MR. PRYWES:

13    Q  Well, what other questions did you have?

14    A  I don't recall.  It's been --

15    Q  Okay.

16    A -- some time since I made that document,

17 since I've typed the document.

18    Q  Did Dr. Gilland ever give you permission

19 to change an answer on the answer sheet?

20    A  Not explicitly, no.

21    Q  Did he give you permission some other way

22 to change an answer?

**83**

1    A  He told me to write my challenge responses

2  how I saw fit.

3    Q  And so if you saw fit to alter an answer,

4  did you think that would be fine with Dr. Gilland?

5    A  I believed that had something been wrong,

6  that he would have come to me.

7    Q  Okay.  That wasn't my question.  My

8  question was --

9    MR. PRYWES:  Could you read my question

10 back, please?

11    (Whereupon the pending question was read.)

12    THE WITNESS:  Under these circumstances,

13 yes.

14 BY MR. PRYWES:

15    Q  Okay.  Why is that?

16    A  Because I had a conversation with him

17 prior to submitting my challenge responses in

18 which he told me to write my answers how I saw

19 fit.

20    Q  Okay.  So you --

21    A  And he -- and I submitted those answers

22 and never received any feedback that was contrary

**84**

1  to that.  And he had also told me on February 1st

2  that if he had an issue, that he would reach out

3  to me --

4    Q  All right.

5    A -- and that never happened regarding any

6  of this.

7    Q  So apparently he did have an issue, right?

8  Because it was reported up the chain, right?

9    A  I don't know.

10    MS. NORRIS:  Objection; calls for

11 speculation.

12 BY MR. PRYWES:

13    Q  Okay.  Did you form an advocacy team to

14 help you with -- get prepared for your hearing?

15    MS. NORRIS:  Objection; asked and

16 answered.

17    MR. PRYWES:  No, I didn't ask that.  I

18 asked her about an attorney.  Now I'm asking

19 about --

20    Q  Did you form an advocacy team --

21    A  My father was my advocacy team.

22    Q  Okay.  Did your father ever tell you that

**85**

1 he thought you were wrongfully expelled?
2   A  Could you repeat that?
3   Q  Did your father ever tell you that he felt
4 you were wrongfully expelled?
5   A  Yes.
6   Q  Okay.  When did he tell you that?
7   A  After I was wrongfully expelled.
8   Q  Okay.  Did he explain why?
9   A  Yes, sir.
10  Q  Why?
11  A  It's -- that's in the Complaint, sir.
12  Q  Okay.
13  A  Those are the reasons why, sir.
14  Q  Okay.
15  A  Dr. Gilland's absence, first and foremost
16 from this entire process --
17  Q  Okay.
18  A  -- the university's concealment of
19 Dr. Gilland during this entire process; the unfair
20 treatment of me in regards to male students during
21 this process; Dr. Mighty's inactions or wrongful
22 actions in the denial of my student grievance

**86**

1 committee appellate rights; Dr. Ford's nepotic
2 actions during the course of this time; and a host
3 of other reasons, including but not limited to,
4 Philise Williams's improper appearance at my
5 honor council --
6   Q  Okay.
7   A  -- hearing.
8   Q  Okay.  Let's -- we're going to discuss
9 some of those things.  So, first of all, did you
10 have a meeting with Dr. Rose on or about
11 April 11th?
12  A  I don't know the exact date.
13  Q  Well, did you have a meeting with him
14 shortly before the hearing council --
15  A  Yes.
16  Q  -- meeting?
17  A  Yes.  Yes, sir.
18  Q  And what was discussed there?
19  A  It was discussed -- the student quorum on
20 the honor council.  And I requested that -- I
21 requested a copy of the honor council members --
22 or the honor council panelists.

**87**

1       I'd also like to make a note that I'd
2 actually requested that of Diane Thomas prior to
3 this, but she could -- she told me, according to
4 her, she could not -- she didn't know that
5 information, she could not supply me with that
6 information, because she was not a member of the
7 honor council.  But she herself never produced
8 that for me, either.  I got it from Dr. Rose.
9   Q  Okay.  Did you ask him any questions about
10 the honor council meeting that was coming up?
11  A  I asked him about the quorum of students
12 part, yes, sir.
13  Q  Okay.  Anything else?
14  A  To -- that I recall at this time, no.
15 That was the most important --
16  Q  Okay.
17  A  -- aspect of it.
18  Q  Did you tell him that you wanted
19 Dr. Gilland to attend the hearing?
20  A  No, sir.  I didn't tell --
21  Q  Okay.
22  A  -- him that.

**88**

1   Q  Let's look at Exhibit 114.
2   A  Do we have that?
3       MS. NORRIS:  Not yet.
4       THE WITNESS:  Oh.
5       (Whereupon Defendant's Exhibit 114 was
6 marked for identification.)
7 BY MR. PRYWES:
8   Q  Okay.  Is this the e-mail that Dr. Rose
9 sent you with a member -- roster of the honor
10 council membership?
11  A  To my recollection, yes --
12  Q  Okay.  Now, did --
13  A  -- this is correct.
14  Q  -- he tell you that all the people listed
15 on this roster would be attending?
16       MS. NORRIS:  You can take a minute to
17 review if you want to actually review the document
18 before answering questions.
19       THE WITNESS:  You asked did he tell me
20 that all would be present --
21 BY MR. PRYWES:
22  Q  Yeah.

89

1  A -- on here?
2  Q Yeah.
3  A No, sir.  He didn't tell me that all these
4  students would be present -- or all these ind- --
5  all these people would be present, rather.
6  Q Did he tell you what would happen if any
7  of the MS-3 or MS-4 students were unavailable?
8  A No, sir, he didn't.
9  Q Okay.  So you mentioned Philise Williams.
10 Was she a fourth-year student?
11 A Yes.
12 Q Did anyone ever tell you that she was
13 acting as vice chair of the honor council
14 committee that met with you?
15 A Not prior to me -- not prior to
16 April 16th, no, sir.
17 Q Well, on April 16th, did anyone tell you
18 she was -- explicitly tell you that she was acting
19 as vice chair?
20 A That's what I was told, that she was the
21 MS -- well, I was told that she was the MS-4
22 student --

90

1  Q Okay.
2  A -- member.  And per the policy, the MS-4
3  student member has the role of the vice chair.
4  Q Okay.  But did anyone explicitly tell you
5  that she was serving as the vice chair?
6  A That was heavily implied --
7  Q Okay.
8  A    so, yes, sir.
9  Q But no one ever said that?
10 A No one ever said that explicitly.
11 Q Okay.
12 A But it was heavily implied.
13 Q Okay.  Do you know how Philise Williams
14 came to serve on the honor council committee
15 hearing?
16 A No.
17 Q Okay.  Do you know whether there'd be
18 anything wrong with the dean's office appointing
19 her if other students were unavailable?
20 A Could you repeat -- I don't understand the
21 question.
22 Q Do you know -- do you understand whether

9

1  it would be permissible for the dean's office to
2  appoint her to the meeting if the other students
3  were unavailable?
4  A I don't believe that to be permissible,
5  no.
6  Q Okay.  Why not?
7  A Because there is no permissibility clause
8  in the policy.
9  Q So what is the univers- -- what is the
10 school of medicine to do if there aren't enough
11 students available?
12     MS. NORRIS: Objection; calls for
13 speculation.
14 BY MR. PRYWES:
15 Q Well, do you have an opinion on that?
16 A So this is my opinion?
17 Q Yeah.
18 A In my opinion, due to the integral nature
19 of the vice -- the fourth-year vice chair's
20 position as the co-investigator, per the policy,
21 this is an individual who should have been
22 involved in this process well before April 16th.

92

1     And it is my opinion that this person
2  involved should have been given -- the name of
3  that person involved should have been given to me
4  when I went to the dean of student affairs just
5  days before, if she wasn't available.
6     Furthermore, it is also my opinion that if
7  these are the -- there's -- since there was no
8  flexibility in these names, or no asterisk
9  notation given to me by the dean of student
10 affairs, it is my opinion that the college of
11 medicine should find a day that would have worked
12 for either Gabe Felix or ▮▮▮▮▮▮▮▮ in that
13 case.
14 Q Okay.  So let's take a look at this list
15 that's on the second page of 114, and I want to
16 ask you --
17 A It's on --
18 Q -- Dr. Kimberly Richardson, is that a
19 woman?
20 A I don't recall.  I didn't --
21 Q Okay.
22 A -- know Dr. --

**93**

1   Q  Do you have any reason to believe that
2  Kimberly Richardson was biassed against you
3  because of your gender?
4   A  No, sir.
5   Q  Let's look at Dr. Carla Williams.  Do you
6  have any reason to believe that Carla Williams was
7  biassed against you because of your gender?
8   A  No, not directly.
9   Q  Let's look up at Dr. Dex- -- well, do you
10 have any reason to believe that any of these
11 faculty members that are listed on this roster
12 were biassed against you because of your gender?
13  A  Dr. Clive Callender, yes.
14  Q  Okay.  What about any of the others?
15  A  No, sir.
16  Q  Do you believe that Sachin Rajpal was
17 biassed against you because of your gender?
18  A  Yes, sir.
19  Q  Okay.  Why do you think he was biassed
20 against you because of your gender?
21  A  Because he did not contact me -- as the
22 secretary -- as the MS-3 secretary of the honor

**94**

1  council, he never contacted me relating to any of
2  these allegations or I never had any
3  correspondence with him prior to the --
4  April 16th.
5   Q  Okay.  Is there any other reason you think
6  he was biassed against you based on gender?
7   A  No, sir.  That's --
8   Q  Okay.  Did you ever hear Sachin Rajpal
9  make any kind of biassed comment about women?
10  A  No, sir.
11  Q  Dr. Callender, did you ever hear him make
12 any biassed comment about women?
13   MS. NORRIS: Objection.  Didn't she say
14 that she, like, didn't think there was any reason
15 that any of the other people had any -- so why are
16 we still asking about specific people?
17   MR. PRYWES: She made an exception for
18 Dr. Callender.
19   MS. NORRIS: Yeah, for Dr. Callender.
20 Yes.
21   MR. PRYWES: Right.  That's what I'm
22 asking about.

**95**

1    MS. NORRIS: Okay.  I mean, you're asking
2  about other people as well there, so --
3    MR. PRYWES: And now I'm asking about
4  Dr. Callender.
5    MS. NORRIS: Okay.
6  BY MR. PRYWES:
7   Q  Okay.  So did Dr. Callender ever make any
8  discriminatory or biassed remarks in your presence
9  or that you heard about?
10  A  Not in my presence or that I heard about,
11 no.
12  Q  Okay.  And what is your basis for
13 believing that he had a gender bias against you?
14  A  Because I believe that the way in which I
15 was notified of the true nature of the charges the
16 day before the hearing on April 15th was
17 unprecedented.
18  Q  Okay.  Actually, you were notified of the
19 charges on February 26th, 2019, weren't you?
20  A  I was never given any formal charges from
21 any -- I was never given any letter that went to
22 Dr. Callender until --

**96**

1   Q  Okay.
2   A  -- I saw Dr. Ford's e-mailed letter to
3  him --
4   Q  Okay.
5   A  -- from March 11th.  But I did not receive
6  it March 11th.  I did not receive knowledge of
7  that short letter, or what have you --
8   Q  Okay.
9   A  -- until April 15th.
10  Q  And you had received, on March 27th, the
11 charge of dishonesty, didn't you?  That Dr. Wilson
12 had signed.
13  A  That did not go to Dr. Callender --
14  Q  Okay.
15  A  -- so that is not the -- a formal
16 allegation, sir.
17  Q  You were fully aware for a month -- at
18 least a month and a half before your hearing of
19 what the nature of the charges were against you,
20 weren't you?
21  A  Dr. Ford's letter stands in contradiction
22 to Dr. Wilson, sir.

