**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————— ) | |
| **MICHAELA SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 21-cv-00920 (APM)** |
| ) | |
| **HOWARD UNIVERSITY,** ) | |
| ) | |
| **Defendant.** ) | |
| ———————————————————— ) | |

**MEMORANDUM OPINION**

## I.  INTRODUCTION

Former medical student Michaela Smith filed this lawsuit against Defendant Howard University after her expulsion from Howard University College of Medicine for committing an act of academic dishonesty.  Plaintiff claims that Defendant's decision to expel her breached their contract and was the result of discrimination based on her sex in violation of Title IX.

Both Plaintiff and Defendant now move for summary judgment.  For the reasons that follow, the court finds that no reasonable jury could conclude that Defendant breached its contractual relationship with Plaintiff or discriminated against her on the basis of her sex.  Thus, the court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

## II.      BACKGROUND

### A.      Undisputed Facts[1]

Plaintiff Michaela Smith enrolled at Howard University College of Medicine ("College of Medicine") in the fall of 2017.  Def.'s Mot. for Summ. J., ECF No. 42 [hereinafter Def.'s Mot.], Def.'s Stmt. of Material Undisputed Facts, ECF No. 42-2, ¶ 2 [hereinafter Def.'s SOF].  She failed two courses in her first semester and subsequently took a medical leave of absence.  Def.'s SOF ¶¶ 6–7.  In the fall of 2018, she rejoined the College of Medicine as a first-year repeating student.  *Id.* ¶ 10.

In December 2018, she began an anatomy course, Structure and Function II ("SF II").  *Id.* ¶ 23.  Each student's grade in that course was calculated as a cumulative weighted average of four written examinations, four laboratory examinations, and quizzes.  *Id.* ¶ 27.  Plaintiff missed the first written and laboratory exams, eventually rescheduling them for April 2019, and failed the second written and laboratory exams.  *Id.* ¶¶ 31–32.  She took the third laboratory exam for the course on January 28, 2019.  *Id.* ¶ 33.  At the conclusion of the exam, she handed in her answer sheet, on which she had written "anterior semicircular canal" as her response to Question 14.  Def.'s Mot., Ex. 16, ECF No. 42-25 [hereinafter Def.'s Ex. 16].  She received the graded answer sheet on January 30, 2019, which reflected that she had earned a 77%, a passing grade.  Def.'s SOF ¶ 36.

After the graded exams were returned to students, Dr. Edward Gilland, the laboratory coordinator and exam proctor, informed the class that the correct answer to Question 14 was

---

[1] These facts are set forth in Defendant's Statement of Material Undisputed Facts, ECF No. 42-2.  Contrary to the court's instruction, *see* Order, ECF No. 38, Plaintiff did not admit or deny each fact asserted by Defendant, *see generally* Pl.'s Stmt. of Material Facts Establishing Genuine Issues, ECF No. 47-1.  Instead, she selectively identified individual facts or a grouping of facts by paragraph number and responded to those she disputes.  *See id.* at 9–14.  The court treats as conceded any fact that Plaintiff has not disputed. Fed. R. Civ. P. 56(e)(2).  The facts set forth below are uncontested.

"posterior semicircular canal." *Id.* ¶ 37.   Plaintiff did not receive credit for her "anterior semicircular canal" answer. *See* Def.'s Mot., Ex. 17, ECF No. 42-26 [hereinafter Def.'s Ex. 17].

College of Medicine students can submit "challenges" to exam scores if they believe that, for example, a response was incorrectly graded, requiring recalculation of the score.  Def.'s SOF ¶ 38.  On February 4, 2019, Plaintiff challenged the grading of four questions on that SF II exam, including Question 14.  *Id.* ¶¶ 41–42; Def.'s Ex. 17.   As part of the process, she resubmitted her exam but only after changing her answer to Question 14 from "anterior semicircular canal" to "posterior semicircular canal."  Def.'s SOF ¶ 42–43; Def.'s Exs. 16, 17.  She made the change by writing a "p" and "o" over the "a" and "n" in "anterior" and squeezing in an "s" after the altered letter "o."  Def.'s SOF ¶ 44; Def.'s Ex. 17.   On a cover page accompanying the resubmitted examination, Plaintiff wrote that her answer to Question 14 "was correct, yet marked wrong" and "recalculation needed."   Def.'s SOF ¶ 46; Def.'s Ex. 17; Def.'s Mot., Ex. 5, ECF No. 42-9 [hereinafter Def.'s Ex. 5], at 7.  Although Plaintiff denies that she intended to cheat, she does not dispute altering the exam answer as described.  Def.'s Mot., Ex. 12c, ECF No. 42-19 [hereinafter Def.'s Ex. 12c], at 2; Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 47 [hereinafter Pl.'s Opp'n], at 10.[2]

A disciplinary process followed.  The Honor Council Committee ("HCC") held a hearing on April 16, 2019.  Def.'s SOF ¶ 82.  Plaintiff admitted that she changed her answer to Question 14 but claimed that she did not do so to cheat.  Def.'s Mot., Ex. 1, ECF No. 42-5 [hereinafter Def.'s Ex. 1], at 220.  The HCC panel found her defense unconvincing.  It unanimously found that Plaintiff had violated the Honor Code.  Def.'s Ex. 12c; Def.'s SOF ¶ 93.  The panel members then voted on a sanction.  The panel split 3–3 on whether to recommend expulsion, with Dr. Clive

---

[2] References to Pl.'s Opp'n are to the CM/ECF page number.