97

1    Q  How is Dr. Ford's e-mail in contradiction
2  to Dr. Wilson?  If you want, you can --
3    **A  Well, ultimately, I --**
4    Q  -- compare --
5    **A  -- don't understand what Dr. Ford's letter**
6  **means, sir.**
7    Q  Okay.
8    **A  I don't bel- -- I don't know if it's a**
9  **typo, but she stated that I changed the answer**
10 **key.**
11   Q  All right.
12   **A  That's what she stated, and that is --**
13 **that's something completely different.**
14   Q  Have you read --
15   **A  But Dr. Gilland did not state anything.**
16   Q  Have you read Dr. Ford's explanation that
17 by "answer key," she meant answer sheet?
18       MS. NORRIS:  Objection.  Where -- like,
19 where is that?  I don't understand what you're
20 referring to.
21       MR. PRYWES:  I'm asking her if she's aware
22 of that.

98

1        THE WITNESS:  I have not received that.
2  BY MR. PRYWES:
3    Q  You never saw that?
4    **A  I've never received that, no.**
5    Q  Okay.  So is that the only respect in
6  which you believe that Dr. Ford's March 11th
7  e-mail is incorrect?
8        MS. NORRIS:  Objection.  Can you restate
9  the question?
10       THE WITNESS:  I'm confused.
11 BY MR. PRYWES:
12   Q  Take a look at Exhibit 80, please.
13   **A  Exhibit 80?**
14   Q  Eighty.
15   **A  Okay.**
16   Q  Did you understand that this was an
17 accusation of academic dishonesty?
18   **A  That it was a -- that it was an allegation**
19 **of --**
20   Q  Yes.
21   **A  -- academic dishonesty?**
22   Q  Yes.

99

1    **A  Yes, I understood that.**
2    Q  Okay.  Do you believe that Philise
3  Williams was biassed against you because of your
4  gender?
5        MS. NORRIS:  Objection.  She already
6  answered that.
7        MR. PRYWES:  I don't think I asked her
8  that.
9        MS. NORRIS:  You asked her if anyone on
10 the list -- oh, I guess she wasn't on the list.
11 Okay.  Yeah, she wasn't on the list.  Okay.
12       THE WITNESS:  You're right, she wasn't.
13 BY MR. PRYWES:
14   Q  Do you believe that Dr. Philise Williams
15 was biassed against you because of your gender?
16   **A  I believe -- yes.**
17   Q  Why do you say that?
18   **A  Because she wouldn't have participate --**
19 **wrongfully participated in this hearing if not.**
20   Q  So she discriminated against you by
21 agreeing to participate and appear at the hearing?
22   **A  Yes.**

200

1    Q  Why was that discriminatory?
2    **A  Because she wasn't supposed to be there.**
3    Q  Okay.  Well, if she wasn't supposed to be
4  there, does that mean it was discriminatory for
5  her to be there?
6    **A  If she hadn't -- not been there for anyone**
7  **else and she was only -- she only agreed to be**
8  **there, you know, for me.**
9    Q  Okay.
10   **A  I don't know how she got there, sir.**
11   Q  Okay.
12   **A  To the other question:  I don't know what**
13 **led to her being there.**
14   Q  Okay.
15   **A  I think you asked that earlier.**
16   Q  Okay.  Do you have any other basis for
17 believing that Dr. Philise Williams, a woman, was
18 biassed against you based on your gender?
19   **A  No, sir.**
20   Q  Okay.  And forgive me, but Dr. Callender,
21 other than him not giving you -- not arranging for
22 you to receive that March 11 document before

20

1 April 15th, was there anything else he did that
2 made you believe that he was biassed against you
3 because of your gender?
4    **A  Yes.**
5    Q  What?  What was that?
6    **A  He allowed a student who was not a part of**
7 **this quorum to be a part of my hearing.**
8    Q  Okay.  Was there -- and that's
9 Dr. Williams?
10   **A  Philise, yes.**
11   Q  Okay.  Is there anything else he did that
12 made you believe he was biassed against you based
13 on your gender?
14   **A  He never gave me or required that the**
15 **secretary give me the formal disposition of my**
16 **honor council hearing, which to date I have not --**
17   Q  Okay.
18   **A  -- received from him.**
19   Q  Okay.  Is there anything in the policies
20 and procedures manual that requires that you be
21 given the honor's council's minutes?
22   **A  Not that I recall.**

202

1    Q  Okay.
2    **A  Not the honor council minutes.**
3    Q  And isn't it true that Dr. Callender did
4 inform you of the findings of the HCC committee?
5    **A  He did not inform me of the findings.**
6    Q  Didn't Dr. Mighty inform you?
7    **A  Inform me of what?**
8    Q  The findings of the honor's council
9 committee.
10   **A  That is what he stated to me in a June --**
11 **in his June 12th letter --**
12   Q  Okay.
13   **A  -- yes.**
14   Q  So you were told the results of the honor
15 council meeting?
16   **A  By the improper party of Dr. Mighty, yes.**
17   Q  Why is Dr. Mighty an improper party?
18   **A  Because the office of the dean was tainted**
19 **with him telling me about the outcome of the**
20 **disposition of the honor council.**
21   Q  I don't understand that at all.  Why was
22 the office of the dean tainted by him telling you

203

1 what the honor council committee had recommend --
2 had decided?
3    **A  Because in -- further on in that June 12th**
4 **letter -- I don't know if you have it available --**
5    Q  I'll get it for you in a second.
6    **A  -- but --**
7    MS. NORRIS:  Do you need it?  Do you want
8 to look at it to refresh your memory?
9    THE WITNESS:  He can give it to me, but
10 I'm pretty certain of what I'm speaking on as it
11 pertains to --
12   MS. NORRIS:  Yeah.  It might make sense
13 to, like, actually look through the document and
14 see how --
15   THE WITNESS:  Okay.
16   MR. PRYWES:  Let me give it to you.  Give
17 me a second.
18   THE WITNESS:  Okay.
19   MR. PRYWES:  Let's mark this as
20 Exhibit 163.
21   (Whereupon Defendant's Exhibit 163 was
22 marked for identification.)

204

1 BY MR. PRYWES:
2    Q  Okay.  Did you receive this, Exhibit 163,
3 a letter from Dean Mighty in mid-June 2019?
4    **A  May I have a moment to review it?**
5    Q  Mm-hm.
6    **A  Yes.  To my knowledge, that is a copy of**
7 **this document.**
8    Q  Okay.  And in the second paragraph, he
9 told you of the outcome of honor council
10 committee --
11   **A  He did.**
12   Q  -- finding, right?
13   **A  He did.**
14   Q  And is there anything in the policy manual
15 or procedures that entitled you to some other kind
16 of notice on the results?
17   **A  In it -- yes.**
18   Q  What -- could you point it out to me?
19   **A  I could try to find it, if you would allow**
20 **me a moment to go through it, but I can --**
21   Q  Why don't you tell me to the best of your
22 recollection?

205

1     A  Okay.
2     MS. NORRIS:  Wait, sorry.  What was the
3 question?
4     MR. PRYWES:  The question is did the
5 policy manual provide for any other kind of notice
6 besides this.
7     MS. NORRIS:  Besides --
8     THE WITNESS:  The --
9     MS. NORRIS:  -- the June 12th, 19 -- 2019,
10 letter?
11     MR. PRYWES:  Mm-hm.
12     MS. NORRIS:  Any notice regarding -- a
13 notice of what?
14     MR. PRYWES:  The outcome of the honor's
15 council committee.
16     THE WITNESS:  Yes.
17 BY MR. PRYWES:
18     Q  Okay.
19     **A  It required that notification come from**
20 **the honor council chair, be it personally or --**
21 **personally is the only thing I recall, actually.**
22 **Personally from him.  That it come from the chair**

206

1 of the honor council.
2     Q  Okay.  Take a look at Exhibit 100, and
3 particularly Page 37 to Page 38.  Does it say
4 anywhere there that you're to receive the results
5 of the honor council committee findings or
6 recommendations directly from the honor council?
7     MS. NORRIS:  Sorry, which page was that?
8 101?
9     MR. PRYWES:  Thirty-six to thirty-eight.
10     THE WITNESS:  Thirty-six to thirty-eight?
11 BY MR. PRYWES:
12     Q  You can look at Page --
13     **A  I thought you said --**
14     Q  -- 37.
15     **A  -- 37.**
16     Q  I said 37, but you can look at whatever
17 pages you want.
18     MS. NORRIS:  Okay.  So we're looking at
19 the pages.  And was there a question there?
20     MR. PRYWES:  Yeah.  You know, she knows
21 the question.
22     MS. NORRIS:  Do you need clarification on

207

1 the question?
2     THE WITNESS:  You can give clarity, since
3 it s taken us a moment and we had the 37 and --
4 BY MR. PRYWES:
5     Q  The question is does it say anywhere here
6 that a respondent is entitled to notice of the
7 honor council committee s findings directly from
8 the honor s committee?
9     **A  Let me look.**
10     MS. NORRIS:  Take your time, if you need
11 to read through it.
12     THE WITNESS:  Thank you.
13     MS. NORRIS:  We re just looking at
14 Page 36?  Is that what we re looking at?
15     MR. PRYWES:  You can look at whatever
16 pages you want, but I m refer -- I m pointing
17 specifically to Pages 37 and 38.  But if she can
18 find the answer elsewhere, please do so.
19     MS. NORRIS:  Do you want her to read the
20 whole thing?  Because she can read the whole
21 like, if you want her to read the whole thing,
22 then take the time to read the whole policy

208

1 manual.  But, you know, she should have --
2     MR. PRYWES:  Well, there s only one
3 section --
4     MS. NORRIS:  -- have time to review it.
5     MR. PRYWES:  There s only one --
6     MS. NORRIS:  If you want her to review one
7 page, then that s one thing.  But if you want her
8 to review the whole thing, it might take a --
9     MR. PRYWES:  Well, why don t we take a
10 break, and she can look at anything she wants.
11 The section on the honor s committee is -- begins
12 on Page 32, I believe, and she can look between
13 there and Page 38.
14     MS. NORRIS:  This is -- okay.  I mean,
15 this is a hundred -- this is a hundred -- like,
16 almost a hundred-page document.
17     MR. PRYWES:  Yeah, I know.
18     MS. NORRIS:  So that could maybe take her
19 a few hours to read.
20     MR. PRYWES:  Why doesn t she look at
21 Pages 32 to 38.
22     MS. NORRIS:  Okay.  She can read --

209

1    MR. PRYWES:  I know you're just trying to
2 be helpful.
3    MS. NORRIS:  I'm trying to be helpful?
4    MR. PRYWES:  Yeah.  I know you're just
5 trying to be helpful.
6    MS. NORRIS:  No.  I'm trying to be
7 realistic about how much she can read in a certain
8 amount of time.
9    MR. PRYWES:  Well, she's made an
10 allegation, and I'd like to know the basis for her
11 allegation.  So I'm happy to sit here and wait for
12 her to review it.
13    MS. NORRIS:  Did you want to take a break
14 or?
15    MR. PRYWES:  That's fine.  We can take --
16 we can go off the record.
17    THE VIDEOGRAPHER:  Okay.  Off the record
18 at --
19    MR. PRYWES:  And we'll go back on the
20 record when she's reviewed it.
21    THE VIDEOGRAPHER:  Okay.
22    MS. NORRIS:  And then if you want a break,

210

1 we can also take another break if you want after
2 that because this is not a break for you.
3    MR. PRYWES:  It's 3:05.
4    THE VIDEOGRAPHER:  Off the record, 3:05.
5    (Whereupon a recess was taken.)
6    THE VIDEOGRAPHER:  Back on record.  The
7 time is 3:27 p.m.
8 BY MR. PRYWES:
9    Q  We took a 20-minute or so break, and I
10 believe you were going to look at the policies and
11 procedures manual and see if you could find any
12 statement there that entitled you to receive the
13 results of the honor council committee's findings
14 directly from the honor's committee.  Did you find
15 any such language in the manual?
16    A  Not in the 20 minutes that I had allotted.
17    Q  I'm sorry, could you --
18    A  Not in the --
19    Q  -- speak up?
20    A  Not in the 20 minutes that I took.
21    Q  Okay.
22    A  But I do have a limited time here, like,

2

1 in D.C., to look, so, I mean, I would --
2    Q  Okay.
3    A  -- prefer -- you know, I didn't find it in
4 the 20 minutes that I looked --
5    Q  Okay.
6    A  -- but from my recollection --
7    Q  Okay.
8    A  -- it was in the policy.
9    Q  Will you let me know in the -- if you find
10 that?
11    A  In the future?
12    Q  Yeah.
13    A  I will.
14    Q  Thank you.  Okay.  I think we're talking
15 about a communication you had with Dr. Callender
16 on April 15th.
17    MS. NORRIS:  And just to clarify:  You can
18 talk to me to tell him.  Like, you don't talk to
19 him directly.
20 BY MR. PRYWES:
21    Q  Yes.  You don't --
22    A  I know.