Callender, the HCC's Chair, casting the tie-breaking vote in favor of expulsion.  Def.'s SOF ¶ 95.
The HCC passed on its recommendation to the Dean of the College Medicine, Dr. Hugh Mighty,
for a final determination of sanctions.  Dean Mighty met with Plaintiff on June 3, 2019, and
although she admitted to changing her exam answer, she maintained that she had not engaged in
academic dishonesty.  *Id.* ¶¶ 119–120.  Later that month, Dean Mighty wrote to Plaintiff to inform
her that she would be expelled.  *Id.* ¶ 124.

Separately, the College of Medicine's Promotions and Graduation Committee
("P&G Committee"), a faculty-only committee, annually decides which students have met the
academic requirements to earn promotion to the next year's class.  *Id.* ¶¶ 105, 111.  The College
of Medicine's Policies and Procedures Manual provides that a repeating student who fails any
course during the second attempt at the first-year curriculum "will be dismissed."  *Id.* ¶ 106
(quoting Def.'s Mot., Ex. 19, ECF No. 42-28 [hereinafter Def.'s Ex. 19], Policies and Procedures
Manual § XX(C), at 61).  Because of the academic dishonesty determination, Plaintiff received a
grade of zero on the third laboratory exam in the SF II course.  *Id.* ¶ 104.  She ended the course
with a failing cumulative final grade.  *Id.*  On May 23, 2019, the P&G Committee met and decided
to dismiss Plaintiff from the College of Medicine because she had failed a class as a repeating first-
year student.  *Id.* ¶ 112.

Dr. Debra H. Ford, the Senior Associate Dean for Academic Affairs and the non-voting
chair of the P&G Committee, sent Plaintiff a letter informing her of the Committee's decision and
her right to appeal according to the Policies and Procedures Manual.  *Id.* ¶¶ 111–12.  Although
Plaintiff claims to have noticed an appeal, the College of Medicine has no record of its receipt.  *Id.*
¶ 116.

### B.       Procedural History

Plaintiff originally filed this action in the D.C. Superior Court on March 22, 2021, and Defendant removed it to this court on April 5, 2021.  ECF No. 1, Notice of Removal.  Her complaint contained two causes of action: (1) breach of contract and (2) sex discrimination in violation of Title IX.  Compl., ECF No. 1-1, at 14–18.  Those claims survived a motion to dismiss.  Mem. Op. & Order, ECF No. 17.  Both sides now move for summary judgment.  Pl.'s Mot. for Summ. J., ECF No. 43 [hereinafter Pl.'s Mot.], Pl.'s Mem. of P&A in Supp. of Pl.'s Mot. [hereinafter Pl.'s Mem.]; Def.'s Mot., Def.'s Mem. in Supp. of Def.'s Mot., ECF No. 42-1 [hereinafter Def.'s Mem.].

## III.    LEGAL STANDARD

The court analyzes the parties' motions under the Rule 56 summary judgment standard.  Fed. R. Civ. P. 56(a).  A court grants summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  A fact is material if it can affect the outcome of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record that "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party may oppose the motion using "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Id.* at 324.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  "To defeat a motion for summary judgment," however, "the non-moving party must offer more than mere unsupported allegations or denials."  *Dormu v. Dist. of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324).

**IV.    DISCUSSION**

**A.    Plaintiff's Motion for Summary Judgment**

The court starts with, and quickly disposes of, Plaintiff's motion for summary judgment. On her Title IX claim, Plaintiff has not carried her burden to show that there is no genuine dispute of material fact that sex was a reason for her dismissal.  *See infra* Part IV.C.1; *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236–37 (4th Cir. 2021) (holding that a claim regarding school discipline under Title IX requires but-for causation); *cf. Radwan v. Manuel*, 55 F.4th 101, 131 (2d Cir. 2022) (strongly suggesting that Title IX requires but-for causation, but not deciding the question).  The College of Medicine's decision-makers, Dr. Callender and Dean Mighty, have attested that sex played no role in their evaluation of Plaintiff's conduct.  *See* Def.'s Ex. 12, Callender Decl. ¶ 19; Def.'s Mot., Ex. 13, ECF No. 42-20, ¶ 12 [hereinafter Mighty Decl.].  That is enough to deny summary judgment on the Title IX claim, because the question of discriminatory intent is one for the jury.  *See Mansfield v. Billington*, 574 F. Supp. 2d 69, 83 (D.D.C. 2008) (denying the plaintiff's motion for summary judgment on a retaliation claim because "discriminatory animus in this instance is a jury question"); *Bradley v. D.C. Pub. Schs.*, 222 F. Supp. 3d 24, 30 (D.D.C. 2016) (stating that "intent is a quintessential jury question").

As for her breach of contract claim, for the reasons discussed below, Plaintiff has not carried her burden as to that claim, either.  Her motion therefore is denied.

**B.    Breach-of-Contract Claim**

Turning to Defendant's motion, the court begins with the contract claim, which Plaintiff frames narrowly.  She does not assert that the Policies and Procedures Manual is an enforceable agreement.  Pl.'s Opp'n at 5 ("Plaintiff does not argue that the HCOM Manual, standing alone, is a contract between Plaintiff and Defendant.").  She likely avoids that theory for good reason: the

Manual expressly states that "[t]he information within this brochure does not constitute a contract." Def.'s SOF ¶ 13.