22

1    Q  Don't call me.
2    MS. NORRIS:  She's represented through
3 counsel.
4 BY MR. PRYWES:
5    Q  Yes.  Don't call me.
6    MS. NORRIS:  So -- just I didn't think you
7 were implying that; that would be improper.  So I
8 didn't you think you were implying that, but just
9 wanted to make that clear for her as well.
10 BY MR. PRYWES:
11    Q  Okay.  So we were talking about a
12 conversation you had with Dr. Callender on
13 April 15th.
14    A  Okay.
15    Q  Was that meeting or a conversation?
16    A  It was a conversation.
17    Q  Telephone?
18    A  Yes.
19    Q  Okay.  Did you --
20    A  April 15th, correct?  Is that April 15th?
21    Q  April --
22    A  Okay.

**23**

1     Q  -- 15th. Was your father on that call,
2 too?
3     **A  My father was not on the call. He was in**
4 **the vicinity of me when the call took place. He**
5 **was next to me when the call took place.**
6     Q  Did he hear both sides of the call?
7     **A  He did.**
8     Q  Okay. And at that time, did you -- what
9 did Dr. Callender say about you -- your notice of
10 the charges against you?
11     **A  He told me to come get them. I should**
12 **have received them a while ago and to go get them**
13 **from Diane Thomas's office, the dean's secretary's**
14 **office.**
15     Q  And that's when you got the March 11th --
16     **A  Yes, sir.**
17     Q  -- e-mail? Now, was there anything that
18 surprised you in that e-mail?
19     **A  It was.**
20     Q  What surprised you?
21     **A  Well, let me also reiterate that I only**
22 **received this portion of that. You know, I didn't**

**24**

1  **receive this e-mail, but, you know --**
2     Q  You're -- the part that says --
3     **A  I didn't receive Dr. --**
4     Q  The part that says "academic dishonesty"?
5     **A  Yes.**
6     Q  Paragraph 2?
7     **A  Yes.**
8     Q  Right.
9     **A  That -- I was shocked because it was in**
10 **stark contradiction to Dr. Wilson's**
11 **February 19th -- what -- what is that?**
12     Q  In what way was it contradictory to
13 Dr. Wilson's letter?
14     **A  She accused me of changing the answer key.**
15 **It was a completely new statement.**
16     **And furthermore, the -- I could barely**
17 **understand or interpret what she was implying in**
18 **the first sentence of that article, lowercase A,**
19 **of academic dishonestly.**
20     Q  Okay. Did you tell Dr. Callender that you
21 wanted to call Dr. Gilland as a witness?
22     **A  Could I -- I'm sorry, before I answer that**

**25**

1  question, could I also make another note of this,
2 also?
3     Q  Sure.
4     **A  So --**
5     Q  What document are you referring to?
6     **A  This is Exhibit 80 still.**
7     Q  Eighty-two?
8     **A  Eighty, 80.**
9     MS. NORRIS: Exhibit 80.
10 BY MR. PRYWES:
11     Q  80?
12     **A  Yes, the e-mail. Yes, sir.**
13     **So whenever -- when I received this**
14 **document, I just want to also note that there was**
15 **a -- what appeared to be a handwritten notation on**
16 **it that said "sent 3, backward slash, 25."**
17     Q  Mm-hm.
18     **A  That was on this as well.**
19     MS. NORRIS: When you received it?
20     THE WITNESS: When I received it from
21 Diane Thomas --
22 BY MR. PRYWES:

**26**

1     Q  Okay.
2     **A  -- this portion of it, there was a**
3 **notation on it that said -- I mean, I could**
4 **demonstrate it with a utensil, if you want -- or**
5 **if --**
6     Q  I think we have that -- we've produced
7 that somewhere. I don't have it with me.
8     **A  Okay.**
9     Q  But -- okay. I understand that.
10     All right. Let's go to your -- back to
11 your conversation with Dr. Callender.
12     **A  Yes.**
13     Q  Did you tell him you wanted to call
14 Dr. Gilland as a witness?
15     **A  No, sir.**
16     Q  Okay. Did you ask him to arrange for
17 Dr. Gilland to be at the hearing?
18     **A  No, sir.**
19     MS. NORRIS: Objection. She's already --
20 asked and answered.
21 BY MR. PRYWES:
22     Q  Okay. So let's go to the hearing on

27

1 Exhibit -- on April 16th.
2 Okay. When you went to the hearing, did
3 you notice that Philise Williams was there?
4 **A Yes. But I didn't know her personally --**
5 Q Did you know --
6 **A -- at that time.**
7 Q -- she was a student?
8 **A At the hearing? She was introduced as a**
9 **student.**
10 Q Okay. And did you object to her presence
11 there?
12 **A No.**
13 Q Okay.
14 **A I didn't know that that was possible to do**
15 **so.**
16 Q And who went with you to the hearing?
17 **A My father was there with me. He wasn't at**
18 **the hearing for its entirety, though. Was not**
19 **permitted to be.**
20 Q At the hearing, did you apologize for any
21 problem you had created?
22 MS. NORRIS: Objection; misstates

28

1 testimony.
2 BY MR. PRYWES:
3 Q At the hearing, did you apologize for any
4 problem you had created?
5 **A I apologized, perhaps, for this**
6 **misunderstanding, and I believed that it was**
7 **unfair that Dr. Gilland was not at my hearing. I**
8 **may have apologized for his absence.**
9 Q Okay. Did you ever -- did you hand out
10 agenda points?
11 **A I did.**
12 Q And do you have copies of those?
13 **A No. Not currently, no.**
14 Q Did you have them on your computer?
15 **A At one point, I believe they were on my**
16 **father's computer.**
17 Q Okay. So have you searched your father's
18 computer for anything relating to this litigation?
19 **A No. I don't even know that he has the**
20 **same computer, sir.**
21 Q Okay. What makes you think that your
22 agenda points were on his computer?

29

1 **A Because I vividly recall us going to the**
2 **library, and me doing not only -- not only writing**
3 **or typing up agenda points, but I also recall**
4 **using a library computer to type up questions for**
5 **Dr. Gilland specifically.**
6 Q Okay. So you typed up questions on the
7 library computer for Dr. Gilland?
8 **A The questions for Dr. Gilland, yes, sir.**
9 Q And you typed up your agenda points on a
10 li- -- on your father's computer?
11 **A Yes, sir.**
12 Q So why didn't you type them up on the
13 library computer?
14 **A I don't recall why.**
15 Q Okay. So have you asked your father to
16 allow you to look at his computer to look for
17 documents relating to this dispute?
18 **A No, sir.**
19 Q Okay.
20 MR. PRYWES: We would ask that that review
21 be undertaken.
22 MS. NORRIS: If you could, just ask Anna.

220

1 MR. PRYWES: Yeah.
2 Q Is there anyone else's computer which may
3 contain documents relating to this dispute?
4 **A No.**
5 Q At any point in the hearing, did you admit
6 that you had tried to cheat?
7 **A No.**
8 Q Did you admit at any time that you had
9 acted in violation of the honor code?
10 **A No.**
11 Q Did you express any remorse for trying to
12 cheat?
13 **A No.**
14 Q Okay.
15 MS. NORRIS: Objection; answered -- asked
16 and answered.
17 BY MR. PRYWES:
18 Q Did you say that you changed the answer to
19 Question No. 14 out of sheer astonishment?
20 MS. NORRIS: Objection; misstates
21 testimony.
22 MR. PRYWES: Well, I'm not -- it's a

22

1   question.
2       Q  Did you say to the hearing panel that you
3   had changed the answer out of sheer astonishment?
4       **A  I don't have those minutes in front of me**
5   **to attest to that.**
6       Q  Do you recall --
7       **A  I don't recall that.**
8       Q  You don't recall that.  What did Dr. Ford
9   say at the hearing?
10      **A  I don't have those minutes to attest to**
11  **that fully, what she stated.**
12      Q  I'm asking you for your memory.
13      **A  From my memory, she stated that she**
14  **received a letter from Dr. Wilson.  And she**
15  **stated -- or I recall her speaking to calling me**
16  **in to talk with her.  And I believe she**
17  **mentioned -- she referenced, you know,**
18  **Dr. Wilson -- Dr. Wilson's, I guess, position and**
19  **his letter.  And she mentioned that she forwarded**
20  **her thoughts in her -- in an e-mail, I suppose, to**
21  **Dr. Callender.**
22      **But that's -- that part is speculative,**

222

1   **because I believe she was referencing her own**
2   **March 11th letter at that time.**
3       Q  Okay.  So after you got your exam back
4   from Dr. Gilland on January 30, did you continue
5   to attend classes?
6       **A  Yes, sir.**
7       Q  Did you ever attempt to meet with
8   Dr. Gilland after what -- after February 15th
9   about your challenge questions?
10      **A  No, sir.  His disposition on the 15th --**
11      Q  Did you --
12      **A  No.**
13      Q  -- decide not to meet with him because of
14  financial and dire academic problems you were
15  facing?
16      **A  Could you ask that question again?**
17      Q  Yeah.  Were you experiencing financial and
18  dire academic problems that semester?
19      **A  I was experiencing financial problems in**
20  **the -- no, not in that semester.  I experienced**
21  **the academic problems --**
22      MS. NORRIS:  Objection; compound.