Instead, Plaintiff's claim is premised on a general "contract to provide educational services to Plaintiff," which Defendant breached by "arbitrar[ily] and capricious[ly] dismiss[ing]" her. Compl. ¶ 89; Pl.'s Opp'n at 5.  To establish such breach, Plaintiff points to Defendant's numerous alleged failures to follow the policies and procedures set forth in the very record that is *not* a contract: the Policies and Procedures Manual.  Pl.'s Opp'n at 5.  She contends that, "in this Court, failure to comply with the published policy, here the HCOM manual, can establish a breach of contract not because the HCOM manual is a contractual document, but because failure to comply with the published policies establishes an arbitrary or capricious action that is a breach of the contract."  *Id.* at 5–6.

### 1.    *University & Student Contractual Relationship*

The problem with Plaintiff's theory is self-evident: she seeks to rely on admittedly non-contractual terms to establish a breach of contract.  She cites no appellate authority that condones such circularity.  True, District of Columbia law recognizes that "the relationship between a university and its students is contractual in nature."  *Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017) (quoting *Manago v. Dist. of Columbia*, 934 A.2d 925, 927 (D.C. 2007)).  But it does not necessarily follow that a plaintiff can rely on violations of a non-binding manual or handbook to establish a breach of that general relationship.

The only case that Plaintiff cites in support is *Hajjar-Nejad v. George Washington University*, in which the court quoted *Bain v. Howard University* for the proposition that "a school's failure to comply with published policies can be evidence of arbitrariness."  37 F. Supp. 3d 90, 119 (D.D.C. 2014) (quoting *Bain v. Howard Univ.*, 968 F. Supp. 2d 294, 299 (D.D.C.

2013)).   The "published policies" in *Bain* were not the university's own policies, but outside accreditation standards.  *See Bain*, 968 F. Supp. at 299–300 ("This is not a case in which a student is attempting to hold his school to its own published policies[.]").  And, as to those standards, the court held that the university's violation of them could *not* establish a breach of contract because the plaintiff had "not identified any statement or document in which Howard promised to abide by [the accreditation] guidelines." *Id.* at 299.  Here, the published policies at issue are the Defendant's own, but the Manual does not "promise to abide" by them, *id.*, and in fact states that "it reserves the right to modify" such policies and procedures.  Def.'s Ex. 19 at 2.  Plaintiff thus cites no authority to support her theory that violations of non-contractual provisions can support a breach of the general university-student contractual relationship.  Defendant's motion is granted on that basis alone.

In any event, even under Plaintiff's contract theory, she does not survive summary judgment.  Where, as here, a case involves "a judgment by school officials that a student has not performed adequately to meet the school's academic standards," such determination "usually calls for judicial deference." *Bain*, 968 F. Supp. at 297 (quoting *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1108 (D.C. 1999)).  A university "will be entitled to summary judgment unless the plaintiff can provide some evidence from which a fact finder 'could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance.'" *Id.* at 298 (quoting *Alden*, 734 A.2d at 1109).  This standard is demanding.  Put differently, courts should not "overturn an academic decision unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Jung v. George Washington Univ.*, 875 A.2d 95, 108 (D.C. 2005) (internal quotation marks and citation omitted).  "Only the most

compelling evidence of arbitrary or capricious conduct" can make such showing. *Id.* (internal quotation marks and citation omitted).

Under these standards, resolving Plaintiff's breach claim is, in one way, straightforward. Plaintiff admitted that, as part of the challenge process, she altered her response to an exam question that she had answered incorrectly.   Def.'s SOF ¶¶ 57 (admission to Dr. Ford), 87 (admission before the HCC).   Still, Plaintiff denied that she had cheated. *Id.* ¶¶ 57, 88; Pl.'s Stmt. of Material Facts Establishing Genuine Issues, ECF No. 47-1 [hereinafter Pl.'s SOF], ¶ 43.   She pleaded her case before the HCC, insisting that her conduct was based on a "misunderstanding." Def.'s SOF ¶ 92. But the HCC unanimously found that she had committed academic dishonesty. *Id.* ¶ 93.  A majority voted to recommend her expulsion from the College of Medicine, *id.* ¶¶ 95–96; Dean Mighty accepted that recommendation after meeting with Plaintiff, *id.* ¶¶ 119–20, 124.  Based on these facts, which Plaintiff has not disputed, no reasonable fact finder could conclude that that "there was *no rational basis* for the decision," *Chenari*, 847 F.3d at 745 (quoting *Alden*, 734 A.2d at 1108) (emphasis added), or that decision-makers "did not actually exercise professional judgment," *Jung*, 875 A.2d at 108.

### 2.    Claimed Procedural Deviations

To save her claim then, Plaintiff must show that the expulsion decision "'was motivated by bad faith or ill will unrelated to academic performance,'" or at least that a reasonable trier of fact could so conclude. *See id.* (quoting *Alden*, 734 A.2d at 1108).  That theory rests exclusively on a bevy of claimed violations of the Policies and Procedures Manual.  But none of those alleged violations, alone or taken together, give rise to a genuine dispute over whether Plaintiff's expulsion was motivated by anything other than an honest effort to impose consequences for her unrepentant academic dishonesty.  In every instance, either Plaintiff offers no evidentiary support for an alleged

violation, or Defendant establishes substantial compliance with the policy or procedure.  And, even where the process may have fallen short, Plaintiff fails to show how that noncompliance could give rise to a reasonable inference of "bad faith or ill will unrelated to academic performance."  *Id.*

In the interest of completeness, the court addresses each claimed deviation from the Policies and Procedures Manual that Plaintiff claims is proof of breach.