223

1       THE WITNESS:  I experienced the academic
2   problems in the spring -- the prior spring
3   semester.
4   BY MR. PRYWES:
5       Q  Okay.  At the hearing, did you bring up
6   any procedural objections?
7       **A  I made an attempt -- I recall making an**
8   **attempt to.**
9       Q  What procedural objections did you want to
10  bring up?
11      **A  I -- well, I did mention that Dr. -- that**
12  **I believe that Dr. Gilland's absence was unfair to**
13  **me.**
14      **And I wanted to bring up the discrepancies**
15  **with the timeline of events, the procedural**
16  **timeline of these events.  I believe that that was**
17  **a part of my agenda points, and I recall that**
18  **because Dr. Callender did not permit me to get**
19  **through all of my speaking points.**
20      Q  Well, did you start addressing some of
21  these issues?
22      **A  I started addressing some of my speaking**

224

1   **points, but not all of my speaking points were**
2   **referencing procedural issues.**
3       Q  Well --
4       **A  I believe --**
5       Q  -- were you --
6       **A  -- to my recollection -- I'm sorry -- one**
7   **of my speaking points was "bring up procedural**
8   **issues."**
9       Q  Okay.
10      **A  Additional procedural issues.**
11      Q  Did you actually bring any up?
12      **A  Dr. Callender did not permit me to, beyond**
13  **what I had stated regarding Dr. Gilland.**
14      Q  What did he say?
15      **A  I don't recall verbatim what he said, but**
16  **it was to the effect of, No, we're going to**
17  **convene; we've been here long enough.**
18      Q  Okay.  Well, did you bring up any -- was
19  it your intention to bring up any issue when you
20  spoke about Philise Williams?
21      **A  Not at that time.**
22      Q  Okay.  Was it your intention to bring up

225

1 any issue about not receiving a charge of
2 misconduct directed to Dr. Callender?
3     A  Yes.
4     Q  Okay.  And what were -- what was the other
5 timeline issues that you had wanted to bring up?
6     A  In part, it was the 21 days, excluding
7 weekends, to the best of my knowledge from looking
8 through the policy.
9        Also, not -- having not been in
10 correspondence regarding the honor council matters
11 with the third-year student acting as secretary.
12 I think that was Mr. Rajpal -- Mr. Sachin.  I
13 wanted to -- I would have addressed that as well.
14     Q  Any other issues that you wanted to bring
15 up but did not have the opportunity to bring up?
16     A  I can't recall at this time.
17     Q  Okay.  Had you raised any of those
18 procedural issues with Dr. Callender when you
19 spoke to him the prior day?
20     A  No, sir.
21     Q  Why not?
22     A  I believed I would have the opportunity to

226

1 do so the following day when my hearing was
2 actually scheduled, as he said in his -- or as he
3 promised -- appeared to have promised to me in his
4 letter summoning me before the honor council.
5     Q  Okay.  On April 15th, did he tell you
6 you'd be able to raise procedural objections the
7 next day at the hearing?
8     A  No, he did not tell me that.
9     Q  Okay.  Okay.  Let's move on.  Did you meet
10 with Dr. Ford on May 21, 2019?
11     A  I apologize.  Just one moment.
12        Yes, sir.  I just wanted to add an
13 additional note in reference to my previous answer
14 on Page 83.
15        MS. NORRIS:  For Exhibit 83?
16        THE WITNESS:  Exhibit 83, sorry.
17 BY MR. PRYWES:
18     Q  Yes?
19     A  Yes.  So he did not tell me, as you
20 stated, that I would be able to bring up
21 procedural objections the following day, but he
22 did tell me, in the second part after he states,

227

1 "Please report to the hearing room at least five
2 minutes before," he told me that I may bring any
3 evidence that I had to the hearing, and then did
4 not allow me to present the evidence that I
5 brought to the hearing.
6     Q  Okay.  What evidence about the charges of
7 misconduct did you bring to the hearing?
8     A  I brought evidence of the procedural
9 errors that --
10     Q  Okay.
11     A  -- related to the charges of my hearing.
12     Q  Did you bring any materials relating to
13 the actual charge that you had done something
14 dishonest?
15     A  No.
16     Q  Okay.
17     A  But I perceived it -- I perceived any
18 evidence that I had as any that I had.
19     Q  Okay.  So did you meet with Dr. Ford on
20 May 21, 2019?
21     A  To my recollection, yes.
22     Q  Did you have any communication with anyone

228

1 about the honor's council hearing or proceedings
2 or any charge of academic misconduct between the
3 April 16, 2019, hearing and the meeting with
4 Dr. Ford on May 21, 2019?
5     A  To my recollection, it was just my father
6 at that point.
7     Q  Okay.  What did -- what was discussed
8 between you and Dr. Ford on May 21?
9     A  My -- it was discussed of her bringing my
10 name before the promotions and graduates
11 committee.
12     Q  Okay.  Had she told you that you had
13 failed the course?
14     A  Yes, in an e-mail.  According to her, I
15 had failed the course.
16     Q  And what did you discuss about that at the
17 meeting?
18        MS. NORRIS:  Objection.  It's ambiguous.
19 BY MR. PRYWES:
20     Q  What did you discuss about that at the
21 meeting?
22     A  What did I discuss about?

229

1    Q   Yeah.  About the -- failing the course.
2  She told you you'd failed the course.  What did
3  you discuss about that?
4    **A   She discussed my grades on each of my**
5  **exams, both written and practicums; she gave me --**
6  **she read out my grades according to how she had**
7  **them documented; and she stated to me, with**
8  **regards to the course that she claimed that I**
9  **failed, that I should go -- she encouraged and**
10 **advised me to go speak with Dr. Wilson so that**
11 **perhaps I could, along with him -- he could find**
12 **some points somewhere to boost me over for that.**
13   Q   Was she trying to be helpful in that
14 respect?
15   **A   I don't believe so, no.**
16   Q   Okay.  And did she tell you that the
17 matter would be going to the P&G committee?
18   **A   Yes, sir.  That's what I previously**
19 **stated.**
20   Q   Okay.  And I think we went over this
21 before, but just to cl- -- to be clear:  You did
22 not ask to appear in person before the P&G

230

1  committee?
2    **A   I did not.**
3    Q   Okay.  What --
4    **A   I did not know -- I was not aware of that**
5  **as an option.**
6    Q   Okay.  And what is -- in your
7  understanding was the function of the promotions
8  and graduation committee?
9    **A   To my understanding, their function was to**
10 **determine whether or not students could be**
11 **promoted to the next year or clerkship or -- et**
12 **cetera.**
13   Q   Okay.  Did that committee have, to your
14 understanding, any role in determining whether you
15 had engaged in academic dishonesty?
16   **A   I don't believe that was the scope of**
17 **that --**
18   Q   Okay.
19   **A   -- committee -- to my knowledge, that was**
20 **not the scope of the committee.**
21   Q   Okay.  Did you submit a written letter for
22 the P&G committee?

23

1    **A   I did, yes, sir.**
2    Q   Okay.
3        MR. PRYWES:  Let mark this as Exhibit 140.
4        (Whereupon Defendant s Exhibit 140 was
5  marked for identification.)
6  BY MR. PRYWES:
7    Q   Is this the letter you sent to the
8  promotions and grad- -- grad- -- promotions and
9  graduations committee?
10       MS. NORRIS:  Do you need a minute to
11 review it?  Some time?
12       THE WITNESS:  Yes, please.
13       MS. NORRIS:  I think she needs some time
14 to review it before you ask questions about it.
15       MR. PRYWES:  Right now I m just asking
16 if this is --
17       MS. NORRIS:  I don t think she s reviewed
18 it, so I don t know that she knows.
19       MR. PRYWES:  Well, she can take the time
20 and --
21       MS. NORRIS:  Okay.
22       MR. PRYWES:  No one s rushing her.

232

1        MS. NORRIS:  Okay.
2        MR. PRYWES:  Take the time to review it --
3        MS. NORRIS:  Okay.
4        MR. PRYWES:  -- and that'll be my
5  question, if this is her --
6        MS. NORRIS:  Okay.  Okay.  Great.
7        THE WITNESS:  Yes, I submitted this.
8  BY MR. PRYWES:
9    Q   And did you submit this before May 28th?
10   **A   Yes.**
11   Q   Okay.  And I noticed in the third
12 paragraph, you wrote in the middle of there:  For
13 several months, I was faced with eviction notices,
14 cut-off notices, limited food resources, and
15 limited transportation.
16       So my question is in the spring 2019, were
17 you faced with eviction notices, cut-off notices,
18 limited food resources, and limited
19 transportation?
20   **A   I was faced with that in the spring of --**
21 **in -- I'm -- I apologize.**
22   I was faced with that in the fall of the

233

1  2018 semester, primarily.  I believe I answered
2  something to that before.
3     Q  You weren't facing any of those problems
4  in spring 2019, were you?
5     A  It was carry-over from that.
6     Q  Okay.  Well --
7     A  It was carry-over --
8     Q  -- I think you told us before that you had
9  ample food resources in spring 2019.  Was that
10 correct?
11    A  Those were not my words.  That's
12 incorrect.
13    Q  Okay.  So what were your food problems in
14 spring 2019?
15    A  I had --
16       MS. NORRIS:  Objection; misclar- --
17 mischaracterizes the testimony.
18 BY MR. PRYWES:
19    Q  You can answer.
20    A  Okay.
21       MS. NORRIS:  What was the -- you're
22 asking -- she didn't say that.  She didn't say

234

1  that she was having -- experiencing food
2  insecurities in the spring.
3  BY MR. PRYWES:
4     Q  Okay.  What was the -- what were the
5  limited food resources issues that you were facing
6  in spring 2019?
7     A  My issues were that I did not wish to have
8  to constantly ask my parents for aid because of a
9  mistake made by Howard's offices.
10    Q  So were you going hungry in spring 2019?
11    A  I wouldn't say that, no.  I didn't say
12 that before, either.
13    Q  Were you facing eviction notices in spring
14 2019?
15    A  In part in spring of 2018 -- so our
16 semester starts a little different from standard
17 semesters, so that's a bit of it.
18       Our semester -- our spring semester
19 begins, in part, to my recollection, before we go
20 on break for Christmas.
21    Q  Okay.
22    A  And so that's kind of -- that's the

235

1  confusion that --
2     Q  Okay.
3     A  -- we're -- I'm not -- I don't know if
4  you're aware of that, but that's --
5     Q  Yeah, I am --
6     A  -- kind of the --
7     Q  -- because the --
8     A  The makeup --
9     Q  -- starts in December.
10    A  Yeah.
11    Q  So my question is while that semester was
12 underway, were you -- did you receive any eviction
13 notices?
14    A  While the spring semester was underway?
15    Q  Yes.  Spring 2019, which started
16 December --
17    A  Yes.
18    Q  -- 2018?  You received eviction notices?
19    A  I do -- to my recollection.
20    Q  Okay.  And when did you receive that?
21    A  I don't recall.  I don't know.
22    Q  And you wrote "cut-off notices."  Are you

236

1  talking about cut-off of electricity?
2     A  I was referring to some utility, yes.
3     Q  Okay.  Were any of your -- did you receive
4  notice of cut-off of any of your utilities during
5  that spring 2019 semester?
6     A  I believe it was the part of the semester
7  that began in 2018.
8     Q  Okay.  In calendar year 2019, did you have
9  any -- were you facing limited food resources?
10    A  Not to my recollection.
11    Q  In calendar year 2019, did you receive
12 eviction or cut-off notices?
13    A  I don't know.
14    Q  Okay.  Why were you bringing that up here
15 in your letter to the P&G committee?
16    A  It was, in part, at the advisement of
17 Dr. Ford.
18    Q  What did Dr. Ford tell you about that?
19    A  She suggested that I -- let me make a note
20 as well -- and she actually told me of this
21 herself, to my recall, in our May 21st meeting
22 that we had.