*Inadequate HCC Investigation.*  Plaintiff first claims that the HCC was required to conduct an independent investigation of the academic dishonesty allegation but failed to do so.  Pl.'s Opp'n at 9–10.[3]  Plaintiff cites to "Complaint Par. 44" to support her position, but a complaint's allegations are not evidence.  *See Anderson*, 477 U.S. at 248.  More substantively, Plaintiff points to the absence of any disclosed records to establish that the HCC did not conduct its own investigation.  Pl.'s Opp'n at 10.

The Policies and Procedures Manual states that the Committee's Chair and Vice Chair "are required to complete an investigation" and that they "will be responsible for gathering information about the case."  Def.'s Ex. 19, Code of Honor, Professionalism, and Ethics ("Honor Code"), § E.3 at 35.  Then, the HCC "convene[s] to determine whether sufficient evidence exists to warrant a formal hearing."  *Id.* § E.5 at 36.  The Manual does not contain further guidance on the elements of an investigation or what types of facts suffice to convene a formal hearing.  *See id.*

The record shows that the HCC's "investigation" was perfunctory and that the HCC seemingly did not convene to determine whether to hold a formal hearing.  On or about March 21, 2019, Dr. Clive Callender met with Gabriel Felix, a fourth-year student and Vice Chair of the HCC, and together they reviewed an email Dr. Ford had sent to Dr. Callender referring the

---

[3] Plaintiff's opposition brief and her opening brief in support of summary judgment effectively mirror one another with respect to the claimed violations of the Policies and Procedures Manual.  *Compare* Pl.'s' Opp'n at 9–16, *with* Pl.'s Mem. at 13–18.  For ease of reference, the court cites only to the opposition brief and the evidence that Plaintiff offers in support.

academic dishonesty charge to the HCC.  Def.'s SOF ¶ 71; Def.'s Ex. 12 ¶ 5.  Dr. Ford's email briefly described Plaintiff's alleged conduct and stated that "[t]he student admitted to changing the answer sheet."  Def.'s SOF ¶ 70.  Apparently, based on Dr. Ford's email alone, Dr. Callender and Felix determined that the accusation "necessitated a formal hearing before the HCC[.]"  Def.'s Ex. 12 ¶ 5.

But even if the HCC investigation can be considered lacking, Plaintiff still does not explain how she was prejudiced or why the absence of a more robust HCC investigation establishes bad faith or ill will by Defendant.  It is not as if there was *no* investigation.  Following Plaintiff's challenge submission, Dr. Gilland, Plaintiff's lab coordinator, "noticed the problem" with Question 14, Def.'s Ex. 12c, and reported it to Dr. James Wilson, the Course Coordinator. Dr. Wilson in turn sent a letter to Dr. Ford on February 19, 2019, accusing Plaintiff of altering her answer to Question 14 and attaching the relevant documents.  Def.'s Mot., Ex. 20, ECF No. 42-29 [hereinafter Def.'s Ex. 20].  Dr. Ford, in turn, spoke with Dr. Wilson, inspected the documents, and then scheduled a meeting with Plaintiff.  Def.'s Mot., Ex. 2, ECF No. 42-6 [hereinafter Def.'s Ex. 2], at 97.  At their meeting, Dr. Ford reviewed the allegation of academic dishonesty with Plaintiff and showed her the original exam and the challenge copy that she submitted.  *Id.* at 88, 104, 107.  Plaintiff admitted that she altered the answer sheet when she submitted the challenge to Question 14.  Def.'s SOF ¶ 57.  Dr. Ford then reported the allegation to the HCC.

So, by the time the matter reached the HCC, the relevant documents had been gathered and Plaintiff had received an opportunity to explain the alterations to Question 14, which she admitted making.  In light of these uncontested facts, no reasonable factfinder could hold that the mere lack of additional investigation by the HCC establishes that bad faith—as opposed to Plaintiff's admitted academic misconduct—was the reason for her dismissal.

The HCC's apparent failure to interview Dr. Gilland does not require a different result. Plaintiff contends that Dr. Gilland "is the key witness with the most knowledge of how [she] completed her exam and challenge response[,]" yet the HCC never interviewed him.  Pl.'s Opp'n at 13.  But Plaintiff offers no record evidence of how Dr. Gilland, if interviewed, would have exonerated her or otherwise mitigated her actions.   Plaintiff had the opportunity to request Dr. Gilland's attendance at the HCC hearing, but she did not ask for him to appear.  Def.'s SOF ¶ 77.  And, when she complained to Dean Mighty on June 3, 2019, about Dr. Gilland's absence from the HCC hearing, he asked what difference Dr. Gilland's testimony would have made.  *Id.* ¶ 122.   Plaintiff could not explain what "exculpatory" information Dr. Gilland would have presented.  *Id.*  Plaintiff cannot now point to the HCC's failure to speak to Dr. Gilland as proof of bad faith when Plaintiff still has not articulated what favorable or mitigating information he would have presented.

*Sharing of Evidence in Advance*.  Plaintiff claims that the HCC violated policy when it did not share "evidence of the investigation" with her in advance of the hearing.  Pl.'s Opp'n at 10–11.  Here, she cites to paragraph 13 of her "Statement of Material Facts Establishing Genuine Issues," but that paragraph does no more than rely on an allegation in her complaint and the absence of records.  Pl.'s SOF ¶ 13 (citing Compl. ¶ 44).  Plaintiff thus cites to no affirmative evidence to establish that she did not receive "evidence of the investigation."  *See Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(c)(1)(A).