237

1    She told me that I could address the P&G
2  committee with a two-page letter and that I
3  wouldn't find it anywhere in the policy where I
4  could address them with a letter.  I wouldn't find
5  any instructions in the policy on how to go about
6  submitting this letter.  This was just an offer
7  she was extending -- or that she extended to
8  students, is the way she made it seem.
9    So to that, she told me that -- I asked
10 her how to go about writing up something, you
11 know, that I had no guidelines or any type of
12 instruction for, and she recommended that I
13 mention whatever hardship or whatever issues I had
14 faced, or what have you, over the '18/'19 academic
15 year --
16   Q  Okay.
17   A  -- at this point.
18    And so I chose -- since this was the
19 promotions and graduates committee, and they would
20 be looking at my entire MS-1 year as a whole, I
21 chose to describe 2018 to '19 as a whole, per her
22 advisement --

238

1    Q  Okay.
2    A  -- on that.
3    Q  All right.  So let's -- let me show you
4  Exhibit 153.
5      (Whereupon Defendant's Exhibit 153 was
6  marked for identification.)
7  BY MR. PRYWES:
8    Q  Did you receive this letter dated May 23,
9  2019, on or about that date?
10   A  Yes, sir.
11   Q  And did you understand that this letter
12 meant you would be dismissed permanently from the
13 school of medicine?
14   A  Dismissed permanently is not -- isn't --
15 is a misnomer, to my knowledge.  Dismissed
16 permanently is somewhat a misnomer.
17   Q  Okay.  Well, did you understand that as a
18 result of the promotions and graduation
19 committee's findings, you would be dismissed as a
20 medical student?
21   A  Yes.
22   Q  Okay.  And did you understand that once a

239

1  student has attempted repeating a year, that that
2  dismissal's permanent?
3    A  No, sir.
4    Q  You didn't understand that?  Okay.
5    A  No, sir.
6    Q  Now, after you received this letter of
7  May 23rd, did you meet with Dr. Wilson?
8    A  Can I clarify that on -- for the record?
9  For --
10   Q  Anything you want.
11   A  -- my previous question?  Yes.
12    So to my knowledge of the policy,
13 dismissal versus expulsion, there's a difference
14 there.  So to my knowledge, no dismissal is
15 permanent; only an expulsion is permanent.  So
16 that -- that's the clarity from that question --
17   Q  Okay.  Did --
18   A  -- to your other question about
19 Dr. Wilson, me meeting with him.
20   Q  Well, did you understand that if you were
21 a repeating student and you failed the first
22 year -- or you failed any course as a repeating

240

1  student, that you would be dismissed without the
2  possibility of readmission?
3      MS. NORRIS:  Objection; asked and
4  answered.  That was asked, like, a long time ago.
5  BY MR. PRYWES:
6    Q  You can answer.
7    A  I -- as I said, there is a distinction --
8  expulsion is a permanent dismissal.  So was I
9  aware by the verbiage that a student would be
10 expelled?  No.  But that's not what you asked
11 specifically.
12   Q  I didn't ask about expulsion.  I'm asking
13 about being dismissed without the possibility of
14 readmission.
15   A  I did not understand dismissal to be
16 permanent.
17   Q  Okay.  So did you have a meeting with
18 Dr. Wilson on May 28th?
19   A  To the -- on or about that date, yes.
20   Q  Okay.  When you met with him, did you have
21 your laptop computer with you?
22   A  I did.

245

1 want to get hung up on the word "awarded." So did
2 he tell you that he knew that anyone had assigned
3 a grade of zero for Lab Exam 3?
4　　**A No, he did not tell —**
5　　Q Okay.
6　　**A — me that.**
7　　Q Okay.
8　　MR. PRYWES: Let's mark this as Exhibit --
9 what was this supposed to be?
10　　MS. CONNOLLY: 121.
11　　MR. PRYWES: 121.
12　　(Whereupon Defendant's Exhibit 121 was
13 marked for identification.)
14 BY MR. PRYWES:
15　　Q Okay. Have you ever seen these minutes of
16 the April 16, '19, meeting before?
17　　**A I have.**
18　　Q Okay. Does -- is there anything in these
19 minutes that is not accurate as to what was said
20 or happened at the meeting?
21　　**A I haven't had the time to review this**
22 **document, because I just received this in recent**

246

1 **discovery from my attorneys. So I don't —**
2　　Q Okay. Well, let me ask --
3　　**A So I've seen it, but just —**
4　　Q Let me ask you --
5　　**A — at the glance.**
6　　Q -- some specific questions.
7　　**A Okay.**
8　　Q On the top of Page -- the second page, did
9 you tell the committee that you were prepared to
10 respond to the charges?
11　　MS. NORRIS: Are you asking if she says in
12 this -- if this says that, or are you asking if
13 that was her recollection of what happened --
14　　MR. PRYWES: I'm asking if --
15　　MS. NORRIS: -- at the hearing?
16 BY MR. PRYWES:
17　　Q I'm not asking you what it says here. I'm
18 asking you whether you can confirm that at the
19 meeting, you said that you'll respond to -- you're
20 prepared to respond to the charges. Did you say
21 that at the hearing?
22　　**A I don't believe I said those words**

247

1 **exactly.**
2　　Q Okay. What words did you say?
3　　**A To my recollection, it was something that**
4 **was asked of me in -- for example, perhaps the**
5 **question was posed to me, Are you prepared to**
6 **respond to the charges? Do you wish to respond —**
7 **to that effect.**
8　　Q Okay.
9　　**A And to that, I believe my response may**
10 **have been "yes."**
11　　Q Okay.
12　　**A That isn't what this says, so —**
13　　Q You say it may have been yes. Was it may
14 have been, or it was yes?
15　　MS. NORRIS: Objection. She answered
16 that. Like, calls for speculation.
17 BY MR. PRYWES:
18　　Q Well, I'm asking you whether you remember
19 saying yes or you're just speculating that you may
20 have said yes.
21　　**A I'm speculating that if asked those**
22 **questions, to my recollection, I'm speculating —**

248

1　　Q So --
2　　**A — that I would have said yes.**
3　　Q So you don't recall one way or the other
4 whether you said you're prepared to respond to the
5 charges?
6　　**A To my recollection, the sentence "I am**
7 **prepared to respond to the charges" did not leave**
8 **my mouth.**
9　　Q Did you, in substance, state that you were
10 prepared to respond to the charges?
11　　**A In substance, I agreed to respond to the**
12 **charges.**
13　　Q So you don't recall one way or the other
14 whether you said that you -- in substance that you
15 were prepared to respond to the charges; is that
16 right?
17　　**A I agreed to respond to the charges —**
18　　Q Okay.
19　　**A — sir.**
20　　Q That's not what I asked you, though, so
21 listen to what I'm asking, please: Did you state,
22 when asked -- either when asked, or affirmatively,

**249**

1  that you were prepared to respond to the charges,
2  or words to that effect?
3        MS. NORRIS:  Objection; ambiguous.
4  BY MR. PRYWES:
5     Q  You can answer.
6        MS. NORRIS:  Do you understand the
7  question?
8        THE WITNESS:  Not -- no.  It just sounds
9  like --
10 BY MR. PRYWES:
11    Q  Okay.  It s a very simple question.  Okay?
12 Did you say, Yeah, I m prepared to respond to the
13 charges?  Do you remember --
14    A  I don't --
15    Q  -- whether you said --
16       MS. NORRIS:  Objection --
17 BY MR. PRYWES:
18    Q  -- that or you didn t say that?
19       MS. NORRIS:  -- asked and answered.
20       MR. PRYWES:  I don t have a clear answer.
21    Q  Did you -- do you remember whether you
22 said that or not?

**250**

1     A  I --
2        MS. NORRIS:  Objection.  She already said
3  that she did not say those words.
4        MR. PRYWES:  That wasn't my question.
5        THE WITNESS:  I do not recall saying those
6  words.
7  BY MR. PRYWES:
8     Q  Okay.  Do you deny that you said those
9  words, "I'm ready to respond to the charges"?
10    A  I can't confirm or deny that I said --
11    Q  Okay.
12    A  -- those words.
13    Q  That's what I wanted to know.
14    A  Okay.
15    Q  Okay.  Let's look at the fourth paragraph
16 on that same page:  She thanked us all for
17 convening.
18       That -- do the statements reported there
19 accurately describe what you said at one point or
20 the other during the meeting?
21    A  In --
22       MS. NORRIS:  And you can take some time to

**25**

1  review what he's asking you, the paragraph.
2        THE WITNESS:  In this entire paragraph?
3  BY MR. PRYWES:
4     Q  Yeah.
5     A  You want me to review -- okay.
6        No, this is not an accurate --
7     Q  Okay.
8     A  This is not accurate to what my point was.
9     Q  What's not accurate about it?  Bearing in
10 mind that -- let me just -- before you answer
11 that, then it goes on later to describe some other
12 comments you made --
13    A  Okay.  Well --
14    Q  -- under Opening Statement, so --
15       MS. NORRIS:  But you're asking about that
16 paragraph, Paragraph 4.
17       MR. PRYWES:  Yeah, I'm asking about that
18 paragraph.
19       THE WITNESS:  Okay.  So --
20       MS. NORRIS:  Paragraph 4.
21       THE WITNESS:  -- for this question we're
22 on now --

**252**

1        MS. NORRIS:  It's Paragraph 4 that you're
2  asking about, right?
3        MR. PRYWES:  Yes?
4        THE WITNESS:  The "She thanked us all for
5  convening"?  That -- the start of that?  Yes.
6  BY MR. PRYWES:
7     Q  What's not accurate about what's written
8  there?
9     A  I never mentioned one of four being
10 illegal.  I didn't mention one of --
11    Q  Okay.
12    A  -- four being illegal.
13    Q  What else is inaccurate?
14    A  To my recollection, that's all I see at
15 this current time.
16    Q  Okay.  So then let's look at the paragraph
17 that says "My version of events."  And -- that
18 paragraph and the next one, could you tell me if
19 the description of what happened at the hearing in
20 those two paragraphs is inaccurate in any respect?
21    A  The last two paragraphs --
22    Q  Yes.

253

1    A -- on this page?
2       MS. NORRIS: So you can take some time to
3 review -- to read through.
4       THE WITNESS: Thank you.
5       What was the question?
6 BY MR. PRYWES:
7    Q Is there anything in those two paragraphs
8 that you believe is not an accurate description of
9 what happened at the hearing?
10   **A Yes. Because I believe at some point I**
11 **also brought up about Dr. Gilland referencing**
12 **[sic] me to write up my response how I see fit as**
13 **well.**
14   Q Okay. But are the statements that you --
15 that are attributed to you here, are those
16 statements you made in these two paragraphs?
17      MS. NORRIS: Which -- are you talking
18 about all the statements, or do you have a
19 specific --
20      MR. PRYWES: The same two paragraphs, "My
21 version of events" and the next paragraph.
22      MS. NORRIS: There's a long -- those are

254

1 two paragraphs there with a lot of statements
2 there.
3 BY MR. PRYWES:
4    Q Is there anything in those two
5 paragraphs -- any statements that are attributed
6 to you that you believe you did not make?
7       MS. NORRIS: And you can take your time to
8 review it. You need time to review it.
9       THE WITNESS: I believe the sheer
10 astonishment is out of context here in line six of
11 the beginning of my -- in the beginning of that
12 initial paragraph.
13 BY MR. PRYWES:
14   Q Is there anything else you believe is not
15 accurate as described here?
16   **A The statement in the second paragraph of**
17 **me trying to gain credit for the exam question**
18 **that I'd changed, because I never changed an exam**
19 **question the first place.**
20   Q What sentence are you referring to?
21   **A Sentence -- the second sentence in the**
22 **last paragraph on that page. It says: Ms. Smith**

255

1 **wanted to explain her understanding of the -- in**
2 **quote -- inner ear canals to try to gain the**
3 **credit for the exam question she had changed.**
4       **I never mentioned changing an exam**
5 **question at the hearing. That wasn't even**
6 **accurately brought up. And I was -- it was not an**
7 **attempt to --**
8    Q I believe --
9    **A -- gain --**
10   Q Yeah, I believe --
11   **A -- credit.**
12   Q -- you testified earlier that you stated
13 at the hearing that you had changed the grade --
14 you had changed the answer.
15      MS. NORRIS: Objection; asked and
16 answered.
17 BY MR. PRYWES:
18   Q Are you saying you didn't -- are you now
19 saying something different?
20   **A No, sir. I'm saying that this is stating**
21 **something different. This says "tried to gain**
22 **credit for the exam question she had changed."**