In any event, Plaintiff was not denied access to the evidence prior to the hearing.  Dr. Ford showed Plaintiff the initial and altered answer sheets on February 19, 2024.  Def's Ex. 2 at 88, 104, 106–107.  Plaintiff received a copy of Dr. Wilson's referral to Dr. Ford on or about March 29, 2024.  Def.'s Ex. 1 at 176–77; Def.'s Ex. 20.  At the HCC hearing, Dr. Ford distributed color

copies of Plaintiff's exam answers before and after the alterations.  Def.'s Ex. 12c at 1.  The HCC considered no other evidence.  Importantly, Plaintiff does not claim to have ever asked for these materials in advance of the hearing.  These undisputed facts do not establish bad faith.

*Timeliness*.  Plaintiff also complains about various timing aspects of the charges and the HCC proceedings.  Only two Manual provisions speak to timeliness.  The first provides that the accuser must report the violation "as soon as possible" to the HCC Chair.  Def.'s Ex. 19 § E.1, at 35.  This is hardly a definite standard.  The second provision establishes that the hearing take place 21 working days after the accusation is reported to the HCC.  *Id.* § E.7 at 36.  The Manual also states that, "[i]n rare instances, a different time period may be determined by the Council based upon the specific circumstances of the case."  *Id.*  Plaintiff claims that there was a 30-day delay in reporting the alleged dishonesty and that more than 21 days passed between the formal allegation and her hearing.  Pl.'s Opp'n at 11.

The timeline is as follows.  Plaintiff took the SF II examination on January 28, 2019, Def.'s SOF ¶ 33; the course coordinator, Dr. Wilson, informed Dr. Ford of Plaintiff's exam alteration on February 19, 2019 (the record does not establish when Dr. Ford first learned of the issue), *id.* ¶ 53; Dr. Ford submitted her formal accusation to the HCC on March 11, 2019, *id.* ¶ 69; and the HCC convened to hear Plaintiff's case on April 16, 2019, *id.* ¶ 82.  So, approximately six weeks passed from the exam date to the date of notice to the HCC.  Plaintiff does not present any evidence to show that this delay caused her any harm.  As for the timing of the HCC hearing, Plaintiff can blame herself.  She does not dispute that the original hearing scheduled for April 1, 2021, was postponed at her request because it conflicted with an exam.  Def.'s SOF ¶ 75; Def.'s Ex. 1 at 165.  Plaintiff was "fine" with the rescheduling.  Def.'s SOF ¶ 75; Def.'s Ex. 1 at 166.

*Inadequacy of Notice.*   Plaintiff attacks the adequacy of the notice she received about the charges.  Pl.'s Opp'n 11–12.  She complains that, contrary to the Policy and Procedures Manual, Defendant did not share the "name of the individual making the initial allegation" or "the nature of the violation with which [she was] charged[.]"  Def.'s Ex. 19, Honor Code, § E.6 at 36; *see* Pl.'s Opp'n at 11–12.  Undisputed evidence refutes this contention.

On March 25, 2019, Dr. Callender and the Dean's office sent Plaintiff a formal notice that the HCC hearing would take place on April 1, 2019, and that the HCC had "received a complaint against [her] alleging academic dishonesty in the changing of an answer on an Anatomy Lab exam which violates the Honor Code[.]"  Def.'s Exs. 8, 12a; Def.'s SOF ¶ 73.  Then, two days later, on March 27, 2019, Plaintiff received via email the "formal allegation of Academic Dishonesty," which was the February 19, 2019 referral letter from Dr. Wilson to Dr. Ford.  Def.'s SOF ¶ 74; Def.'s Ex. 20.  The February 19 letter identified Dr. Wilson as her accuser and alleged that Plaintiff had "attempted to cheat on the 3rd laboratory examination that was given on January 28, 2019 in *Structure and Function, Unit 2*."  Def.'s Ex. 20.  The letter further identified the answer that Plaintiff had altered, as well as her note indicating that "My answer was correct, yet marked wrong."  *Id.*  The claimed lack of notice is thus contradicted by the record.

Plaintiff also asserts that she "only received the charge against her the day before her hearing."  Pl.'s Opp'n at 12.  As discussed, the evidence is to the contrary.  Plaintiff references paragraph 19 of her Statement of Material Facts as support, but that assertion ineffectually cites only to her complaint.  Pl.'s SOF ¶ 19 (citing Compl. ¶ 40).

*Select Advisor & Adequate Preparation*.  Plaintiff claims that she was deprived of the opportunity to select an advisor and adequately prepare for the hearing, because she learned of "the charges the day before the hearing."  Pl.'s Opp'n at 12.  As discussed, her claim of untimely

notice is just wrong. Plaintiff had weeks to prepare for the hearing. She first learned of the cheating allegations at her meeting with Dr. Ford on February 26, 2019. Def.'s SOF ¶ 56. Then, on March 25, 2019, and March 27, 2019, she received notices from the HCC setting forth the allegations, her accuser, the nature of the charges, and a hearing date of April 1, 2019. *See supra.* The March 25 letter advised her that she had "the option of bringing an advisor who can be present during the hearing but will not be allowed to testify." Def.'s Mot., Ex. 8, ECF No. 12-2. Her hearing took place over three weeks later on April 16, 2019. Def.'s SOF ¶ 82. Plaintiff thus had ample time to identify an advisor and prepare for her hearing.