256

1    Q I under- --
2    **A I never changed an exam question.**
3    Q Okay.
4    **A Dr. Gilland made the exam questions, to**
5 **the best of my knowledge. I never mentioned**
6 **changing an exam question, sir.**
7    Q You changed an exam answer, though, didn't
8 you?
9    **A No. It was not --**
10   Q You didn't change an exam answer
11 between --
12      MS. NORRIS: Objection --
13 BY MR. PRYWES:
14   Q -- your exam --
15      MS. NORRIS: -- misstating the testimony.
16      MR. PRYWES: Hm?
17      MS. NORRIS: Objection; misstating the
18 testimony. That's not what she said.
19      MR. PRYWES: I miss -- I'm just trying to
20 -- that's why I'm trying to understand. That's
21 why I'm following up.
22   Q What -- did you tell the hearing [sic]

257
1 council committee that you had changed your answer
2 sheet before you resubmitted it as a challenge to
3 Dr. Gilland?  Did you tell them that?
4     **A Yes.**
5     Q Okay.  Is there anything else in these two
6 paragraphs that you believe is not an accurate
7 description of what happened at the hearing?
8     **A Yes.  When I -- when it states -- the**
9 **sentence after the last one, which is discussed:**
10 **She said that if Dr. Gilland hadn't given her the**
11 **points, she still would have passed the exam.**
12     **I had already passed the exam, so I**
13 **believe whoever took this may have -- whoever**
14 **took -- recorded this, typed this, what have you,**
15 **may have -- that sounds misleading or out of**
16 **context from what I recall I actually said to**
17 **that.**
18     Q Okay.
19     **A I had already passed this test.**
20     Q Okay.  Is there anything else here that
21 you believe was not an accurate description of
22 what happened at the hearing?

258
1     MS. NORRIS:  Do you mean -- "here," the
2 last two paragraphs still or?
3     MR. PRYWES:  Yes.
4     THE WITNESS:  To my knowledge at this
5 time, I don't --
6 BY MR. PRYWES:
7     Q Okay.
8     **A -- believe so.**
9     Q You said the comment "sheer astonishment"
10 was taken out of context.  What did you say about
11 astonishment at the hearing?
12     **A I don't fully recall.  I don't recall.**
13     Q I couldn't hear you.
14     **A I don't recall.**
15     Q Did you say anything about astonishment at
16 the hearing?
17     **A I don't recall.**
18     Q Do you deny saying anything about sheer
19 astonishment at the hearing?
20     MS. NORRIS:  Objection; asked and
21 answered.
22 BY MR. PRYWES:

259
1     Q You can answer.
2     **A I don't recall, sir.**
3     Q Okay.  Let's go to the next page; it's
4 Page 3 of this document.  About halfway down, it
5 says:  Dr. Callender asked if in Ms. Smith's prior
6 meeting with Dr. Ford if she admitted that she
7 changed the answer.
8     Ms. Smith responded saying, Yes, that is
9 correct.
10     Was that -- is there -- is that an
11 accurate description of what was said at hearing
12 by you?
13     **A No.  I don't recall that.**
14     Q Do you recall that -- are you denying that
15 you made those comments?
16     **A Yeah.  I don't recall saying that, sir.**
17     Q Do you recall one way or the other whether
18 you admitted to Dr. Ford -- whether you said that
19 you admitted to Dr. Ford that you changed the
20 answer?
21     **A I don't recall saying that, sir.**
22     Q Do you recall -- do you deny that you said

260
1 that?
2     **A I don't recall saying that, sir.**
3     Q Could you answer my question, please.
4     MS. NORRIS:  She did answer your question.
5     THE WITNESS:  I don't recall --
6 BY MR. PRYWES:
7     Q Do you recall --
8     **A -- saying that.**
9     Q -- one way or the other whether you said
10 that?
11     **A No, I do not recall --**
12     MS. NORRIS:  Objection.
13     THE WITNESS:  -- one way or the other.
14 BY MR. PRYWES:
15     Q That's all I'm trying to find out.  Okay?
16 I'm trying to find out --
17     MS. NORRIS:  Objection.
18 BY MR. PRYWES:
19     Q -- what you remember and what you don't
20 remember.
21     MS. NORRIS:  So it's 4:30 now.  We have
22 about an hour until 5:30?

**26**

1     MR. PRYWES: Let's go off the record if
2 you want to discuss.
3     MS. NORRIS: Did you want to --
4     THE VIDEOGRAPHER: One second.
5     Off the record at 4:31 p.m.
6     (Whereupon a recess was taken.)
7     THE VIDEOGRAPHER: Back on the record.
8 The time is 4:54 p.m.
9     MR. PRYWES: Okay. Let me mark this as
10 Exhibit 152.
11     (Whereupon Defendant's Exhibit 152 was
12 marked for identification.)
13 BY MR. PRYWES:
14   Q Okay. Is this a letter that you wrote?
15   **A I'm just reading it for a moment.**
16   Q Go ahead.
17   **A Yes. This is the letter that I submitted.**
18   Q Okay. And did you sign this on May 28,
19 2019?
20   **A Yes.**
21   Q Yes?
22   **A Yes. To my knowledge, to the -- yeah.**

**262**

1   Q And what computer did you prepare this on?
2   **A I can't recall at this time. I can't**
3 **recall exactly.**
4   Q Did you prepare it on your laptop?
5   **A I may have. I don't recall.**
6   Q Have you checked your laptop to see if
7 this document can be found on it?
8   **A I no longer have the laptop that I had at**
9 **this time.**
10   Q Okay. Have you checked your father's
11 laptop to see if it's on there?
12   **A No. No, sir. I wouldn't have used my**
13 **father's laptop for --**
14   Q Okay.
15   **A -- this.**
16   Q Did you type -- prepare --
17   **A He wasn't -- and I know that because he**
18 **wasn't around me on this date.**
19   Q Okay. Did you print this out somewhere on
20 May 28th?
21   **A Yes. I was at Howard when I printed it**
22 **out.**

**263**

1   Q Okay. And do you remember what printer
2 you used?
3   **A I can't recall which printer I used.**
4   Q Okay.
5   **A It was a -- it was either in the**
6 **university library or in the actual college of**
7 **medicine --**
8   Q Okay.
9   **A -- printer lab, to my knowledge.**
10   Q Okay. And did you give this -- hand
11 deliver this letter to anyone on May 28th?
12   **A I did.**
13   Q Who did you hand deliver it to?
14   **A Diane Thomas.**
15   Q Did you actually give it to her
16 personally?
17   **A To her personally, yes.**
18   Q Okay. And that was on May 28th, 2019?
19   **A Yes.**
20   Q What time of day did you deliver it to
21 her?
22   **A I don't recall. I don't recall exactly.**

**264**

1   Q Was it after your meeting with Dr. Wilson?
2   **A It was.**
3   Q Okay. And did you put it in an envelope
4 before you gave it to Ms. Thomas?
5   **A I did not.**
6   Q Okay.
7   **A I don't recall -- I don't recall if I did**
8 **or not. For clarity: I don't recall if I did.**
9   Q Did you send or deliver a copy of this to
10 Dr. -- Dean Ford?
11   **A No, sir, I don't believe that I did.**
12   Q Why didn't you?
13   **A There was no requirement for me to do so.**
14   Q Doesn't it say --
15   **A To my best knowledge.**
16   Q Doesn't it say in the policy manual that
17 any appeal of a P&G committee finding should be
18 sent to Dr. Ford?
19   **A It doesn't say by who.**
20   Q Well -- so you don't think you had an
21 obligation under the policy manual to provide this
22 to Dr. Ford?

265

1    A  It doesn't say that the student should,
2  so, no, sir.
3    Q  Okay.  And did Dr. Ford ever ask you if
4  you had filed an appeal?
5    A  I believe she did via e-mail --
6    Q  Okay.  Let's --
7    A  -- yes.
8    Q  Let's look at that e-mail.  This is
9  Exhibit 155.
10    (Whereupon Defendant's Exhibit 155 was
11  marked for identification.)
12  BY MR. PRYWES:
13    Q  Do you see in the middle there's an e-mail
14  from Dr. Ford to you May 31, 2019, and -- at
15  10:16 a.m., and in there she wrote, quote:  Just a
16  reminder that today will be seven days from the
17  day that you received the dismissal letter.  If
18  you plan to appeal this decision, then you must
19  send your request to the dean today as per the
20  policies and procedures manual.
21    Did you receive that from Dr. Ford on
22  May 31?

266

1    A  I did.
2    Q  Did you ever respond to her that you'd
3  already submitted your appeal?
4    A  I don't recall that I did --
5    Q  In --
6    A  -- no.
7    Q  -- response to her, there's no indication
8  that you had -- by you that you had already
9  submitted your appeal, right?
10    A  In my response to her?
11    Q  Yeah.  Up on top of the page at 3:30 p.m.,
12  you responded to her and you did not address her
13  reminder about the deadline there, did you?
14    A  No, I did not.
15    Q  Okay.  And did you ever advise Dr. Ford
16  that you had already submitted your appeal?
17    A  No, sir.
18    Q  Okay.  Why not?
19    A  There was no requirement for me to do so.
20    Q  Okay.
21    A  She herself didn't even say it.  She said,
22  Send your request to the dean.  She did not say,

267

1  Send it to me --
2    Q  Okay.  Well --
3    A  -- as well.
4    Q  -- did you ever tell her that you had
5  already submitted an appeal?
6    A  No, sir.  There was no requirement for me
7  to --
8    Q  All right.
9    A  -- tell her that.
10    Q  Did her e-mail suggest to you that perhaps
11  your letter had not been received, or it had not
12  been noted?
13    A  No, sir.  Because -- or, no, sir.  Not
14  what you asked.
15    Q  All right.  So --
16    A  I had already submitted it.  By the time
17  Dr. Ford sent this, I had already submitted it to
18  the dean.  But they are two different offices, and
19  I would be speculating as to if I knew that she
20  knew what Dr. Mighty's office had received --
21    Q  Okay.
22    A  -- so....