*HCC Student Members.* Plaintiff challenges the HCC's composition, claiming that two student members were not present for her hearing. Pl.'s Opp'n at 13. She also complains that one student, Philise Williams, was not "neutral" or properly appointed. *Id.* at 14. Plaintiff, however, cites only to her complaint as to the first allegation, *see id.* at 13 (citing Pl.'s SOF ¶ 26,[4] which cites Compl. ¶¶ 55, 57–58), and she cites no evidence in the record as to the second, *see id.* at 14.

Two students in fact were present for her HCC hearing: "Philise Williams (a fourth-year student) and Sachin Rajpal (a third-year student who was also the HCC Secretary) both sat on the HCC panel for the HCC hearing on April 16, 2019." Def.'s SOF ¶ 81; Def.'s Ex. 12c (listing HCC attendees, including Williams and Rajpal). Plaintiff purports to dispute this fact, but she cites only to her complaint, not record evidence. *See* Pl.'s SOF ¶ 45 (citing Compl. ¶¶ 55, 57–58). The court therefore treats the presence of two students at the HCC hearing as conceded.

*Timing of HCC Decision.* Plaintiff learned of her expulsion on or about June 12, 2019. Def.'s SOF ¶ 124. Plaintiff claims that her receipt of the decision was untimely. Pl.'s Mem. at 17. Plaintiff identifies no Manual provision that specifies a deadline for the delivery of HCC

---

[4] Plaintiff's opposition incorrectly identifies the paragraph as "25."

decisions.  Moreover, Plaintiff ignores the fact that Dean Mighty met with her on June 3, 2019, and only afterwards made the final decision to expel Plaintiff.  Thus, there was no impermissible delay in notifying her of the expulsion decision.

*Appeal of P&G Committee Decision.*  Separately from the HCC's finding, the College of Medicine's P&G Committee determined that Plaintiff should be dismissed for failing a course as a repeating student.  Def.'s Mot., Ex. 26, ECF No. 42-35.  Plaintiff claims that Defendant improperly failed to consider her appeal of that decision.  Pl.'s Mem. at 17–18.  She did not, however, follow the proper procedure for filing an appeal, and the College of Medicine has no record of having received it.  *See* Def.'s SOF ¶¶ 113–18.  Thus, there was no arbitrary disregard of her "appeal" of the P&G Committee's decision.  In any event, the P&G Committee's decision was not the reason for her expulsion.  It was her act of academic dishonesty.  That appeals process from the P&G Committee's decision thus is not relevant to the ultimate issue.

*Sanction.*  Finally, Plaintiff claims that similarly situated students found guilty of academic dishonestly did not face expulsion, which proves that her sanction was imposed in bad faith.  Pl.'s Opp'n at 15.  The court need not decide, however, whether a disproportionate penalty might be enough to establish a breach.  As discussed below, Plaintiff has not shown that the harsher discipline she received was irrational or based on impermissible factors.

In sum, even accepting Plaintiff's legal theory that violations of non-contractual policies and procedures can support a breach of the general contractual relationship between a university and student, no reasonable factfinder could make that finding based on this record.

### C.    Title IX Claim

#### 1.    Selective Enforcement

Plaintiff brings a Title IX claim against Defendant, as well.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity[.]" *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638 (1999) (quoting 20 U.S.C. § 1681(a)). Plaintiff frames her claim as one of "selective enforcement," in which "the severity of the penalty," regardless of guilt or innocence, "was affected by the student's gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  *See* Pl.'s Opp'n at 17 (stating that Plaintiff "questions Defendant's treatment of male and female students when the alleged conduct was similar or the same" and alleges "gender discrimination was the basis for [Plaintiff's] receipt of a harsher sanction than those given to her male colleagues").

Plaintiff does not claim to have direct evidence, such as statements or remarks, of sex discrimination.  *See* Pl.'s Opp'n at 19.  Plaintiff instead relies on indirect evidence, to which the familiar *McDonnell-Douglas* burden-shifting framework applies.  *Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021); *Radwan*, 55 F.4th at 130 ("Title VII's burden-shifting framework generally guides our analysis of claims brought under Title IX."); *see also Richardson v. Loyola Coll. in Md., Inc.,* 167 F. App'x 223, 224 (D.C. Cir. 2005) (applying *McDonnell-Douglas* to Title IX discrimination claim).  That framework places an initial burden on a plaintiff to establish a prima facie case of discrimination, but when the defendant proffers a legitimate, non-discriminatory reason for its actions, the prima facie case "is no longer relevant."  *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  The "central question" then at summary judgment is whether the plaintiff has produced sufficient evidence for a reasonable jury

to find that the defendant's asserted non-discriminatory reason was pretext and that the defendant intentionally discriminated against the plaintiff, in this case, on the basis of sex.  *Id.*

Here, Defendant has offered a legitimate, non-discriminatory reason for expelling Plaintiff: she cheated.  To establish pretext, Plaintiff relies primarily, if not exclusively, on comparator evidence.  *See* Pl.'s Opp'n at 19.  In the Title VII context, the D.C. Circuit has said that a relevant comparator's employment situation must be "nearly identical" to that of the plaintiff in "all relevant respects."  *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C Cir. 2016) (quotation marks and citation omitted).  Other circuits have applied a similar formulation to Title IX cases.  "[U]nder Title IX, to support a claim of selective enforcement using [comparator] evidence, a female student must show that a male student in circumstances sufficiently similar to her own was treated more favorably by the university."  *Radwan*, 55 F.4th at 132; *see also Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) (analyzing whether a plaintiff had sufficiently pleaded that a "similarly situated" student of the opposite sex was treated more favorably).