268

1    Q  Did you meet with the dean on June 3rd,
2  2019?
3    A  Per his request, yes, sir.
4    Q  Okay.  And what happened at that meeting?
5    A  At that meeting, he -- well, his secretary
6  had e-mailed me asking to come in in order to
7  discuss I think what she referred to as honor
8  council matters.
9    And there was a bit of rescheduling on
10  Dr. Mighty's behalf, as well as my behalf, for
11  other personal things that came up for the both of
12  us.  So ultimately, the date that it occurred on
13  was June 3rd.
14    Q  Okay.
15    A  So at that time, he tried to discuss the
16  nature of the allegations with me, which I didn't
17  deem appropriate because I believed that the
18  college of medicine had already put the honor
19  council in place to adjudicate such matters.  It
20  wasn't for the office of the dean to discuss.
21    Q  Okay.
22    A  And so he went ahead and wanted to discuss

269

1 that, but I decided to tell him, in similar
2 fashion to what I had told the honor council, that
3 I was prepared to face Dr. Gilland, as the policy
4 permitted that the accuser must face the accused.
5     And so there was no requirement for me to
6 ask Dr. Gilland to appear, because if he was the
7 only person who proctored this exam, then he was
8 the accuser. So I told him that the accuser did
9 not face the accused in that circumstance and I
10 believed that that was unfair to me. And he
11 seemed to disagree with that, to my knowledge, in
12 whatever way he disagreed at that time.
13     And I spoke to him about -- I believe I
14 inquired of him Dr. Ford's role in the assignment
15 of grades. I wasn't aware that she had the duty
16 to assign grades, particularly prior to any
17 hearing or any investigation done by the honor
18 council.
19     I told him that Dr. Callender did not
20 allow me to get through all of my talking points.
21     And in the end, I told him, you know, that
22 I never had any intention of any type of academic

270

1 dishonesty whatsoever and that only a conversation
2 between me and Dr. Gilland could have elucidated
3 that, but he never came to me and he had been
4 shielded from me -- or I believed him to have been
5 shielded from me. I conveyed that to him.
6     And in the end, I -- after I'd submitted
7 my appeal letter on P&G --
8     Q  Let's just stick with the meeting on --
9     A  This is --
10    Q  -- March 23rd.
11    A  This is a part of that, sir.
12    Q  Okay.
13    A  This is relevant to that. It is.
14    Q  Okay.
15    A  So I'm just trying to find the name of the
16 exhibit that you called it so that I can correct
17 my statements.
18    Q  Exhibit 152?
19    A  Exhibit 152, yes, sir.
20       So after I had submitted Exhibit 152, I
21 received a follow-up e-mail from Dr. Wilson
22 confirming me of my approximately 74 percent --

27

1 what ended up being an approximate 74 percent.
2     And he also stated that he got my grade on
3 that fourth lab exam from -- so I sub- -- I
4 printed out a copy of that e-mail and handed it in
5 to Dr. Mighty as an attachment to this. I did
6 that at June 3rd as well.
7     Q  So on June 3rd, you gave Dean Mighty a
8 copy of Exhibit 152?
9     A  Let me find Exhibit 152. Sorry.
10    Q  I think 152's on top of your pile. Did
11 you give Dean Mighty a copy of 152 --
12    A  No, sir.
13    Q  -- when you met with him on --
14    A  I didn't --
15    Q  -- June 3rd?
16    A  No, sir. I did not give Dean Mighty a
17 copy. I had already given --
18    Q  Okay.
19    A  152 to Diane --
20    Q  Okay.
21    A  -- to -- which his -- to Ms. Thomas, which
22 is his office. I gave him a copy of an e-mail

272

1 that Dr. Wilson sent me post our -- in -- near end
2 of May meeting.
3     Q  Okay.
4     A  I give him a printout of that in support
5 of Article 4 on -- of Exhibit 152.
6     Q  Okay.
7     A  So Article [sic] 152 is my scheduled
8 meeting with Dr. Wilson. I provided him an e-mail
9 that Dr. Wilson sent me.
10    Q  Okay. And what do you recall Dean Mighty
11 saying?
12    A  In regards to the e-mail?
13    Q  No. Anything you -- your -- well, first
14 of all, do you recall anything else that you said
15 to Dean Mighty, other than what you've just
16 mentioned?
17    A  Not currently. I mean --
18    Q  Okay.
19    A  -- not currently.
20    Q  What did Dean Mighty say to you?
21    A  He -- well, I do recall asking him for the
22 dis- -- the honor council disposition. Like, if

273

1 he knew what the honor's council -- like, could he
2 deliver me the honor's council disposition from
3 Dr. Callender or, you know, if he had that.
4     And in essence, he told me, you know,
5 We're not going to get to that right now; we're
6 not going to talk about that.
7     And when I spoke to having
8 Dr. Gilland's -- or when I spoke to Dr. Gilland's
9 absence being unfair to me and how Dr. Wilson
10 shouldn't have been there and Dr. Gilland not be
11 there when Dr. Wilson's entire February 19th
12 letter was based upon information that he claimed
13 to have received from Dr. Gilland, why wasn't
14 Dr. Gilland there?
15     And to that, he -- I recall him asking,
16 Well, what difference would it have made if
17 Dr. Gilland was there?
18     And I don't recall the leading
19 information, but he also made comment about
20 students who performed highly on many academic
21 assignments or in classes.  He just said something
22 regarding, Oh, I -- there are students who ace

274

1 every course.  Or something to that degree.  He --
2 I don't remember the leading information to that.
3     And when I asked him about Dr. Ford's
4 authority in assigning grades, I believe he told
5 me, Well, she's the dean of academic affairs.
6 Almost implying that her office in and of itself
7 permitted her to assign grades.  And my thought
8 process to that at that time was whether or not
9 she assigned grades to her daughter or those
10 associated with her daughter.
11     And in the end when I submitted the e-mail
12 that I referred to from Dr. Wilson, he just
13 accepted it and told me "okay."  And I -- if I
14 recall, he had, like, a stack or a file folder or
15 something and just sort of stuck it in it and was,
16 like, Okay.
17     But I did tell him what it was before I
18 handed it to him.  I didn't -- I wasn't just,
19 like, Dean, please take this.  You know.
20     Q  Do you remember anything else he said at
21 the meeting?
22     A  I can't recall at this time, no.

275

1     Q  Okay.  Did -- at the meeting, did you tell
2 him that you had changed the answer sheet?
3     A  No, sir --
4     Q  Did you --
5     A  I don't recall that.
6     Q  -- tell him that you had changed an answer
7 -- from the original answer sheet that you
8 received back -- in the answer sheet that you
9 submitted with your challenge?
10     A  No, sir.
11     Q  Did you explain to him that you had
12 changed an answer because you were trying to
13 explain your knowledge to Dr. Gilland?
14     A  No, sir.  I referenced having a
15 conversation with Dr. Gilland prior to.
16     Q  Okay.  Let me ask you to take a look at
17 Exhibit 163.  It's the June 12th letter from the
18 dean.
19     A  Let me find it, please.  153?
20     Q  One sixty-three.
21     MS. NORRIS:  I see 153.
22     MR. PRYWES:  One sixty-three.  It's the

276

1 June 12th, 2019 --
2     THE WITNESS:  I've got it, sir.
3 BY MR. PRYWES:
4     Q  Okay.  Down the third paragraph, second
5 sentence, Dean Mighty wrote to you:  You
6 acknowledged that you changed your test answer
7 sheet from an incorrect answer to the right answer
8 and submitted it to the instructor.
9     Did you tell him that you had changed your
10 test answer sheet?
11     A  No, sir.
12     Q  Okay.  But you had changed your test
13 answer sheet, correct?
14     A  Yes.
15     Q  Okay.  Did you -- when you met with him,
16 did you deny changing your test answer sheet?
17     A  No, sir.  I don't recall that.
18     Q  Did you describe any extenuating
19 circumstances to explain why you had changed the
20 answer sheet?
21     A  Not in the -- I explained to him that I
22 spoke with Dr. Gilland regarding my challenge

277

1  responses --
2      Q  Okay.  That's all you told him?
3      **A -- prior to -- that's all I recall.**
4      Q  Okay.  And down in the last part where it
5  says -- paragraph, it says:  The dean's decision
6  is final.  Please note that you have a right to
7  appeal this decision.
8          Did you read that language when you
9  received Exhibit 163?
10     **A I did.**
11     Q  And did you file an appeal of
12 Dean Mighty's decision to expel you for an honor's
13 code violation?
14     **A I did not.**
15     Q  Why not?
16     **A  Well, I had actually sent him an e-mail**
17 **acknowledging that I wouldn't accept anything else**
18 **from his offices because my P&G appeal, the SGC**
19 **already had neglected to follow up with me,**
20 **according to that, and that process on my P&G**
21 **appeal was supposed to have been well underway**
22 **with the SGC by this point.**

278

1          **So instead -- ultimately, I filed a**
2  **complaint against Dean Mighty to the university**
3  **provost, Dr. Wutoh.**
4      Q  Okay.  But you did not file an appeal of
5  his -- of this June 12 decision with him or with
6  the Student Grievance Commission, did you?
7      **A  No.  I didn't.**
8      Q  Okay.  And why not?
9      **A  Because he was out of line for me**
10 **having -- I had already told him how I had been**
11 **wronged in how my SGC appeal had not been**
12 **scheduled with regards to P&G, and I did that**
13 **by -- I inquired about an -- the SGC to Diane**
14 **Thomas on, I believe, June 5th, and that request**
15 **was ignored for that.**
16          **And so at that time, I understood that I**
17 **would not receive any fair treatment and relief**
18 **within the college of medicine, and so I followed**
19 **the policies and procedures student handbook in**
20 **conjunction with the student handbook to file a**
21 **formal complaint with the university provost --**
22     Q  Okay.

279

1      **A -- instead.**
2      Q  Okay.  Now, at that meeting with
3  Dean Mighty on June 3rd, did you tell them that
4  you had filed an appeal of the P&G committee
5  decision?
6      **A Yes.  Yes, sir.**
7      Q  Okay.  And I think we went over this
8  before, but the P&G committee dealt with whether
9  or not you should be promoted, right?  It didn't
10 deal with academic dishonesty?
11     **A Correct.**
12     Q  Correct.  So this was a decision -- in
13 Exhibit 163 -- based on academic dishonesty,
14 right?  That is your --
15     **A Would you please repeat it -- repeat that.**
16     Q  Yeah.  The decision of Dean Mighty to
17 expel you was based on a finding that you had
18 engaged in academic dishonesty, correct?
19     **A  That's what he said the honor council**
20 **said --**
21     Q  Okay.
22     **A -- yes.**

280

1      Q  So if the -- let's say your P&G committee
2  appeal had been successful, could you still have
3  been expelled for an honor's committee vio- --
4  honor council -- honor's code violation?
5      **A That's specula- -- I would be**
6  **speculating --**
7      Q  Okay.
8      **A -- as to that, and I'm not supposed to --**
9      Q  Is there anything -- let's say you had
10 received a passing grade, a 73 or a 78 or
11 whatever --
12     **A Yeah.**
13     Q  -- on Lab Exam 3.
14     **A Yes.**
15     Q  Was there anything to prevent -- any
16 reason the university could not properly expel you
17 if it properly determined that you had engaged in
18 academic dishonesty?
19     **A It did not properly assess --**
20     Q  But if it had.  If it had properly reached
21 that determination, could you have been expelled
22 for a violation of the honor code, even if your

28

1  SGC appeal had been successful?
2      MS. NORRIS:  Objection; it calls for
3  speculation.
4  BY MR. PRYWES:
5      Q  What's your understanding of the
6  university's rules on that?
7      **A  What's my understanding of the**
8  **university's rules on?  Could you please be more**
9  **specific?**
10     **Could you please be more specific?  I -- I**
11 **don't understand.  The way in which the question**
12 **is phrased, I don't understand.**
13     Q  If you had been properly found to have
14 violated the honor code, could you be expelled on
15 that basis alone, irrespective of your P&G appeal?
16     MS. NORRIS:  Objection; calls for
17 speculation.
18 BY MR. PRYWES:
19     Q  What's your understanding?
20     **A  My understanding is that the -- my**
21 **understanding is that the -- I'm sorry.  It's --**
22 **this is very -- this is really an odd question, so**

282

1  **I'm trying to best to answer it.  It's an odd**
2  **question because it does involve some degree of**
3  **speculation.**
4      **In my -- to my understanding, the honor**
5  **council can only recommend a sanction.  They can**
6  **only recommend a sanction, but to my knowledge,**
7  **the P&G committee can actually administer a**
8  **sanction themselves.**
9      **I -- in my opinion and to my**
10 **understanding, the honor council committee votes**
11 **to establish any sort of recommendation for a**
12 **sanction.**
13     **So they're -- they have two different**
14 **abilities.  One can actually -- one can just**
15 **recommend a sanction; the other can -- actually**
16 **has the authority to sanction.  That's the way**
17 **that I understand it --**
18     Q  Okay.
19     **A  -- and so --**
20     Q  Let's --
21     **A  -- that's where my --**
22     Q  Let's assume --

283

1      **A  -- confusion lies.**
2      Q  Let's assume that you passed the course,
3  the SF2 course, and there was a determination that
4  you -- a proper determination that you had
5  cheated.  Could the HCC council and the dean expel
6  you under those circumstances?
7      MS. NORRIS:  Objection; compound question.
8      THE WITNESS:  Could it be -- could that be
9  asked in a different way?  I mean -- or
10 separately?
11 BY MR. PRYWES:
12     Q  I can't hear you.
13     **A  Can that be asked in a different -- I --**
14 **I'm not -- I don't really understand that question**
15 **again.**
16     Q  My question is basically does the P&G
17 committee have anything to do with whether to
18 expel a person for academic dishonesty?
19     **A  Does the P&G committee --**
20     Q  Yes.
21     **A  -- have anything to do with whether or not**
22 **to expel a person for academic dishonesty?**

284

1      Q  Yes.
2      **A  To my understanding, no.**
3      Q  Okay.  Well, let's leave that at that.
4      Let's look at Exhibit 165.
5      (Whereupon Defendant's Exhibit 165 was
6  marked for identification.)
7      THE WITNESS:  Do we have to --
8      MS. NORRIS:  Not yet.
9      THE WITNESS:  Oh.
10 BY MR. PRYWES:
11     Q  Did you send this e-mail to Diane Thomas
12 on June 17, 2019?
13     **A  Yes.**
14     Q  And this was intended for Dr. -- for
15 Dean Mighty, too, correct?
16     **A  It's addressed to both --**
17     Q  Okay.
18     **A  -- Ms. Thomas and Dean Mighty.**
19     Q  Okay.  Is there anything -- anywhere in
20 this letter did you inform Dean Mighty that you
21 had filed an appeal of the P&G committee's
22 decision?