To meet her burden, Plaintiff provides evidence of three male students at the College of Medicine that engaged in acts of academic dishonesty but were not expelled.  Pl.'s Mem. at 17.[5]

- The closest comparator of the three is A.C. ("A.C. I").  The HCC found that, like Plaintiff, during the 2018–2019 academic year, he had altered an exam sheet in the same SF II course and sought additional credit.  Yet, he received only a written warning

---

[5] Although her burden, Plaintiff does not identify any comparators in her opposition brief to establish an inference of discrimination.  *See* Pl.'s Opp'n at 18–22.  She does, however, identify comparator evidence in her own motion, so the court will consider that evidence as if it were raised in her opposition brief.

in his academic file, which Dean Mighty determined would remain part of his permanent academic record.  *Id.*; Def.'s SOF ¶¶ 134–35.

- Plaintiff identifies a second unnamed "male student from the previous 2017-2018 academic year with an identical accusation [who] received a sanction of a permanent written record."  Pl.'s Mem. at 17, 10 ¶ 32; Def.'s Stmt. of Material Facts in Resp. to Pl's SOF, ECF No. 46-1, ¶ 7 (admitting that the allegations against the unnamed student were "substantially the same as those against Plaintiff").

- A third male student, also with the initials A.C. ("A.C. II"), during the 2018–2019 academic year, took a screen shot of a proprietary online quiz and circulated it to classmates.  Pl.'s Mem. at 17; Pl.'s Mot, Ex. B, ECF No. 43-1, No. 23.  He was suspended for 30 days and required to make a presentation on professionalism to other students.  Def.'s SOF ¶ 133.[6]

Defendant disputes that Plaintiff is similarly situated to any of the three male comparators in "all relevant respects."  They are distinguishable, Defendant contends, because each male student "expressed remorse and admitted their guilt," while Plaintiff did not.  Def.'s Mem. at 39; *see also* Def.'s Reply Mem. in Supp. of Mot. for Summ. J., ECF No. 52, at 17–19.  The record, which Plaintiff does not dispute, bears this out.

- A.C. I's HCC Hearing notes reflect that he apologized for his conduct and said, "I cheated my medical education" and "compromised my medical education and the future patients I will have."  Def.'s Ex. 12e.  He also acknowledged that he believed

---

[6] Plaintiff identified an additional male comparator in her opposition brief and sought additional discovery, Pl.'s Opp'n at 17, which Defendant provided, ECF No. 62, upon court order, ECF No. 60.  The court invited the parties to supplement their filings, as summary judgment briefing had closed, *see id.*, but Plaintiff did not do so.  Only Defendant filed a supplement.  Def.'s Suppl. Filing Related to Student C, ECF No. 62.  So, the court does not consider the evidence relating to this additional comparator.

that cheating would improve his grade level.  *Id.*  When the HCC discussed the
infraction, Dr. Callender recognized A.C. I's "honesty during the statement he made."
*Id.*

- The unnamed student whose infraction was similar to Plaintiff's also expressed that he
  "understood he was guilty and took responsibility for his actions."  Def's Reply Br. in
  Supp. of Def.'s Mot., Ex. B., ECF No. 46-5, ¶ 5.

- A.C. II also "admitted to the violation."  Def.'s Ex. 12d; Def.'s SOF ¶ 133.  A.C. II's
  conduct occurred during the same academic year as Plaintiff's and, according to Dean
  Mighty, he "did not expel several other students who were found to have engaged in
  academic dishonesty" in that year "because those students admitted to their violations,"
  which would include A.C. II.  Mighty Decl. ¶ 11.

In sharp contrast, Plaintiff refused to admit to any act of academic dishonesty.  She told the
HCC that the "gross allegations" against her were "false" and "meant to impugn her reputation."
Def.'s Ex. 12c at 2.  She said in her opening statement, "My version of events: I did not cheat, this
is about four questions . . . not just the one.   My intent is to prove that all this is an attempt to
wrongfully charge me."  *Id.*  And she went beyond just denying the allegations and defending
herself.  She blamed others, claiming that, because Drs. Gilland and Wilson had not spoken to her
since the exam, they "demonize[d] [her] actions through even more false allegations."  *Id.*
She accused Dr. Wilson's presence at the hearing as "obstruct[ing] her line of questioning,"
because she had prepared for Dr. Gilland to be present instead.  *Id.* at 3.  She further said, even
though she had admitted to Dr. Ford that she changed the answer, she felt "misled" and "coerce[d]
[by Dr. Ford] into making an admission of some sort."  *Id.*  Eventually, Plaintiff admitted to the
Committee that she had changed the exam answer but insisted that she had done so merely to start

a conversation with Dr. Gilland, not to claim credit for an incorrect answer. *Id.* at 4–5. During their deliberations, members of the HCC stated that Plaintiff's conduct and her attempts to defend it raised serious questions about her character and integrity to work as a doctor. *See id.* at 6 (student Philise Williams expressing the concern that "she might lie" as an intern or resident; Dr. Richardson stating she did not think "remediation would be helpful for this student").

Importantly, after the HCC hearing, when Plaintiff appeared before Dean Mighty to plead her case, she admitted to altering the exam answer but continued to insist that "she had not engaged in academic dishonesty[.]" Def.'s SOF ¶ 120. Her persistent denials put Plaintiff in a different position than the male comparators who also had engaged in acts of academic dishonesty. According to Dean Mighty, "[u]nlike Smith, [he] felt that [the others] had learned from the experience and would in the future likely conduct themselves with integrity." Mighty Decl. ¶ 11. Plaintiff offers no proof to contradict that Dean Mighty honestly held this belief. The record therefore establishes that none of the male comparators were similarly situated to Plaintiff in "all relevant respects."