285

1     A  Where I -- yes, actually.
2     Q  Where is that?
3     A  I reference it in the first section -- I'm
4  sorry, I'm reviewing this at the same time.
5       I reference it in -- not explicitly, but
6  when I speak of -- as -- when I speak of "This
7  e-mail comes to you referencing my e-mail to you
8  dated June 5th, 2019" -- that's a typo I made
9  that -- we're not in '21 yet -- "in which I noted
10 several issues of concern within its content and
11 to date have gone unanswered without any
12 response."
13      In that June 5th e-mail, as I recall, I
14 asked about when I should be expecting to hear
15 something or receive something from the SGC.
16    Q  Okay.  Let's go look at the June 15th
17 e-mail.
18      By the way, when you met with Dean Mighty,
19 did you -- on June 3rd, did you express any
20 remorse for what you had done?
21    A  I don't recall.
22    Q  Did you apologize for what you had done?

286

1     A  I don't recall that.
2     Q  Did you admit you had cheated?
3     A  No, sir.
4     Q  Okay.  Let's take a look --
5     A  I did not cheat, and that is my
6  testimony --
7     Q  Let's take a --
8     A  --again.
9       MR. PRYWES:  Let's take a look at
10 Exhibit 160.
11      (Whereupon Defendant's Exhibit 160 was
12 marked for identification.)
13      THE WITNESS:  Mr. Prywes, I didn't fully
14 answer your -- the question that you asked before
15 this, if I could just complete that also --
16 BY MR. PRYWES:
17    Q  Certainly.
18    A  -- beforehand?  Okay.  Because -- so I
19 referenced the P&G appeal in No. 10 on
20 Exhibit 165, also.  So I referenced it -- I
21 referenced it explicitly in No. 10, and at the
22 beginning, I referenced it more indirectly.

287

1       But -- that's to my knowledge of -- and
2  the quick review I've done over Exhibit 165 right
3  now.
4     Q  Okay.  And let's look at Exhibit 160.
5  This is June 5th.
6     A  Yes, sir.
7     Q  Did you refer anywhere in this memo to an
8  appeal of the P&G committee decision to the
9  Student Grievance Committee?
10    A  Did I what, sir?  I'm sorry, I was
11 reviewing it and --
12    Q  Did you refer -- is there any reference in
13 this June 5, 2019, e-mail to the fact that you had
14 sought to appeal the P&G committee's decision?
15    A  Yes.  I was referencing the -- I
16 referenced the SGC in this e-mail.  That's what I
17 see before me.
18    Q  Okay.  This was all about the meeting with
19 Dean Mighty on June 3rd, right?  And at that
20 meeting, you discussed the honor's committee --
21 council -- the honor's code issue, right?
22    A  Yes, sir.  But at the end of that meeting,

288

1  I gave him the e-mail copy from Dr. Wilson.
2     Q  Right.
3     A  And -- so it -- I addressed P&G at the
4  June 3rd meeting as well.
5     Q  What'd you say at the June 3rd meeting
6  about the P&G appeal?
7     A  So I had -- at the end of that meeting, I
8  referenced the appeal that I had hand-delivered to
9  Diane, which at that point in time, I hadn't
10 received any honor council recommend -- I'd only
11 received the decision of the P&G, so what's that I
12 had appealed.
13      And I referenced that on June 3rd when I
14 handed him a copy of the e-mail that Dr. Wilson
15 sent --
16    Q  Okay.
17    A  -- to me speaking to my final course
18 grade.  That's what I gave him as an attachment
19 that I said to you earlier that, like, he kind of
20 stuck in a binder of folder of some sort.
21    Q  Are you changing your testimony from
22 earlier testimony?

53

1    Q  Did you ever get treatment or see a
2  therapist or get counseling before you entered
3  Howard?
4    **A  No, sir --**
5    Q  Okay.
6    **A  -- not at that time.**
7    Q  And no one diagnosed you with depression
8  or anxiety before you got to Howard; is that
9  right?
10    **A  No -- no, sir, no one did --**
11    Q  Okay.
12    **A  -- diagnose me.**
13    Q  All right.  So you enrolled in medical
14  school at Howard in fall 2017; is that right?
15    **A  Yes.**
16    Q  And did your parents provide any financial
17  support for you while you were in medical school?
18    **A  Yes.**
19    Q  What did they pay for?
20    **A  Incidentals, living expenses.  For**
21  **example, dorm room supplies, food, the like.**
22    Q  Okay.  Did there ever come a time when you

54

1  didn't have money for living expenses or food?
2    **A  When I -- not a -- yes.  I couldn't**
3  **provide it myself, but I had to get it from my**
4  **parents.**
5    Q  They'd been providing you living expenses
6  and food for your whole time at Howard, right?
7    **A  Yes.**
8    Q  Okay.  So was there --
9    **A  As much as was necessary.**
10    Q  Okay.  So was there ever a time when you
11  didn't -- simply did not have the money to pay
12  rent?
13    **A  Yes --**
14    Q  Okay.
15    **A  -- there was a time.**
16    Q  When was that?
17    MS. NORRIS:  Objection; relevance.
18  BY MR. PRYWES:
19    Q  When was that?
20    **A  I did not have the money to pay rent in**
21  **the fall of 2018 due to a financial aid issue**
22  **brought on me on the part of Howard.**

55

1    Q  Okay.  Was there ever a time when you were
2  at Howard that you didn't have enough money for
3  food?
4    MS. NORRIS:  Objection.  I think that's a
5  little bit -- that could be considered harassing.
6  I think that that's not really appropriate.
7  BY MR. PRYWES:
8    Q  You can answer.
9    **A  I was able to receive money from my**
10  **parents to cover food expenses.**
11    Q  Okay.  So at no time were you unable to
12  get food that you needed while you were at Howard;
13  is that right?
14    **A  That is, in part, correct, yes.**
15    Q  Okay.  What's the "in part" it's not
16  correct?
17    **A  The "in part" is that I could not**
18  **supplement these things myself, but I did receive**
19  **assistance and help that did came -- come --**
20    Q  Okay.
21    **A  -- from my parents.**
22    Q  Okay.  When you enrolled at Howard in fall

56

1  of 2017, did you receive any materials about your
2  rights and duties as a student?
3    **A  I believe so, yes.**
4    Q  What did you receive?
5    **A  I don't know the titles of those exact**
6  **documents.  I did receive a copy of the policies**
7  **and procedures manual.  I believe I signed**
8  **something to the effect of an integrity or**
9  **statement of discourse or an agreement to**
10  **matriculate.  Things of that nature.**
11    Q  Okay.  Let me show you Exhibit 3.
12    (Whereupon Defendant's Exhibit 3 was
13  marked for identification.)
14    THE WITNESS:  Thank you.
15    THE COURT REPORTER:  I'll hand you the
16  marked copies, Ms. Smith.
17    MR. PRYWES:  Yeah, I'm sorry.  I'll take
18  that.
19    Q  Okay.  Is that your signature on the
20  bottom of this page?
21    **A  Yes.**
22    Q  And you signed that on July 26th, 2017?

57

1    A  Yes.
2    Q  And I'd like to direct your attention to
3 the bottom of that first page, and the language
4 there, towards the end, it says, and I quote:
5 That the profession of the physician is an
6 honorable one and that physicians and students
7 must eschew dishonorable practices that -- and
8 that expulsion from the college of medicine be the
9 penalty for a student adjudged of cheating in an
10 examination.
11      Did you understand at that time that if
12 you cheated on an examination and were found
13 guilty of that, you'd be expelled?
14    A  Yes.
15    Q  Okay.  And did that understanding ever
16 change while you were at Howard?
17    A  No, sir.
18    Q  Okay.  Did you fail two courses in the
19 fall 2017 semester?
20    A  Yes.
21    Q  And did you take a leave of absence
22 starting in January 2018?

58

1    A  It was either January or February, to my
2 recollection.
3    Q  Okay.  And why did you take a leave of
4 absence?
5    A  I took the leave of absence because my
6 grades were being affected by the depression and
7 the test anxiety that I was experiencing during
8 that time.
9    Q  And what was -- what do you believe was
10 the source of your depression and anxiety at that
11 time?
12    A  I have -- I've had irritable bowel
13 syndrome, and it -- I have flare-ups of it, and it
14 was presenting itself with the new rigors and, as
15 I had expressed before, the transition from
16 undergrad into Howard --
17    Q  Okay.
18    A  -- with, you know, that situation that we
19 spoke about earlier.
20      And I believe it was, you know, the new
21 environment, the new rigors, and my IBS symptoms,
22 exacerbating.

59

1    Q  Okay.  Did you see any sort of counselor
2 or therapist at Howard University?
3    A  I did.
4    Q  And was that Dr. Erica Shelby?
5    A  I don't recall her name.
6    Q  Dr. Shelby?
7    A  That rings a bell, but I don't recall her
8 name.
9    Q  Well, how often did you see the counselor?
10    A  I saw her, I believe, one time.
11    Q  Okay.
12    A  Perhaps twice.
13    Q  And did you see any other counselors to
14 help you through the -- that difficult period for
15 you?
16    A  Yes, sir.  I sought out spiritual
17 counselors and pastors of that sort as well.
18    Q  Can you speak up a little bit?
19    A  Yes, sir.  I said I --
20    Q  You said you sought out spiritual
21 counseling?
22    A  Yes, sir.

60

1    Q  And who was that from?
2    A  That was from Mr. Greg White, Bishop Greg
3 White at time as well.
4    Q  And is he a man of the cloth?  Is he --
5    A  He is.
6    Q  -- a clergyman?
7    A  He is, he is.
8    Q  Okay.
9    A  Yes.
10    Q  And have you ever --
11    A  He's a pastor.
12    Q  -- seen anyone else for depression,
13 anxiety, those kinds of issues?
14    A  No, sir.
15    Q  Okay.  When you with- -- when you -- you
16 withdrew from the first year, right?
17    A  Yes, sir.
18    Q  And was Dr. Debra Ford helpful with you --
19 helpful to you in arranging your withdrawal and
20 ability to come back?
21    A  In part.  In part, yes.
22    Q  In what way was she helpful to you?