Plaintiff insists that acceptance of responsibility is not a legitimate basis on which to draw a distinction between her and the comparators. Pl.'s Opp'n at 19–20. She contends that "Defendant presents no case law to show that admission of guilt is a basis for disparate punishment." Pl.'s Opp'n at 20. That is wrong. Defendant cites to cases from this District Court and others that have recognized in the Title VII context that an employee's acceptance of responsibility and expression of remorse makes such an employee distinct from one who does not.

For instance, in *Gulley v. District of Columbia*, the plaintiff, a police officer, offered as a comparator a fellow officer who made racist comments and was aggressive while drunk. 474 F. Supp. 3d 154, 168 (D.D.C. 2020). The court rejected the two as similarly situated because the

other officer had joined Alcoholics Anonymous, whereas the plaintiff "not only failed to show remorse for his conduct, he . . . lied to [the police deputies] about his conduct." *Id.*  True, the plaintiff there also had a long history of disciplinary problems unlike the comparator officer, but *Gulley* recognized that an employee who expresses remorse for conduct is differently situated from one who does not.

Other courts have done the same.  For example, in *Banks v. Jefferson-Smurfit*, the court ruled that the defendant-employer had "articulated legitimate, non-discriminatory reasons" for differences in discipline where, unlike the comparators, the plaintiff had "never expressed remorse for his actions and never agreed to obey the rule in the future."  176 F. Supp. 2d 499, 509 (M.D.N.C. 2001), *aff'd*, 37 F. App'x 610 (4th Cir. 2002).  Similarly, the court in *Henson v. U.S. Foodservice, Inc.*, held that comparators were not similarly situated to the plaintiff because, unlike him, "management perceived that the insubordinate employee was remorseful."  Civil No. 11-1809 (JBS/KMW), 2013 WL 6080359, *aff'd*, 588 F. App'x 121, 124, 126 (3d Cir. 2014); *cf. Radwan*, 55 F.4th at 134 (finding that the plaintiff and her male comparator were similarly situated in part because they both "later expressed remorse").

Plaintiff also argues that her failure to express remorse "is an insufficient and inadequate explanation for Defendant's conduct."  Pl.'s Opp'n at 20.  She contends that "[a] student in this instance, who believes she has not committed the alleged conduct, is well within her right to contest the accusations against her without retaliation."  *Id.*  On issues of "professional comportment," however, courts generally "defer[] to academic decisions," *Hajjar-Nejad*, 37 F. Supp. 3d at 117, and they "should refrain from second-guessing the disciplinary decisions made by school administrators," *Davis*, 526 U.S. at 648.  Here, the Policy and Procedures Manual identifies "acknowledg[ing] [one's] own mistakes" as an aspect of "honor and integrity," a trait that the

22

College of Medicine defines as a component of professional behavior.  Def.'s SOF ¶ 137 (quoting Def.'s Ex 19, Policy and Procedures Manual at 30).  An accused student of course has the right to defend herself against alleged misconduct.  But that does not preclude a school from treating less harshly a student that is contrite and admits wrongdoing, as compared to a student like Plaintiff who, despite admitting to the conduct, not only refuses to accept responsibility but also attempts to shift the blame onto others.

Further undermining Plaintiff's position is that, during the same academic year, Defendant did not suspend a female student who accepted responsibility for her misconduct.  In that case, a female student was accused of manipulating language in a faculty recommendation letter and was referred to the HCC.  Def.'s SOF ¶ 132.  At the hearing, she "admitted that her actions were wrong and that she had made a grave error for which she apologized."  *Id.*; Def's Mot, Def.'s Ex. 3, ECF No. 42-7, at 19–20.  The HCC recommended that a disciplinary letter remain in the student's file temporarily.  Dean Mighty then determined that the letter would permanently remain in her academic file but took no further action "[i]n light of her apology and expressions of remorse."  Def.'s SOF ¶ 132.  This evidence underscores that remorse and acceptance of responsibility, not sex, explain the different outcomes between Plaintiff and the other students who engaged in acts of academic dishonesty around the same time.

In sum, Defendant has offered a legitimate, nondiscriminatory reason for Plaintiff's expulsion, and Plaintiff has failed to show that there is a genuine dispute of material fact that the real reason for that discipline was her sex.  *See* 20 U.S.C. § 1681(a).

### 2. *Process Discrimination*

Plaintiff also contends that Defendant discriminated against her because male students received more favorable procedural protections during the disciplinary process than she did.  Pl.'s

Mem. at 18–22; Pl.'s Opp'n at 22.  As support for this theory, Plaintiff points to the same purported process deficiencies that she relied on for her breach-of-contract claim.  *See* Pl.'s Mem. at 18–22; Pl.'s Opp'n at 22.

The court rejects Plaintiff's process-based discrimination claim for much the same reasons as her contract-based theory: she fails to demonstrate material deviations from the Policies and Procedures Manual.  *See* Part IV.A.  No reasonable jury could conclude that Plaintiff was denied the process that she was due.  Correspondingly, no reasonable jury could find that Defendant discriminated against her in the disciplinary process based on her sex.

## V.    CONCLUSION

In conclusion, the court grants Defendant's Motion for Summary Judgment, ECF Nos. 42, 45, and denies Plaintiff's Motion for Summary Judgment, ECF Nos. 43, 44.  A final, appealable order accompanies this Memorandum Opinion.

Dated:  March 21, 2024

Amit P. Mehta
United States District Judge